# EXHIBIT A

<u>**PROMISSORY NOTE SECURED BY MORTGAGE**</u>

**Notice to Borrower: This Loan calls for a Balloon Payment on Maturity**

FOR VALUE RECEIVED, the undersigned Borrower hereby promises to pay to the order of Lender, the principal sum of the Loan Amount together with interest on the sums advanced and other sums herein referred to in this Note (the "Loan").

1.    <u>Basic Note Terms</u>. The following are the basic terms of this Note. To the extent there is any conflict between the provisions of this Section 1 and the remainder of this Note, this Section 1 shall control.

| | | |
|---|---|---|
| **1.1.** | **Date** | May 18, 2018 ("**Loan Date**") |
| **1.2.** | **Borrower** | **Platform II Lawndale, LLC,** an Illinois limited liability company |
| **1.3.** | **Lender** | **GREENLAKE REAL ESTATE FUND LLC,** a California limited liability company and/or Assignees |
| **1.4.** | **Loan Amount** | $6,250,000.00 is hereby made available to Borrower. At Borrower's request, in order to reduce interest payable hereunder, such amount shall be advanced in tranches, in accordance with the following: |

i. On the Loan Date, $3,300,000.00 shall be advanced on behalf of Borrower, as follows:

   a.   $1,600,000.00 shall be paid through the loan closing to pay current liens against the Property, closing costs, and all approved third party and Lender expenses;

   b.   $1,200,000.00 shall be placed in a Construction Holdback Account on Lender's books (the "Construction Holdback"), and shall be paid to the Disbursement Agent pursuant to that certain Loan Disbursement Agreement attached hereto as <u>Exhibit A</u> (the "Disbursement Agreement") to pay construction costs for the improvement of the Property; and

   c.   $500,000.00 shall be placed in a Working Capital Holdback Account on Lender's books (the "Working Capital Holdback") and used to pay interest on this Note, real estate taxes on the Property, and expenses of operating the Property during construction, including but not limited to utilities, grass mowing, and snow removal, as approved by Lender in its reasonable discretion.

ii. On the earlier of September 1, 2018 or one Business Day after written request by Borrower after having depleted the Construction Holdback, an additional $1,600,000.00 shall be advanced on behalf of Borrower. Such amount shall be placed in the Construction Holdback, and shall be paid to the Disbursement Agent pursuant to the Disbursement Agreement for construction costs incurred for the improvement of the Property.

iii. On the earlier of December 1, 2018 or one Business Day after earlier written request by Borrower after having depleted the Construction Holdback or the Working Capital Holdback, an additional $600,000.00 shall be advanced on behalf of Borrower as follows:

a. $300,000.00 shall be placed in the Construction Holdback and shall be paid to the Disbursement Agent pursuant to the Disbursement Agreement for construction costs incurred for the improvement of the Property.

b. $300,000.00 shall be placed in the Working Capital Holdback and used to pay interest on this Note, real estate taxes on the Property, and expenses of operating the Property during construction, including but not limited to utilities, grass mowing, and snow removal, as approved by Lender in its reasonable discretion.

iv. One Business Day following Lender's receipt of (a) confirmation that a licensed and franchised CubeSmart facility has commenced operation and is providing storage services to the public on the Property and (b) if requested by Lender, an appraisal issued by an appraiser approved, in writing, by Lender indicating that the Property has a stabilized value of at least $10,900,000.00, the Lender shall advance an additional $750,000.00 (the "Opening Advance") on behalf of Borrower, for a total Loan Amount of $6,250,000.00. The Opening Advance shall be placed in the Working Capital Holdback and used to pay interest on this Note, real estate taxes on the Property, and expenses of operating the Property during construction, including but not limited to utilities, grass mowing, and snow removal, as approved by Lender in its reasonable discretion.

| | |
|---|---|
| **1.5. Fixed Rate** | 11.00% per annum, which applies to all amounts advanced hereunder at anytime |
| **1.6. Maturity Date** | October 31, 2020 |
| **1.7. Extension Term** | Borrower shall have one option to extend the Maturity Date for 6 months, as provided in Section 14 of this Note |
| **1.8. Extension Fee** | 3% of the outstanding balance of this Note at the time of extension |
| **1.9. Guarantor** | Scott Krone, an individual; Martin Taradejna, an individual; Coda Design + Build, LLC, an Illinois limited liability company, jointly and severally; and any other person acquiring 20% of more of the ownership interest, directly or indirectly, of the Borrower, |
| **1.10. Monthly Payments** | Borrower shall make Interest Payments and payments of the monthly Tax Impounds on the first day of each month. Assuming no Event of Default and no additional costs or fees are due and owing, the Total Monthly Payment will be the following: |

| Outstanding Loan Amount | Interest Payment | Tax Impounds | Insurance Impounds | Total Monthly Payment |
|---|---|---|---|---|
| $3,300,000.00 | $30,250.00 | $3,800.00 | $1,600.00 | $35,650.00 |
| $4,900,000.00 | $44,916.67 | $3,800.00 | $1,600.00 | $50,316.67 |
| $5,500,000.00 | $50,416.67 | $3,800.00 | $1,600.00 | $55,816.67 |
| $6,250,000.00 | $57,291.67 | $3,800.00 | $1,600.00 | $62,691.67 |

| | |
|---|---|
| **1.11. Use of Loan Proceeds** | (a)    The uses set forth in Section 1.4, as further specified in Section 5;<br><br>(b)    If the Loan Amount is insufficient to cover the items in 1.11(a) (the "Shortfall") then Borrower shall deposit the Shortfall with Lender or Disbursement Agent within 10 days after request by Lender. |

| | | |
|---|---|---|
| **1.12. Origination Fee** | | $220,000.00 to be paid at closing and $30,000.00 to be paid upon the issuance of the Opening Advance (the latter from the proceeds of the Opening Advance) as detailed in Section 1.4. |
| **1.13. Broker Fee** | | None |
| **1.14. Broker** | | None |
| **1.15. Finder Fee** | | None |
| **1.16. Finder** | | None |
| **1.17. Exit Fee** | | None |
| **1.18. Lockout Date for Prepayment (the "Lockout Date")** | | May 31, 2019 |
| **1.19. Property** | | 1750 N. Lawndale Avenue, Chicago, Cook County, Illinois 60647 (Parcel Nos. 13-35-319-002-0000; 13-35-319-015-0000; 13-35-319-039-0000) – as more particularly described in the Mortgage |
| **1.20. Loan Documents** | (a) | This Note |
| | (b) | The Payment and Performance Guaranty for each Guarantor |
| | (c) | The Open-End Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing |
| | (d) | Correction Agreement |
| | (e) | Pledge and Security Agreements |
| | (f) | Collateral Assignment of Facility Management Agreement |
| | (g) | Assignment of Contracts |
| | (h) | Consents |
| | (i) | Indemnity Agreement |
| | (j) | Acknowledgment and Control Agreement |
| | (k) | Disbursing Agreement |
| | (l) | Any other documents evidencing or securing the obligations under this Note, as such documents may be modified from time to time. |
| **1.21. Additional Representations Warranties** | | None |

| **1.22. Additional Covenants** | (a) | Scott Krone and Martin Taradejna shall each hold no less a membership interest in Borrower than each holds as of the Loan Date and Scott Krone and Martin Taradejna, collectively, shall own no less than a controlling interest in Borrower. Scott Krone and Martin Taradejna shall continue, at all times during which the Loan is outstanding, as Managers of the Borrower with no less authority to operate the Borrower than on the Loan Date. |
|---|---|---|

(b)  Borrower shall maintain a bank account for all Property operating activities.

(c)  Borrower shall ensure remediation of the Property, subject to Lender's ultimate satisfaction and approval. To that end, as of the Loan Date, Borrower has completed hazard mitigation measures and site investigation and assessment through a licensed environmental engineer or licensed environmental geologist and has obtained a permit for the removal of all underground storage tanks located on the Property with the City of Chicago's Department of Public Health Underground Storage Tank Unit and has completed the removal of all such tanks. Borrower has prosecuted remediation of the Property and removal of all underground storage tanks in accordance with all applicable laws and regulations. Borrower has submitted all relevant documentation, testing and evidence to the applicable state agency tasked with providing a no further remediation letter. Borrower shall promptly notify Lender of any further communication, clarification or action required from the applicable state agency, and Borrower shall have responded to and satisfied any additional requirement(s) within seven (7) business days. The total cost of such remediation and tank closure shall not be estimated to exceed or actually exceed $63,000.00. Borrower must receive a no further remediation letter within one (1) year of the Loan Date. Should Borrower fail to receive a no further remediation letter within one (1) year of the Loan Date, Lender shall have the right, but not the obligation, to undertake any actions it deems necessary to protect its security in the Loan and the Property, including, but not limited to, engaging environmental professionals on behalf of Borrower to undertake such activities. Lender shall have the right, but not the obligation, to apply any and all of the funds in the Interest and Working Capital Reserve or any advance required to be made hereunder to payment of any costs involved in remediating the Property.

(d)  Cash Management. Upon an Event of Default, Lender may, in its sole and absolute discretion, require cash management accounts subject to the following terms, which shall be effective immediately upon notice by Lender to Borrower.

d.1. Lender will establish one of more bank accounts as determined by Lender at Bank of America, N.A. or such other bank as Lender may elect (the "Lock Box Accounts") in the name of Lender or its affiliate with Borrower given revocable electronic transfer privileges. Borrower shall deposit (and direct any property manager to deposit) all income, rents, proceeds and other revenues received by Borrower in the appropriate Lock Box Account on a daily basis as received. Borrower's credit card processor shall be irrevocably directed to deposit all proceeds into the appropriate Lock Box Account. At Lender's request, Borrower shall enter into a contract with an armored car pick up company approved by Lender to pick up all cash on a weekly basis and deposit the cash in the appropriate Lock Box Account.

d.2. So long as no Event of Default has occurred, Borrower may use its electronic transfer privileges to transfer the balance of the Lock Box Accounts into one or more operating accounts for Borrower. Borrower shall provide Lender with electronic access to view the balance of these operating accounts. Following

an Event of Default, Borrower's electronic transfer privileges shall be revoked and Lender shall have the right, in its sole discretion, to selectively disburse the balance of the Lock Box Accounts to pay sums due under the Loan Documents including without limitation repayment of the principal balance of this Note and operating expenses of the Property that Lender desires to pay to protect its collateral.

d.3. Following an Event of Default, Borrower shall, within 5 days after the request of Lender, direct all payments at the Property, if any, to remit payments directly to the Lock Box Accounts or as otherwise directed by Lender. Lender shall also have the authority to so instruct the tenants at the Property and this provision of this Note shall constitute Borrower's express agreement giving Lender permission to require the tenants to pay rents as directed by Lender. Borrower hereby waives any claim whatsoever against any tenant that follows Lender's direction as to tendering rental and other payments to Lender in accordance with this provision. Nothing contained in this Section 1.22 or any other Section or term or provision of this Note or any Loan Documents shall be construed to make Lender a Lender in possession.

d.4. Borrower shall be responsible for all fees of the Lock Box Accounts, which shall be deducted from the balance of the Lock Box Accounts. In connection with any assignment of the Loan, Lender shall have the right to cause the Lock Box Accounts to be transferred and entitled with such other designation as Lender may select to reflect an assignment or transfer. At Lender's request, the Lock Box Accounts may be transferred to another bank or financial institution.

(e)  Post-Closing Conditions.

e.1.1. Borrower shall continue to diligently defend any and all lawsuits or claims related to the Property.

e.1.2. Borrower shall cause all existing surveys related to the Property to be certified to Lender within 30 days after the date of this Note.

e.1.3. CubeSmart Commitment. No later than May 31, 2018, Borrower shall have received a Letter of Intent or other commitment, in a form acceptable to Lender, from CubeSmart to (i) operate a CubeSmart storage facility at the Property following completion of construction and (ii) concurrently with the execution of the Management Agreement as provided in Section 7.21 enter into a Collateral Assignment of Facility Management Agreement, in the form attached hereto as Exhibit I.

(f)  Working Capital Holdback.

f.1.1. Provided there are sufficient funds available in the Working Capital Holdback and there is no Event of Default under the Loan, Lender shall apply funds from the Working Capital Holdback to Monthly Payments of interest when due (up to the balance of the Working Capital Holdback). Borrower shall remain responsible for timely payment of the amount due which is not funded from the Working Capital Holdback.

f.1.2. Following an Event of Default under this Note, Lender may use the Working Capital Holdback (as well as the Construction Holdback and any then yet to be advanced Loan Amount) in its discretion for payment of principal or interest or other sums due under this Note.

f.1.3. The Working Capital Holdback is being set aside by Lender for the purposes intended and therefore shall accrue interest hereunder to be paid by Borrower to Lender from the advancing of any such amount to the Working Capital Holdback, which interest shall be payable as part of the Monthly Payment. The Working Capital Holdback need not be maintained by Lender in a separate account and shall not earn any interest.

f.1.4. Upon Lender Approval, the funds in the Working Capital Holdback may be disbursed to or on behalf of Borrower for any other purpose set out in Section 1.4(c).

(g) Lender may use funds in the Construction Holdback to pay for consultant work related to any and all construction or environmental remediation on the Property. In the event there are insufficient funds in the Construction Holdback to cover the costs of such consultant work, Lender may use funds in the Working Capital Holdback to cover such consultant work costs.

**1.23. Additional Items**  None.

| | | |
|---|---|---|
| **1.24. Borrower Address for Notices** | Platform II Lawndale, LLC<br>600 Waukegan Rd., Ste 129<br>Northbrook, IL 60062<br>Attn: Scott Krone<br>(O) 847-272-77775 x 1<br>(M) 847-651-7373<br>(E) skrone@codamg.com | *with copies to:*<br><br>LEVIN GINSBURG<br>180 N. LaSalle St.,<br>Suite 3200<br>Chicago, Illinois 60601-2800<br>Attention: Jeffrey M. Galkin<br>P: (312)368-0100<br>E: jgalkin@lgattorneys.com |
| **1.25. Lender Address for Notices** | GreenLake Real Estate Fund LLC<br>1416 El Centro Street<br>Suite 200<br>South Pasadena, California 91030<br>Attention: Hugeng Shieh<br>P: 626-529-1088<br>E: hshieh@greenlakefund.com | *with copies to:*<br><br>Sandberg Phoenix & von Gontard<br>600 Washington Ave., 15th Floor<br>St. Louis, MO 630101<br>Attention: Anthony Soukenik<br>P: (314) 231-3332<br>E:Asoukenik@sandbergphoenix.com |

**1.26. Other Definitions**

(a) "Affiliate": shall mean with respect to any party: (i) any entity in which such party or the owners of the party has an ownership or other financial interest, (ii) any entity controlled by the party or the owners of the party, (iii) any Person who is an owner or has a financial interest in such party or (iv) any relative by blood or marriage to such party or any entity owned by such relative.

(b) "Borrower" means the parties set forth in Section 1.2. Borrower shall mean a reference to each of the entities comprising Borrower unless otherwise specified.

(c) "Bankruptcy Event" means any one or more of the following with respect to any Loan Party:

(1) the commencement, filing or continuation of a voluntary case or proceeding under one or more of the insolvency laws by any Borrower seeking to take advantage of any other laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, debt adjustment, winding up or composition or adjustment of debts;

(2) the acknowledgment in writing by any Loan Party other than to Lender in connection with a workout that it is unable to pay its debts generally as they mature;

(3) the making of a general assignment for the benefit of creditors by any Borrower;

(4) the commencement, filing or continuation of an involuntary case or proceeding under one or more insolvency laws against any Borrower;

(5) the appointment of a receiver (other than a receiver appointed at the direction or request of Lender under the terms of the Loan Documents), liquidator, custodian, sequestrator, trustee or other similar officer who exercises control over any Loan Party or any substantial part of the assets of any Loan Party; or

(6) any action by any Borrower for the purpose of effecting any of the foregoing, provided, however, that any proceeding or case under (4) or (5) above shall not be a Bankruptcy Event until the ninetieth (90th) day after filing (if not earlier dismissed) so long as such proceeding or case occurred without the consent, encouragement, active participation or the failure to object in a timely and appropriate manner by any Borrower (in which event such case or proceeding shall be a Bankruptcy Event immediately).

(d) "Business Day" means any day other than a Saturday, Sunday or other day on which banks located in the State of Illinois or any state in which any portion of the Property is located are closed or are authorized to close.

(e) Intentionally Omitted.

(f) "Controlled Substance Activities" means any activity, use, existence or occurrence, including without limitation, selling, distributing, possessing, consuming, cultivating, planting, harvesting, manufacturing or processing, whether for person or commercial purposes, in or, about or in connection with the Property or any portion thereof, related to (i) "marijuana," as that term is defined under applicable Illinois law, (ii) any controlled substance which would be a violation of federal law, even if permitted by state of local law or (ii) any controlled substance prohibited by Law in the state where the Property is located.

(g) "Disbursement Agreement" has the meaning given to it in Section 1.4(i)(b).

(h) "Default Rate" is defined in Section 11.

(i) "Disbursement Agent" shall mean the title company, escrow company or other third party that will be disbursing funds pursuant to the Disbursement Agreement.

(j) "Event of Default" is defined in Section 15.

(k) "Guarantor" means the parties set forth in Section 1.9. If Guarantor is comprised of more than one entity, then any reference to "Guarantor" shall mean a reference to each of the entities comprising Guarantor unless otherwise specified

(l) "Hazardous Materials" as used in this Note shall include, without limitation,

petroleum and petroleum products (excluding a small quantity of gasoline used in maintenance equipment on the Property in compliance with all applicable Hazardous Materials Laws), flammable explosives, radioactive materials (excluding radioactive materials in smoke detectors), polychlorinated biphenyls, asbestos in any form that is or could become friable, paint with more than 0.5 percent lead by dry weight, mold, hazardous waste, toxic or hazardous substances or other related materials whether in the form of a chemical, element, compound, solution, mixture or otherwise including, but not limited to, those materials defined as "hazardous substances," "extremely hazardous substances," "hazardous chemicals", "hazardous materials", "toxic substances", "toxic chemicals", "air pollutants", "toxic pollutants", "hazardous wastes", "extremely hazardous waste", or "restricted hazardous waste" by any Hazardous Materials Law.

(m) "Hazardous Materials Law" means all Laws relating to Hazardous Materials (collectively, the "Hazardous Materials Laws"), including, without limitation: the Clean Air Act, as amended, 42 U.S.C. Section 7401 et seq.; the Federal Water Pollution Control Act, as amended, 33 U.S.C. Section 1251 et seq.; the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. Section 6901 et seq.; the Comprehensive Environment Response, Compensation and Liability Act of 1980, as amended (including the Superfund Amendments and Reauthorization Act of 1986, "CERCLA"), 42 U.S.C. Section 9601 et seq.; the Toxic Substances Control Act, as amended, 15 U.S.C. Section 2601 et seq.; the Occupational Safety and Health Act, as amended, 29 U.S.C. Section 651, the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. Section 11001 et seq.; the Mine Safety and Health Act of 1977, as amended, 30 U.S.C. Section 801 et seq.; the Safe Drinking Water Act, as amended, 42 U.S.C. Section 300f et seq.; and all comparable Illinois State and local laws, orders and regulations. Hazardous Materials means all materials defined as Hazardous under applicable Hazardous Materials Laws.

(n) Intentionally deleted.

(o) "Law" means all provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any federal, state or local governmental authority; (b) any consents or approvals of any federal, state or local governmental authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any federal, state or local governmental authority.

(p) "Lender's Approval" is defined in Section 30.

(q) "Loan Parties" means Borrower and Guarantor, collectively.

(r) "Mortgage" means the First Priority Open-End Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing of even date hereof encumbering the Property by Borrower in favor of Lender.

(s) "Person" means any human Person, any corporation, any limited liability company, any trust, any corporation or any other legal entity.

(t) "Prepayment Notice" is defined in Section 8.2.

(u) Intentionally Deleted.

(v) Intentionally Omitted.

(w) "Tax Impound" is defined in Section 10.

2.    <u>Interest Rate</u>. The Loan shall bear interest on the Outstanding Loan Amounts indicated in Section 1.10 (including without limitation, any amounts held back or retained or used to pay costs and expenses or used to pay fees due to Lender) from the date of advance (whether to Disbursement Agent or directly to Borrower) at the Interest Rate. The Interest Rate shall be the Fixed Rate Interest Rate or the Floating Rate Interest Rate, as determined by Lender in its sole discretion from time to time. The Floating Rate shall be the Prime Rate (as quoted by the Wall Street Journal) plus 500 basis as it shall change from time to time. The Interest Rate is in all cases, subject to Lender's ability to charge interest at the Default Rate as provided herein. The Interest Rate shall initially be the Fixed Rate, and Lender shall provide Borrower notice of all elections to change the rate. Without limiting the generality of any terms or provisions of this Note or otherwise, Borrower hereby irrevocably authorizes and agrees that Lender may determine the Interest Rate used for this Note and/or the Loan from time to time as set forth or provided in this Section 2 and any other applicable Section of this Note or any other Loan Documents.

3.    <u>Payments</u>.

3.1.    <u>Payment Schedule/Maturity Date</u>. This Note shall be payable in monthly installments of interest only at the Interest Rate, commencing with the first day of the month following the date of this Note and continuing on the first day of each and every month thereafter until the Maturity Date at which time the entire outstanding principal balance of this Note, together with accrued and unpaid interest thereon and any other sums due hereunder, shall be due and payable in full. All installments of interest shall be paid in advance and shall be deemed earned by Lender when paid regardless of any pre-payment of this Note. Any sums not paid when due hereunder shall be compounded monthly and such unpaid sums shall bear interest at the Default Rate (as defined herein). Other than in connection with any option to extend in this Note Borrower hereby further agrees that Lender is, and shall be, under no obligation of any kind whatsoever to renew or extend the Maturity Date and any potential future extension and/or renewal (or otherwise) of such Maturity Date evidenced by, and/or set forth in, this Note shall be at Lender's sole discretion.

3.2.    <u>ACH Payment</u>. If, at any time, the Working Capital Account has been exhausted, at Lender's option, payments shall be made by ACH or wire withdrawal from Borrower's account (the "<u>Account</u>"). Borrower is responsible for providing Lender with the bank account number, name and routing number. If Borrower desires to change or close the Account, Borrower shall give Lender thirty (30) days prior written notice of the change, along with the relevant information for a replacement Account and, at Lender's option, the payment provided for herein shall be made by ACH or wire withdrawal from such replacement Account. If Borrower does not provide the account information in a timely manner or the Account does not have a sufficient balance to pay amounts when due, that shall be deemed a failure of Borrower to pay the payment when due and Borrower shall be (a) subject to a late charge pursuant to Section 11 of this Note, (b) charged interest at the Default Rate, and (c) subject to the expiration of the applicable cure period, there shall be an Event of Default under Section 14 of this Note.

4.    <u>Conditions to Closing</u>. Lender's obligation to fund shall be conditioned on the satisfaction of the following conditions in Lender's sole discretion:

4.1.    <u>Authorization</u>. The Loan Parties shall have provided documents authorizing the execution of the applicable Loan Documents by the Person(s) who shall execute them.

4.2.    <u>Good Standing</u>. Each Loan Party that is not a natural Person shall have provided proof that such Loan Party is validly formed and in good standing in the state of its formation. Borrower shall have provided proof that entity Guarantors are validly formed and in good standing in the state in which such entities are formed.

4.3.    <u>Guarantor</u>. Each Guarantor shall have executed a Payment and Performance Guaranty (the "<u>Guaranty</u>") guarantying repayment of the amount due hereunder and other obligations of Borrower.

4.4.    Title Insurance. Lender shall have received the irrevocable commitment of the title company to provide such lender's title insurance and endorsements as Lender shall request;

4.5.    Funding of Shortfall. Borrower shall have funded any Shortfall under Section 1.11; and

4.6.    Lender Approval. Lender shall have approved in writing, in its sole and absolute discretion, its underwriting of the Loan Parties and the Property and all due diligence that Lender desires to complete with respect to the Property, and the Loan Parties and Lender shall have authorized closing in writing to Disbursement Agent.

4.7.    Other Loan Documents. The Loan Parties shall have executed and had notarized the applicable Loan Documents and delivered them to Lender.

4.9    Construction Plan, Budget and Schedule. Borrower shall provide Lender with a written construction plan, budget and schedule reasonably acceptable to Lender. Such final written construction budget, as accepted and approved by Lender, (the "Budget") shall be attached hereto as Exhibit G. Such final written construction and rehabilitation schedule, as accepted and approved by Lender, (the "Schedule") shall be attached hereto as Exhibit H. Such final specifications and plans detailing construction and rehabilitation, as accepted and approved by Lender, shall be attached hereto as Exhibit J.

5.    Initial Funding. The proceeds from this Loan shall be applied as follows:

5.1.    First, for payment of the Origination Fee to Lender;

5.2.    Intentionally Omitted;

5.3.    Intentionally Omitted;

5.4.    Second, if this Note is funded between the 1st day of the month and the 15th day of the month, the sum required to pay Lender interest from the date of disbursement by Lender to Disbursement Agent until the last day of the month, which interest shall be deemed earned when paid regardless of any pre-payment of this Note;

5.5.    Third, if this Note is funded after the 15th day of the month, the sum required to pay Lender interest from the date of disbursement by Lender to Disbursement Agent until the last day of the month and interest for the entire following month, which interest shall be deemed earned when paid regardless of any pre-payment of this Note;

5.6.    Fourth, to the payment of costs to cure any title issues related to the Property including without limitation, any monetary lien encumbering the Property, including without limitation delinquent taxes, mechanics' liens, income tax liens, or judgment liens;

5.7.    Fifth, for payment of all closing costs including but not limited to charges by Disbursement Agent, title insurance, background checks, appraisal and attorneys' fees and any other out-of-pocket costs incurred by Lender in connection with this Note;

5.8.    Sixth, for the Use of Loan Proceeds as specified in Section 1.11 of the Summary of Loan terms.

6.    Application of Payments. All interest on this Note shall accrue from the date of advance to Disbursement Agent or disbursement to Borrower and be calculated on the basis of a thirty (30) day month and a three hundred sixty (360) day year and based on the then current principal balance of the Loan. This method of

interest calculation will result in a higher effective annual interest rate. Each installment hereunder shall be first applied to the payment of costs and expenses for which Borrower is liable hereunder, next to the payment of accrued interest and lastly to the reduction of principal. This Note shall continue to bear interest at the Interest Rate (or at the Default Rate if and so long as any default exists hereunder) until and including the date of collection.

7.    Representations and Warranties and Covenants

7.1.    Information Provided. All information provided by or on behalf of Borrower and Guarantors is true, complete and accurate and contains no omissions that would cause such information to be misleading. Borrower shall promptly provide Lender written notice of any change in information previously provided. All financial statements delivered to Lender are true and correct, have been prepared on a consistent basis, and fairly present the respective financial conditions of Borrower and the subjects thereof as of their respective dates. No materially adverse change has occurred in the financial conditions reflected in the financial statements, and no additional borrowings have been made by Borrower or the subjects thereof.

7.2.    No Conflict. The execution, delivery, and performance by Borrower under this Note does not and will not contravene or conflict with (i) any Laws, order, rule, regulation, writ, injunction or decree now in effect of any government authority, or court having jurisdiction over Borrower or (ii) any contractual restriction binding on or affecting Borrower or Borrower's assets. To the best of its knowledge, Borrower is not in default with respect to any order, writ, injunction, decree or demand of any court or other governmental authority.

7.3.    Binding. This Note creates legal, valid, and binding obligations of Borrower enforceable in accordance with its terms.

7.4.    No Action. Except as disclosed in writing to Lender, there is no action, proceeding, or investigation pending or, to the knowledge of Borrower, threatened or affecting Borrower. There are no judgments or orders for the payment of money rendered against Borrower for an amount in excess of $10,000.00 that have been undischarged for a period of ten (10) or more consecutive days and the enforcement of which is not stayed by reason of a pending appeal or otherwise. Borrower is not in default under any agreements which may adversely affect Borrower's ability to fulfill its obligations under this Note.

7.5.    Due Authorization. Each entity comprising Borrower is duly formed and validly existing in good standing in the state of its formation. The execution of the Loan Documents is duly authorized by Borrower and Guarantor.

7.6.    OFAC. Borrower is in compliance with the requirements of Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 23, 2001) (the "Order") and other similar requirements contained in the rules and regulations of the office of Foreign Assets Control, Department of the Treasury ("OFAC") and in any enabling legislation or other Executive Orders or regulations in respect thereof (the Order and such other rules, regulations, legislation, or orders are collectively called the "Orders." Neither Borrower nor any beneficial owner of Borrower (a) is listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to the Order and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Orders (such lists are collectively referred to as the "Lists") or (b) is a Person who has been determined by competent authority to be subject to the prohibitions contained in the Orders; or (c) is owned or controlled by, or acts for or on behalf of, any Person on the Lists or any other Person who has been determined by competent authority to be subject to the prohibitions contained in the Orders.

7.7.    Proper Subdivision. The Property is taxed separately without regard to any other real property and has been properly subdivided or entitled to exemption therefrom so that for all purposes the Property may be mortgaged, conveyed, and otherwise dealt with as a separate legal lot or parcel.

7.8.    Compliance. Except as set forth on Exhibit C attached hereto: (i) the construction, use and occupancy of the Property comply in full with all federal, state and local governmental requirements, restrictions of record title, and Non-Residential Building Energy Use Disclosure Requirements; and (ii) there are no Controlled Substance Activities that have or may have occurred at, in, on, or in connection with the Property or any portion thereof.

7.9.    Zoning. The use of the Property by Borrower is permitted by the current zoning or is legally non-compliant. Neither the zoning nor any other right to construct or use the improvements is to any extent dependent upon or related to any real property other than the Property.

7.10.    Licenses and Approvals. Borrower shall take all actions necessary to obtain all approvals, licenses, permits, certifications, filings or any other actions required for Borrower's occupancy and operation of the Property.

7.11.    Hazardous Materials. Except as set forth on Exhibit D attached hereto, to Borrower's knowledge, there has been no (1) violation of Hazardous Materials Laws at the Property (2) lawsuit brought or threatened, settlement reached, or government order relating to Hazardous Materials in, on, under or from the Property or any violation of Hazardous Materials Laws; (3) use, generation, refining, manufacture, transportation, transfer, production, processing, storage, handling, or treatment of any Hazardous Materials, in, on, under, from, or affecting the Property; or (4) administrative claim, legal enforcement action or other claim related to Hazardous Materials in, on, under or from the Property or any violation of Hazardous Materials.

7.12.    Criminal Conviction. No Loan Party has been convicted of any crime, excepting misdemeanor traffic violations.

7.13.    Title. Borrower is the sole owner of the fee simple interest in the Property. Borrower is not aware of any claims, liens and encumbrances other than those shown in the preliminary title report and the proforma title policy. All personal property granted as security for this Note is vested solely in Borrower, free and clear of all claims, liens and encumbrances, and the security interest of Lender in the Personal Property is a first lien thereon.

7.14.    Other Financing. Borrower has not received, and will not receive any other financing related to the Property whether secured or unsecured.

7.15.    Non-Foreign Entity. Section 1445 of the Internal Revenue Code of 1986, as amended, provides a transferee of a United States real property interest must withhold tax if the transferor is a foreign person. To inform Lender that the withholding of tax will not be required in the event of the disposition of the Property pursuant to the Mortgage, Borrower hereby certifies, under penalty of perjury, that Borrower is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Internal Revenue Code and regulations promulgated thereunder.

7.16.    Funds for Business Purposes. Borrower represents and warrants that the proceeds are being used only for business and commercial purposes and for not for personal, family or household use.

7.17.    Judgments. There are no outstanding judgments against Borrower or any Guarantor.

7.18.    Litigation. There is no pending litigation against Borrower or Guarantor other than as set forth in Exhibit E, attached hereto and incorporated herein by reference.

7.19.    Insurance Claims. There are no outstanding insurance claims for claims against Borrower or Guarantor other than as set forth in Exhibit F attached hereto and incorporated herein by reference

    7.20.   <u>Service Contracts</u> Borrower has service agreements (oral or written) for all services necessary for the efficient and lawful operation of the facility operated by Borrower at the Property and has previously provided all such service contracts to Lender.

    7.21.   <u>Management Agreement</u>. Within thirty (30) days after the Certificate of Occupancy has been received for the Property, Borrower shall have entered into a Management Agreement with CubeSmart or another entity that is satisfactory to Lender and a collateral assignment thereof to Lender, all in a form approved by Lender in its sole discretion.

    7.22.   <u>Indemnity for Payment of Broker Fees</u>. Borrower covenants and agrees at its sole cost and expense, to protect, defend, indemnify and hold Lender, its directors, officers, shareholders, employees, agents, successors, assigns and attorneys harmless from and against any and all losses, liabilities, obligations, claims, damages, penalties, causes of action, fines, costs and expenses, including without limitation, litigation costs (including, without limitation, reasonable attorneys' fees, expenses, sums paid in settlement of claims and any other such fees and expenses) related to or arising out of the payment of any broker fees related to or arising out of the transaction contemplated by this Note or other Loan Documents.

    8.   <u>Repayment & Prepayment</u>.

    8.1.   <u>Lockout Date</u>. Before the Lockout Date, this Note may be prepaid in full (but not in part) upon payment of a prepayment premium equal to the amount of interest that would have accrued from the date of prepayment through the Lockout Date, assuming that all advances contemplated to have been made through such date had been made. Any prepayment shall require a 90 day Prepayment Notice as provided in Section 8.2.

    8.2.   <u>Prepayment Notice</u>.

    8.2.1.   After Lockout Date, this Note may be prepaid in full or in any installment greater than or equal to $100,000.00 without any prepayment penalty or premium on 90 days' prior written notice from Borrower to Lender (the "<u>Prepayment Notice</u>"). If Borrower desires to prepay this Note prior to the date 90 days after the Lender's receipt of the Prepayment Notice, Borrower may do so upon payment of the interest that would have accrued from the date of prepayment through the date 90 days after the Prepayment Notice was received by Lender. If Borrower gives a Prepayment Notice and then fails to prepay the loan by the 90th day after Lender's receipt of the Prepayment Notice, then for any other prepayment, another Prepayment Notice shall be required and the provisions of this Section shall apply. If Borrower gives a Prepayment Notice, Borrower may have up to an additional five (5) business days from the 90th day after Lender's receipt of such Prepayment Notice to prepay the loan, provided Borrower (i) shall pay to Lender as part of the prepayment a per diem portion of interest for each additional day utilized to prepay the loan; and (ii) provides evidence to Lender that any and all documents related to securing funds for the prepayment have been executed. If Borrower gives a Prepayment Notice and then later determines that it will not be able to prepay the loan within that 90 day period, it may rescind that notice and make a Prepayment Notice at a later date.

    8.2.2.   If Borrower gives a Prepayment Notice within 90 days of the Maturity Date Borrower shall owe a prepayment penalty to Lender equal to the interest that would accrue on this Note for 90 days after Lender's receipt Prepayment Notice, even though such 90 day period extends beyond the Maturity Date.

    8.3.   <u>Repayment Notice</u>. Borrower must give Lender notice of its intent to repay this Note on the Maturity Date at least 90 days prior to the Maturity Date so as to give Lender an ability to re-lend the funds (the "<u>Repayment Notice</u>"). If the Repayment Notice is given, but is not timely given, then on the Maturity Date Borrower shall owe interest through the date that is 90 days after the Lender's receipt of the Repayment Notice, even though such 90 day period would extend beyond the Maturity Date. If Borrower fails to give the Repayment Notice at all, then on the Maturity Date Borrower shall owe an additional 90 days of interest.

8.4.    No Limitation of Remedies. Nothing in this Section 8 shall limit any Lender right or remedy for any Event of Default.

8.5.    Liquidated Damages. Borrower hereby acknowledges that the additional consideration be charges for prepayment constitutes liquidated damages to compensate Lender for reinvestment costs, lost opportunity costs, and the loss by Lender of its bargained-for investment in the loan evidenced by this Note. Borrower agrees that such liquidated damages are not a penalty but are a reasonable estimate in good faith of the actual damages sustained by Lender as a result of such prepayment, which actual damages are impossible to ascertain with precision.

8.6.    Payoff Demand. Lender shall provide a payoff demand upon Borrower's written request. At Lender's option, Lender may charge a fee of up to $250 for each payoff request, which sum may be added to the payoff or collected in advance at Lender's option. The $250 fee shall be waived if (a) a prospective buyer provides Lender with the escrow company contact information with an escrow number and (b) the Disbursement Agent confirms that closing of the escrow or the payoff is scheduled to occur within 10 business days.

8.7.    No Refund of Fees. The Origination Fee, , Extension Fee, if any, and all other closing costs shall all be deemed earned when paid and not subject to refund or proration in connection with any prepayment.

9.    Intentionally deleted.

10.    Real Property Tax Impound.

10.1.    Payment of Impound. Each month following exhaustion of the Working Capital Holdback Account, Borrower shall deposit with Lender the Tax Impound or a sum determined by Lender to be a reasonable estimate of the real property taxes next coming due divided by the number of monthly payments that will occur until such date, if higher. Lender may revise this sum from time to time with written notice to Borrower during the term of this Note. Prior to exhaustion of the Working Capital Holdback Account, Lender shall apply funds from the Working Capital Holdback Account to Monthly Payments of the Tax Impound when due (up to the balance of the Working Capital Holdback Account) provided: (a) there are sufficient funds available from the Working Capital Holdback Account to pay the Monthly Payment for Tax Impound, and (b) there is no Event of Default under the Loan. Borrower shall remain responsible for timely payment of the Monthly Payment for Tax Impound which is not funded from the Working Capital Holdback Account.  The Tax Impound and/or the Working Capital Holdback Account need not be maintained by Lender in a separate account and shall not earn any interest.

10.2.    Borrower Pays Taxes. Borrower is responsible for the payment of the real property taxes for the Property prior to delinquency. Borrower may request Lender in writing to fund sums from the Tax Impounds and/or Initial Impound to pay real property taxes due (which request shall include copies of the applicable tax bill(s)) or to reimburse Borrower for taxes previously paid (which request shall include proof of payment). Lender shall fund any sums requested by Borrower within 30 days of such written request either directly to the taxing authority or to Borrower for payment to the taxing authority. Borrower shall be responsible for late penalties or interest or other sums payable for late payment of real property taxes resulting from Borrower's failure to timely request funds from Lender. Borrower shall be responsible for payment of any real property tax obligation in excess of the amounts held in the Tax Impound. Any amount left over in the Tax Impound after payment of taxes will be held by Lender for future tax periods. Once this Note has been repaid in full, Borrower shall receive a refund of any Tax Impound not credited to Borrower.

10.3.    Tax Impound After Default. If there is any Event of Default under this Note, then Lender may use the Tax Impound and/or the Initial Impound in its discretion for payment of real property taxes or payment of principal or interest or other sums due under this Note or to cure any Event of Default. Upon repayment of the sums owed under this Note in full, Lender shall release the Tax Impound to Borrower or apply

the Tax Impound to the amount due. The Tax Impound or other sums held by Lender for Borrower shall not be deducted from the loan balance for the purposes of calculation of interest at the Interest Rate or the Default Rate.

      11.    <u>Late Charges; Default Rate</u>. If any monthly installment of interest (or principal on the maturity date or acceleration) is not paid when due as scheduled (other than Lender's failure to make payment from the Working Capital Holdback, provided there are sufficient funds available in the Working Capital Holdback to make such payment and there is no Event of Default under this Note or any other Loan Document) or upon acceleration of this Note after an Event of Default, the amount due shall be increased by a late charge equal to ten percent (10%) of the amount so due but not paid. Said charge shall be assessed for each such monthly installment not paid when due and shall be due and payable with such payment without demand, and shall be fully secured by the Mortgage (as defined below) and other Loan Documents (as defined herein). The imposition or collection of a late charge from time to time shall not be in lieu of any other remedy of the Lender, and the failure to collect the same shall not constitute a waiver of the Lender's right to require such payment for past or future defaults. Additionally, without limiting Borrower's obligation to pay such sums, such sums (including the late charge) shall be added to the principal balance of the Loan. Additionally, during the continuance of an Event of Default under this Note or any of the other Loan Documents, the interest rate on this Note, and on any judgment obtained for the collection of this Note, shall be increased to a rate (the "<u>Default Rate</u>") equal to 21.0% per annum which shall be effective from the date of the Event of Default to the date of the cure. If the Event of Default continues for 30 days or longer, then the Default Rate shall be applied to this Note retroactively from the date of this Note. The late charge and the charging of interest at the Default Rate are for the purpose of defraying the expenses incurred in connection with handling and processing delinquent payments and to compensate Lender for the loss of the use of the delinquent payment and are payable in addition to any other remedy Lender may have. Unpaid late charges and interest payable at the Default Rate shall become part of the secured indebtedness and shall be added to any subsequent payments due under the Loan Documents. In the event of a judgment under this Note for any amount due but unpaid under this Note, the Default Rate shall not merge in the judgment and shall be due and payable on the judgment amount until paid.

      12.    <u>Costs</u>.

      12.1.    <u>Costs of Collection</u>. Borrower promises to pay, upon demand, all costs, expenses and attorneys' fees incurred by, or on behalf of, Lender in the exercise of any remedy (with or without litigation or arbitration), in any proceeding for the collection of the debt, in any trustee's sale or foreclosure of the Mortgage or the realization upon any other security securing this Note, in protecting or sustaining the lien or priority of the Mortgage or other security, or in any litigation, arbitration or other controversy arising from or connected with this Note, or any of the other Loan Documents. Said proceedings shall include, without limitation, any probate, bankruptcy, receivership, injunction, arbitration, mediation or other proceeding, or any appeal from or petition for review of any of the foregoing, in which the holder of this Note appears to enforce the Loan Documents, collect this debt or protect its security for this Note. Borrower shall also pay all of Lender's costs and attorneys' fees incurred in connection with any demand, workout, settlement, compromise or other activity in which Lender engages to collect any portion of this debt not paid when due or as a result of any other default of Borrower. If a judgment is obtained which includes an award of attorneys' fees, such attorneys' fees, costs and expenses shall be in such amount as the court shall deem reasonable, which judgment shall bear interest at the Default Rate from the date it is rendered to and including the date of payment to Lender. If Lender is served with any subpoena, request for documents, request for deposition or similar request related to a third party action against Lender, Borrower shall pay all costs associated with compliance with such item, including without limitation, attorney's fees and costs and the costs of Lender's personnel to comply with such item.

      12.2.    <u>Costs for other Transactions</u>. Lender shall have the option to add to the principal balance of this Note any unpaid costs owed to Lender relating to any transaction or prospective transaction between Lender and any Affiliate of Borrower or any Affiliate of any Guarantor of this Note.

13.    <u>Mortgage</u>.  This Note is secured by, among other things, a first priority Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing of even date herewith on the Property and the other Loan Documents, provided however, if Lender requires an unsecured indemnity agreement in connection with this Note, that document shall not be secured by the Mortgage.

14.    <u>Extension</u>. Provided that Borrower has obtained a Certificate of Occupancy and a CubeSmart storage service is operating on the Property at such time, Borrower shall have the options to extend the Maturity Date for a period of the Extension Term as indicated in Section 1.7, if any. The exercise of such options shall require written notice by Borrower at least 30 days prior to the then applicable Maturity Date and satisfaction of the following conditions as of the date of notice of extension and as of the Maturity Date:

14.1.    Borrower shall have made all payments when due under this Note (and not within any cure periods);

14.2.    There shall have been no Event of Default under this Note and no event which, with the passage of time of the giving of notice would constitute an Event of Default under this Note;

14.3.    There shall have been no material adverse change in the financial condition of Borrower or Guarantor, or the physical condition or value of the Property or the improvements thereon;

14.4.    All property taxes, and premiums for property insurance, and general liability insurance for the Property that are due and payable (whether delinquent or not) shall have been paid;

14.5.    All of the representations and warranties in any Loan Documents continue to be true accurate and complete in all respects;

14.6.    Lender shall have obtained, at Borrower's sole cost and expense, (i) a title insurance endorsement insuring that the lien of the Mortgage remains a first position lien on the Property, subject only to title exceptions approved by Lender;

14.7.    Borrower shall have delivered to Lender the Extension Fee;

14.8.    The Loan Parties shall have executed and delivered to Lender an amendment to the Note and or Mortgage as well as any other documents, agreements or instruments of any kind whatsoever, required or requested by Lender in connection with any extension of the Maturity Date in form and substance satisfactory in all respects to Lender in its sole discretion;

14.9.    Borrower shall have paid (i) any and all recording fees of any kind whatsoever in connection with the recording of the modification agreements described in subsection 14.8 above, and (ii) all of Lender's out-of-pocket costs in connection with the extension, including any escrow or title fees and Lender's attorneys' fees;

14.10.    Borrower shall have paid all of Lender's out-of-pocket costs in connection with the extension, including any fees of Disbursement Agent or title fees and Lender's attorneys' fees; and

14.11.    An occupancy permit shall have been issued for the Property and a CubeSmart storage service shall be providing public storage services thereon.

15.    <u>Defaults; Acceleration</u>. The occurrence of the following shall be deemed to be an event of default ("<u>Event of Default</u>") hereunder:

15.1.    Borrower's failure to pay (including without limitation, as a result of insufficient balance in Borrower's Account) any payment of principal or interest due (plus any applicable late charge) within five (5) business days after due pursuant to the terms of this Note;

15.2.    Any failure to comply with any covenant, condition or obligation under the terms of this Note; provided that, for failures that do not involve payments due hereunder, Borrower shall have thirty (30) days to cure such failure after notice;

15.3.    Any representation or warranty under this Note or any other Loan Document was inaccurate when made or becomes inaccurate;

15.4.    Any default under the terms of this Note, the Mortgage, or any other Loan Documents or any Guaranty executed in connection with this Note; provided that, for failures that do not involve payments due hereunder, Borrower shall have thirty (30) days to cure such failure after notice;

15.5.    Default in performance of any obligation in favor of Lender (whether or not related to this transaction) by any Affiliate of any Loan Party; provided that, for failures that do not involve payments due to Lender, such Affiliate shall have thirty (30) days to cure such failure after notice

15.6.    There is a material adverse change in the financial condition of Borrower or any Guarantor for the Loan, or the physical condition of the Property or the improvements thereon;

15.7.    The occurrence of any Bankruptcy Event;

15.8.    Borrower sells any portion of the Property in violation of the restrictions on transfer contained in the Mortgage;

15.9.    The cost of remediation of the Property and removal of all underground storage tanks is estimated to exceed $63,000.00;

15.10.    Borrower pays a commission or other fee or compensation to an unlicensed loan broker by using any portion of the Loan Amount;

15.11.    Failure of CubeSmart or such other operator approved by Lender to enter into that certain Collateral Assignment of Facility Management Agreement in the form presented to and acknowledged and agreed to by CubeSmart no later than May 31, 2018, and attached hereto as Exhibit I within thirty (30) days of Borrower receiving its Certificate of Occupancy; or

15.12.    Failure to comply with the Budget (as attached hereto as Exhibit G) or Schedule (as attached hereto as Exhibit H) unless as otherwise provided in Exhibit B.

16.    Remedies. Upon the occurrence and during the continuance of an Event of Default, Lender may at its option, in addition to any other rights or remedies to which it may be entitled under the Loan Documents or at Law or in equity:

16.1.    Declare the total unpaid principal balance of the indebtedness evidenced hereby, together with all accrued but unpaid interest thereon and all other sums owing, immediately due and payable and all such amounts shall thereafter bear interest at the Default Rate. All such interest shall be paid at the time of, and as a condition precedent to, the curing of any default should Lender, in its sole discretion, allow such default to be cured.

16.2.    Withhold any undisbursed funds or holdbacks and use them to cure, in whole or in part, the Event of Default, to offset or repay interest, principal, late charges or for any other sums due under this Note or the Loan Documents.

16.3.    Withhold any Tax Impounds, Working Capital Holdback, Construction Holdback, or any other sums held by Lender for the benefit of Borrower and use them to cure, in whole or in part, the Event of Default to offset or repay interest, principal, late charges or for any other sums due under this Note or the Loan Documents

17.    Holidays. If any payment to be made by the Borrower shall otherwise become due on a day other than a Business Day, such payment shall be made on the next preceding day which is a Business Day.

18.    Usury. It is the specific intent of the Borrower and Lender that this Note bear a lawful rate of interest, and if any court of competent jurisdiction should determine that the rate herein provided for exceeds that which is statutorily permitted for the type of transaction evidenced hereby, the interest rate shall be reduced to the highest rate permitted by Law, with any excess interest theretofore collected being applied against principal or, if such principal has been fully repaid, returned to Borrower on demand.

19.    Renewals. Borrower, any Guarantor of this Note and all others who may become liable for all or any part of this obligation, consent to any number of renewals or extensions of the time of payment hereof, to the release of all or any part of the security for the payment hereof and to the release of any party liable for repayment of the obligations hereunder. Any such renewals, extensions or releases may be made without notice to any of said parties and without affecting their liability.

20.    Multiple Parties. If Borrower is comprised of more than one Person or entity, each of such Persons and entities shall be unconditionally and jointly and severally liable for the indebtedness evidenced hereby and obligated in all respects for the obligations herein. A default on the part of any one Person comprising Borrower or any guarantor of this Note shall be deemed a default on the part of Borrower hereunder. All references to "Borrower" in the Loan Documents shall mean all entities comprising Borrower as well as each entity individually. Unless and to the extent otherwise limited by the express terms hereof, this Note is executed with recourse against the separate property of all Persons comprising Borrower who are executing this Note in their individual capacities (or as a general partner or in some other capacity causing such Person to be Personally liable). To the extent permissible by Law, each Borrower waives any right to require Lender to: (1) proceed against the other Borrower, Guarantor or any other Person liable for any of the indebtedness, obligations and/or liabilities of any kind whatsoever under or in connection with this Note, the Mortgage or any of the other Loan Documents; (2) proceed against or exhaust any security now or hereafter held in connection with any of the indebtedness, obligations and/or liabilities of any kind whatsoever under or in connection with this Note, the Mortgage or any of the other Loan Documents, including the Property; or (3) pursue any other right or remedy in Lender's power whatsoever.

21.    Waivers. Except with respect to Borrower's right to cure defaults as provided in this Note, Borrower hereby waives presentment, demand for payment, notice of dishonor, protest, notice of nonpayment and any and all other notices and demands whatsoever. No covenant, condition, right or remedy in this Note may be waived or modified orally, by course of conduct or previous acceptance or otherwise unless such waiver or modification is specifically agreed to in writing executed by Lender. Without limiting the foregoing, no previous waiver and no failure or delay by Lender in acting with respect to the terms of this Note or any of the other Loan Documents shall constitute a waiver of any breach, default or failure of a condition under this Note, any of the other Loan Documents or any obligations contained therein or secured thereby. The undersigned further waives exhaustion of legal remedies and the right to plead any and all statutes of limitation as a defense to any demand on this Note, or to any agreement to pay the same, or to any demands secured by the Mortgage, or any other security for this Note.

22.    Integration. This Note and the Loan Documents shall supersede any and all prior written or oral agreements related to the relationship between Borrower and Lender and shall constitute the sole agreement with respect to the loan.

23.    Governing Law and Interpretation. This Note shall be governed by and construed in accordance with the Laws of the State of Illinois without regard to conflicts of laws. All sums referred to herein shall be calculated by reference to and payable in the lawful currency of the United States. This Note and all other Loan Documents and guaranties executed in connection with this Note have been reviewed and negotiated by Borrower, Lender and Guarantor at arms' length with the benefit of or opportunity to seek the assistance of legal counsel and shall not be construed against either party. The titles and captions in this Note are inserted for convenience only and in no way define, limit, extend or modify the scope or intent of this Note. Any reference to Lender in this Note shall include any successor to or assignee of Lender. Unless the context otherwise requires, singular nouns and pronouns, when used herein, shall be deemed to include the plural and vice versa, and impersonal pronouns shall be deemed to include the personal pronoun of the appropriate gender.

24.    Partial Invalidity. If any section or provision of this Note is declared invalid or unenforceable by any court of competent jurisdiction, said determination shall not affect the validity or enforceability of the remaining terms hereof. No such determination in one jurisdiction shall affect any provision of this Note to the extent it is otherwise enforceable under the laws of any other applicable jurisdiction.

25.    Notices. Any notice, demand or request required hereunder shall be given in writing and sent by personal delivery, nationally recognized overnight delivery service, registered or certified mail, return receipt requested, or by facsimile or email transmission with a "hard" copy delivered within the next two (2) business days addressed as set forth in Sections 1.24 and 1.25. Notices shall be deemed given upon receipt at the address set forth herein. Notice of any change of address or of the Person to whom notices are to be sent shall be given in the manner set forth in this Section 25. Even if Borrower consists of multiple entities, the notices party or parties set forth in Sections 1.24 and 1.25 shall be sufficient.

26.    BORROWER, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, (I) SUBMITS TO PERSONAL JURISDICTION IN THE STATE IN WHICH THE PROPERTY IS LOCATED OVER ANY SUIT, ACTION OR PROCEEDING BY ANY PERSON ARISING FROM OR RELATING TO THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS, (II) AGREES THAT ANY SUCH ACTION, SUIT OR PROCEEDING MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION SITTING IN THE COUNTY IN WHICH THE PROPERTY IS LOCATED, (III) SUBMITS TO THE JURISDICTION OF SUCH COURTS, AND, (IV) TO THE FULLEST EXTENT PERMITTED BY LAW, AGREES THAT IT WILL NOT BRING ANY ACTION, SUIT OR PROCEEDING IN ANY FORUM OTHER THAN THE COUNTY IN WHICH THE PROPERTY IS LOCATED (BUT NOTHING HEREIN SHALL AFFECT THE RIGHT OF LENDER TO BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM). BORROWER FURTHER CONSENTS AND AGREES TO SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER LEGAL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY REGISTERED OR CERTIFIED U.S. MAIL, POSTAGE PREPAID, TO THE BORROWER AT THE ADDRESS FOR NOTICES DESCRIBED HEREIN, AND CONSENTS AND AGREES THAT SUCH SERVICE SHALL CONSTITUTE IN EVERY RESPECT VALID AND EFFECTIVE SERVICE (BUT NOTHING HEREIN SHALL AFFECT THE VALIDITY OR EFFECTIVENESS OF PROCESS SERVED IN ANY OTHER MANNER PERMITTED BY LAW).

27.    Transfer. Upon the commencement of any foreclosure action related to the Property in the county in which the Property sits, Lender and Borrower agree to consent to transfer any additional pending suits, claims or actions related to Borrower, Lender and this transaction to the same county as the foreclosure action within sixty (60) days of the commencement of such a foreclosure action, pending the court's approval of such a transfer. If the court does not authorize such a transfer, Borrower and Lender shall voluntarily dismiss any pending suits, claims or actions related to Borrower, Lender and this transaction without prejudice and may refile any such suits, claims or actions in the county in which the Property sits. This Section 27 shall not apply if: (i) there is a third-party involved in any suit, claim or action related to Borrower, Lender and this transaction pending outside of the

county in which the Property sits; or (ii) Lender cannot refile a voluntarily dismissed suit, claim or action in the county in which the Property sits due to an applicable statute of limitation or any other legal bar.

28.    Full Power and Authority. Borrower has the full power and authority to execute and deliver this Note, and this Note constitutes the valid and binding obligation of Borrower, enforceable in accordance with its terms.

29.    Marketing Release. Notwithstanding anything to the contrary contained herein or in any of the documents evidencing this Loan, Borrower acknowledges and agrees that Lender may disclose any information regarding this Loan to third parties in relation to its marketing.

30.    Time is of the Essence. Time is of the essence in this Note.

31.    Lender's Approval. "Lender's Approval" and words of similar import involving concepts of approval, consent or the acceptability of any document or condition shall mean the approval, consent or acceptance of Lender in its sole and absolute discretion.

32.    Successors and Assigns. This Note shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns. Borrower shall not, without the prior written consent of Lender, assign any rights, duties or obligations hereunder.

33.    Dispute Resolution Through Binding Arbitration. In case of any claims, disputes or other matters in question between the parties hereto (a "Party" or the "Parties") arising out of this Note, the aggrieved Party shall give written notice to the other Parties and the Parties will agree to negotiate in good faith to resolve their dispute ("Dispute Notice"). If the Parties agree, an independent third-party mediator may be retained to assist in the resolution of the dispute, each Party to pay their pro rata and equal share of the cost of the mediator and their own attorneys' fees and other costs, if any. In the event the Parties are unable to resolve their controversy within forty-five (45) calendar days of the Dispute Notice, then the controversy shall be decided by arbitration before an agreed-upon arbiter with the American Arbitration Association. In the event the Parties cannot agree to a single arbiter, then each Party may select an arbiter and the arbiters selected shall select an arbiter from the American Arbitration Association to arbitrate the claims raised in the Dispute Notice. Unless otherwise agreed to by the Parties, the arbitration will occur at the offices of Sandberg, Phoenix & von Gontard, P.C. in O'Fallon, Illinois. The arbitration shall be conducted in conformance with the Illinois Uniform Arbitration Act. The arbitration decision shall be final and binding on the Parties. Notice of demand for arbitration shall be filed in writing with the American Arbitration Association within ninety (90) calendar days of the Dispute Notice. This agreement to arbitrate shall be specifically enforceable under the prevailing Illinois arbitration law. Judgment may be entered upon the arbitration award in accordance with applicable law in any court having jurisdiction thereof, and shall be final and binding on each and all of the Parties and their respective heirs, personal representatives, successors, and assigns.

Notwithstanding the foregoing, in the event the Lender initiates non-judicial proceedings for foreclosure, judicial proceedings for foreclosure or other non-judicial or judicial remedies under the Loan, including, without limitation, actions for specific performance or injunctive relief, at the Lender's election in its sole discretion, claims against the Borrower may be joined and determined in the litigation and without regard to the rights of arbitration in this Section.

33.    Jury Trial Waiver. THE BORROWER WAIVES, TO THE EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY ACTIONS BROUGHT BY EITHER THE BORROWER OR LENDER IN CONNECTION WITH THE LOAN AND/OR THIS NOTE.

34.    Illinois Provisions. Borrower agrees that: (i) the obligation evidenced by this Promissory Note is an exempted transaction under Section 1603(1) of the Truth In Lending Act, 15 U.S.C. §1601, et seq.; (ii) said

obligation constitutes a business loan and a loan secured by real estate within the purview of 815 ILCS 205/4 (1992); (iii) the proceeds of the indebtedness evidenced by this Promissory Note will not be used for the purchase of registered equity securities, within the purview of Regulation "U" issued by the Board of Governors of the Federal Reserve System; and (iv) upon the Maturity Date, Lender shall have no obligation to refinance the indebtedness evidenced by this Promissory Note or to extend further credit to the Borrower.

35.     Illinois Insurance Notice. Unless Borrower provides Lender with evidence of insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interest in the Collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the Collateral. Borrower may later cancel any insurance purchased by Lender but only after providing Lender with evidence that Borrower has obtained insurance as required by this Mortgage. If Lender purchases insurance for the Collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on Borrower's own.

**[SIGNATURES ON NEXT PAGE]**

IN WITNESS WHEREOF, the undersigned have executed this Promissory Note as of the date and year first referenced.

THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.

Acknowledged, agreed, and accepted by Borrower:

**PLATFORM II LAWNDALE, LLC,**
An Illinois limited liability company

By: _____

    Scott Krone, Manager

THIS DOCUMENT MUST BE NOTARIZED

| |
|---|
| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |

STATE OF __ILLINOIS__    }
                   } ss.
COUNTY OF __COOK__    }

    SUBSCRIBED, SWORN TO, and ACKNOWLEDGED before me this __ day of __MAY_____, 2018, by __Scott KRONE_____, as manager of Platform II Lawndale, LLC.

Witness my hand and seal.

My commission expires _____.

                                        _____
                                        Notary Public

JEFFREY M GALKIN
Official Seal
Notary Public - State of Illinois
My Commission Expires Nov 2, 2019

Acknowledged, agreed, and accepted by Guarantor:

**CODA DESIGN + BUILD, LLC, LLC,**
An Illinois limited liability company

By:_____

    Scott Krone, Manager

THIS DOCUMENT MUST BE NOTARIZED

| |
|---|
| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |

STATE OF ILLINOIS    )
                           ) ss.
COUNTY OF COOK    )

    SUBSCRIBED, SWORN TO, and ACKNOWLEDGED before me this __ day of MAY_____, 2018, by
Scott Krone_____, as manager of Coda Design + Build, LLC.

    Witness my hand and seal.

    My commission expires _____

                            Notary Public

> JEFFREY M GALKIN
> Official Seal
> Notary Public - State of Illinois
> My Commission Expires Nov 2, 2019

Acknowledged, agreed, and accepted by Guarantor:

_____

SCOTT KRONE, Individually

THIS DOCUMENT MUST BE NOTARIZED

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
|---|

STATE OF __ILLINOIS__              )
                                   ) ss.
COUNTY OF __COOK__                 )

SUBSCRIBED, SWORN TO, and ACKNOWLEDGED before me this __ day of __MAY__, 2018, by ____Scott Krone____, individually.

Witness my hand and seal.

My commission expires _____.

_____
Notary Public

JEFFREY M GALKIN
Official Seal
Notary Public - State of Illinois
My Commission Expires Nov 2, 2019

Acknowledged, agreed, and accepted by Guarantor:


_____
**MARTIN TARADEJNA**, Individually


THIS DOCUMENT MUST BE NOTARIZED

> A notary public or other officer completing this
> certificate verifies only the identity of the
> individual who signed the document to which
> this certificate is attached, and not the
> truthfulness, accuracy, or validity of that
> document.

STATE OF _ILLINOIS_          )
                             ) ss.
COUNTY OF _COOK_             )

SUBSCRIBED, SWORN TO, and ACKNOWLEDGED before me this __ day of _MAY_____, 2018, by
___MARTIN TARADEJNA_____, individually.

Witness my hand and seal.

My commission expires _____.

_____
Notary Public

JEFFREY M GALKIN
Official Seal
Notary Public - State of Illinois
My Commission Expires Nov 2, 2019

EXHIBIT A

Loan Disbursement Agreement

 **First American**

First American Title Insurance Company
27775 Diehl Road

Warrenville, IL 60555
Phone: (630)799-7070
Fax: (866)799-6770

## CONSTRUCTION  LOAN ESCROW AGREEMENT

Escrow No.: 2919093C

Date: 05/17/2018                    Refer to: 1750 N. Lawndale Avenue

To: First American Title Insurance Company, Escrowee

At the request of Platform II Lawndale LLC hereinafter referred to as "Owner/Borrower", Greenlake Real Estate Fund LLC, hereinafter referred to as "Lender", will deposit with you at intervals and in installments to be determined by the Lender and the Borrower, $_____ being the proceeds of a first mortgage in the amount of $6,250,000.00, covering land located in Cook County, Illinois and described as:

(See Commitment No. 2919093)

**Commonly known as:1750 N. Lawndale Avenue, Chicago, IL 60647**

As Escrowee, you are authorized and directed to disburse the funds hereunder pursuant to statements of amounts due, approved by the Owner/Borrower, after obtaining such releases and satisfactions of mechanic's liens or waivers of mechanic's liens and sworn statements of the general contractor, subcontractors and material suppliers required by First American Title Insurance Company for the purpose of providing the insurance coverage herein specified.

The Inspector/Architect is Lender's Representative and the General Contractor is _____.

There will be periodic disbursements, which are to be made in accordance with the terms and conditions of this escrow as hereinafter set forth.

I.       Prior to the first disbursement of funds hereunder, the following are requirements of this escrow, to wit:

      A.   The Escrowee shall be furnished:

           1.   An approval by the Lender of the condition of title to the premises described above; An approval by the Lender for loan disbursement purposes of the owner's statement and the general contractor's statement, which are provided at IA3 and IA4 below;

           2.   A sworn Owner's statement disclosing the various contracts entered into by the Owner and setting forth the names of the contractors, their addresses, work or materials to be furnished, amounts of the contracts, amounts paid to date, amounts of current payments and balances due;

           3.   A sworn General Contractor's statement setting forth in detail all contractors and material suppliers with whom he has contracted, their addresses, work or material to be furnished, amounts of the contracts, amounts paid to date, amounts of current payments and balances due.

      B.   The Escrowee shall be prepared to furnish to the Lender an ALTA Loan Policy covering the recording date of the above mortgage and showing the Lender as the insured. Said Policy shall contain the endorsement in the form attached as Exhibit A.

II.      Prior to each disbursement of funds hereunder, it is a requirement of this escrow that the Escrowee be furnished:

A.   A sworn Owner's statement disclosing the various contracts entered into by the Owner and setting forth the names of the contractors, their addresses, work and materials to be furnished, amounts of the contracts, amounts paid to date, amounts of current payments and balances due;

B.   A sworn General Contractor's statement setting forth all contractors and material suppliers with whom he has contracted, amounts of contracts, amounts paid to date, amounts of current payments and balances due;

C.   A written approval by the Owner/Borrower of the requested disbursement;

D.   A report by the Inspector or a certification by the Architect certifying that work has been completed and materials are in place as indicated by the request for payment of the General Contractor. Said inspection is to be made and submitted by Lender;

E.   Sufficient funds to cover the requested disbursements and to pay for extras or change orders for which waivers have not been deposited and for which funds have not previously been deposited;

F.   Statements, waivers, affidavits, supporting waivers and releases of lien from such persons and in such form as may be required by First American Title Insurance Company for the purpose of providing the title insurance coverage specified herein;

**G.   All required documentation for the final draw request must be submitted to the Escrowee prior to any disbursements of the final draw.**

III.   All disbursements for construction purposes will be made by the Escrowee directly to the subcontractors. In the event that the General Contractor and any subcontractor jointly authorize the Escrowee to pay any funds due one to the other, the Escrowee may comply with such authorization. However, it is the intention of the parties named herein and signatories hereto that no person not a party signatory to this escrow shall have the right to look to the Escrowee for any disbursement hereunder, under a third party beneficiary theory or otherwise, and that the Escrowee owes no duty to any such third party to make any disbursement.

IV.   As the Escrowee makes a partial disbursement of mortgage proceeds hereunder, it will furnish the Lender the Disbursement Endorsement attached as Exhibit B, covering each requested disbursement.

V.   Prior to the final disbursement of the funds hereunder, it is a requirement of this escrow that First American Title Insurance Company be prepared to furnish its endorsement to said policy in the form attached hereto as Exhibit B, covering the date of final disbursement. With respect to the conditions of title, the liability of Escrowee in making any disbursements in reliance upon the title evidence referred to above shall not extend to the determination of whether or not it is acceptable to the Lender, the furnishing of funds for disbursement being considered the acceptance of title as so reported.

VI.   If at any time during the course of construction the total of the unpaid disclosed cost of construction as indicated by the column totals on the General Contractor's sworn statement exceeds the amount of the undisbursed mortgage proceeds as calculated by subtracting the total amount of liability taken on the endorsements from the face amount of the mortgage, the Escrowee need not make further disbursements under the terms of this escrow until the Owner/Borrower has deposited in this escrow the sum necessary to make the available funds equal to the unpaid disclosed cost of construction, unless specifically directed to do so by the Lender. Also, if Escrowee discovers a misstatement in an affidavit furnished by General Contractor or Owner/Borrower, it may stop disbursement until the misstatement has been corrected. First American Title Insurance Company has no liability hereunder to the Owner/Borrower relating to protection against mechanic's lien claims.

VII.   The functions and duties assumed by First American Title Insurance Company  include only those described in this agreement, and the Escrowee is not obligated to act except in accordance with the terms and conditions of this escrow. First American Title Insurance Company does not insure that the building will be completed nor does it insure that the building, when completed, will be in accordance with plans and specifications, nor that sufficient funds will be available for completion, nor does it make the certifications of the Inspector/Architect its own, nor does it assume any liability for same other than procurement as one of the conditions precedent to each disbursement.

VIII.   Bill all title and escrow charges to the Borrower. Escrow fees are payable when billed. If escrow fees are not paid within fourteen (14) days of billing, Escrowee may cease making any further disbursements until escrow fees have been paid.

IX.   General Conditions: At any time prior to its commencement of disbursement of funds hereunder, the Escrowee reserves the right to decline commencement of disbursement of funds, if First American Title Insurance Company declines any risk offered for insurance hereunder, whereupon Escrowee shall return to Lender any documents in its possession relating to such loan and the funds received by it. Commencement of disbursement makes this agreement effective as to all funds received and disbursed on the construction in question.

Where, after the first disbursement, a further title search reveals a subsequently arising exception over which First American Title Insurance Company is unwilling to insure, Escrowee will notify the Lender and may discontinue disbursement until the exception has been disposed of to the satisfaction of the Lender.

A mechanic's lien claim over which First American Title Insurance Company is required to insure hereunder does not warrant a discontinuance of disbursement.

Escrowee has no liability for loss caused by an error in the certification furnished it hereunder as to work in place.

Escrowee shall not be responsible for any loss of documents or funds while such documents or funds are not in its custody. Documents or funds deposited in the United States mail shall not be construed as being in custody of the Escrowee.

In the event of default as declared by the Lender and/or foreclosure by the Lender, Escrowee shall have the right to discontinue further disbursements under this agreement.

Interest, income or other benefits, if any, earned or derived from the funds deposited shall belong to First American Title Insurance Company. First American Title Insurance Company  may deposit all funds received hereunder to one or more of its general accounts. First American Title Insurance Company shall be under no duty to invest or reinvest any funds, at any time, held by it pursuant to the terms of this agreement.

X.   The undersigned agree that this Construction Loan Escrow Agreement is not intended by any of the undersigned to give any benefits, rights, privileges, actions or remedies to any person, partnership, firm or corporation other than First American Title Insurance Company, Greenlake Real Estate Fund LLC (Lender), and Platform II Lawndale LLC (Owner/Borrower), as a third party beneficiary or otherwise under any theory of law.

Lender:                                                    Owner/Buyer:

By:_____          By:_____

Its:_____          By:_____

Accepted: First American Title Insurance Company, Escrowee

By:_____

Name:_____          Office:_____

General Contractor:

The undersigned acknowledges that he/she is neither a party to the Construction Loan Escrow Agreement, nor does that agreement confer any benefits, rights, privileges, actions or remedies to any person, partnership, firm or corporation other than First American Title Insurance Company, Greenlake Real Estate Fund LLC (Lender), and Platform II Lawndale LLC (Owner/Borrower), under a third party beneficiary theory or otherwise under any theory of law.

The undersigned agrees that the improvements referred to in the escrow agreement will be constructed and completed in strict accordance with the plans and specifications and the building contract. The undersigned also concurs in the above escrow instructions signed by the Owner/Borrower and the Lender or their representatives.


_____

For the General Contractor

Exhibit A

## CONSTRUCTION LOAN PENDING
## DISBURSEMENT ENDORSEMENT

**Issued by**

Attached to Policy No.:

File No.: 2919093

1. Covered Risk 11(a) of this policy is deleted.

2. The insurance [for Construction Loan Advances] added by Section 3 of this endorsement is subject to the exclusions in Section 4 of this endorsement and the Exclusions from Coverage in the Policy, the provisions of the Conditions, and the exceptions contained in Schedule B. For the purposes of this endorsement and each subsequent Disbursement Endorsement:

   (a) "Date of Coverage", is [Date of Policy] unless the Company sets a different Date of Coverage by an ALTA 33-06 Disbursement Endorsement issued at the discretion of the Company.

   (b) "Construction Loan Advance," shall mean an advance that constitutes Indebtedness made on or before as of Date of Coverage for the purpose of financing in whole or in part the construction of improvements on the Land.

   (c) "Mechanic's Lien", shall mean any statutory lien or claim of lien, affecting the Title, that arises from services provided, labor performed, or materials or equipment furnished.

3. The Company insures against loss or damage sustained by the Insured by reason of:

   (a) The invalidity or unenforceability of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage;

   (b) The lack of priority of the lien of the Insured Mortgage as security for each Construction Loan Advance made on or before the Date of Coverage, over any lien or encumbrance on the Title recorded in the Public Records and not shown in Schedule B; and

   (c) The lack of priority of the lien of the Insured Mortgage, as security for each Construction Loan Advance made on or before the Date of Coverage over any Mechanic's Lien if notice of the Mechanic's Lien is not filed or recorded in the Public Records, but only to the extent that direct payment to the Mechanic's Lien claimant has been made by the Company or by the Insured with the Company's written approval.

4. This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) by reason of any Mechanic's Lien arising from services, labor, material or equipment:

   (a) furnished after Date of Coverage; or

   (b) to the extent that the Mechanic's Lien claimant was not directly paid by the Company or by the Insured with the Company's written approval.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements

Date:

By:

      Authorized Countersignature

| Form 50-10691 (7-1-14) | Page 6 of 7 | ALTA 32.1-06 Construction Loan Pending Disbursement (2-3-11) |
| --- | --- | --- |

Exhibit B

**DISBURSEMENT ENDORSEMENT**

**Issued by**

Attached to Policy No.:

File No.: 2919093

1.  The Date of Coverage is amended to .

    a.  The current disbursement is: $

    b.  The aggregate amount, including the current disbursement, recognized by the Company as disbursed by the Insured is: $

2.  Schedule A is amended as follows:

3.  Schedule B is amended as follows:

This endorsement is issued as part of the policy.  Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.  To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls.  Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date:

By:

    Authorized Countersignature

| Form 50-10692 (7-1-14) | Page 7 of 7 | ALTA 33-06 Disbursement (2-3-11) |

Exhibit B

Disbursement of Construction Funds

1.    Construction Funds.

1.1.    Scope of Work. Borrower intends to perform rehabilitation of the Property (collectively the "Construction Work"). The scope of work, schedule and budget for each project shall be subject to the prior written approval of Lender. Once approved, Borrower may not make any changes to the Construction Work without the prior consent of Lender. However, Borrower may modify Budget item allocations of amounts under $10,000.00, provided that such modifications do not increase the total Budget set for the Construction Work. The terms of this Exhibit B shall apply to each distinct construction project separately.

1.2.    Performance of the Construction Work. All the Construction Work shall be performed in a good and workman like manner with licensed general contractors using new materials and in compliance with all Laws. Borrower shall obtain customary warranties from all contractors doing any of the Construction Work. Borrower, Borrower's Members, Borrower's manager, Guarantor, and their respective Affiliates shall not be paid any compensation or fees or earn any profit in connection with the performance of the Construction Work.

1.3.    Payment for the Construction Work. The cost of the Construction Work may be funded from the Construction Funds in accordance with the terms of this Exhibit B. Any costs related to the Construction Work that is in excess of, or not fundable from the Construction Funds as provided herein shall be paid for by Borrower.

1.4.    Conditions Precedent to Funding from the Construction Funds

1.4.1.    Lender shall have approved in writing the scope of work for all Construction Work to be funded from the Construction Funds which shall include as a minimum the items shown on the Schedule 1, attached hereto;

1.4.2.    Lender shall have approved in writing all construction contracts for the work to be funded from the Construction Funds, which approval shall not unreasonably be withheld;

1.4.3.    Lender shall have approved in writing insurance certificates evidencing insurance coverage for course of construction and other insurance reasonably required by Lender with respect to Borrower's activities on the Property;

1.4.4.    Lender shall have received and approved in writing evidence that Borrower has obtained any all required governmental permits and approvals for the work to be performed at the Property and that no further action is required by Borrower other than the payment of fees;

1.4.5.    Lender and Borrower shall have entered into such disbursement agreement(s) with third party disbursement agents as Lender may desire to effectuate the payments, lien release and title verifications and inspections on behalf of Lender, all at the expense of Borrower.

1.4.6.    There shall be no Event of Default or circumstance with the giving of notice or the passage of time would constitute an Event of Default.

1.5.    Disbursement Procedure for the Construction Funds. Lender shall make disbursements from the Construction Funds up to once per calendar month, subject to the satisfaction of the conditions in Section 1.4 of this Exhibit B and the conditions below:

1.5.1.    Borrower shall have provided Lender a written request for disbursement,

specifying the amount of disbursement requested, the labor performed or materials procured, evidence that the work has been in fact performed and/or materials procured and such other documentation and information that may be reasonably requested by Lender;

1.5.2.   Lender shall have inspected or had its agent inspect the Construction Work for which payment is sought and Lender shall have approved such inspection;

1.5.3.   For any scope of work which requires an interim or final inspection by any governmental authority, such inspection shall have been obtained and evidence thereof approved by Lender in writing;

1.5.4.   Lender shall have been provided with lien releases from the contractors or vendors to whom payment will be made. (Such lien releases may be conditional for incremental payments to any contractor but prior to any concurrently with any final payment or retention a final unconditional release shall be obtained.);

1.5.5.   Lender shall have been provided with an endorsement to lender's title insurance continuing the effective date of such title insurance through the date of the disbursement;

1.5.6.   There shall be no continuing Event of Default;

1.5.7.   Except for the final disbursement, following completion of all of the Construction Work, there shall be remaining funds allocated for Construction Work that have not been distributed to Borrower.

Disbursements by Lender shall be made, at Lender's option, either directly to Borrower, directly to the party being paid or by joint check to Borrower and the party being paid. Disbursements shall be made at 90% of the amount requested by Borrower and Borrower shall fund any amounts due that are not funded by Lender. The final 10% disbursement to be made upon Completion (as defined below); provided, however, that demolition contractors, masonry contractors and locker and storage suppliers and installers (e.g. DBCI) that have completed all of their work may be paid in full up to the amount set forth on the Budget, attached to the Note as Exhibit G, upon confirmation that such work has been satisfactorily completed and receipt of a full and final release of mechanic's lien by such payee.

1.6.   Costs. Borrower shall be responsible for Lender's out-of-pocket costs in connection with a third party disbursement agent that will disburse the Construction Funds and inspect the Construction Work.

1.7.   Completion. "Completion" shall have occurred when (a) all of the Construction Work has been completed and approved by Lender and its agent, (b) Lender has been provided with proof of acceptance of completion by the applicable governmental authorities, and (c) Lender has been provided final unconditional lien waivers from the contractor and all subcontractors that are eligible to file mechanics' liens.

1.8.   Notices/Filings. Once the Completion has occurred Borrower shall display or file all such notices or other documents as may be required to limit or eliminate the rights of any of the contractors to file mechanic's liens on the Property to the full extent possible.

1.9.   Final Disbursement from Construction Funds. If there are funds remaining in the Construction Funds after Completion, upon a draw request from Borrower such funds shall be disbursed to Borrower.

1.10.   Completion. Borrower shall complete the Construction Work on or before the Completion Date.

1.11.   Remaining Funds. Once Completion has occurred, so long as there has been Event

of Default, any funds remaining the Construction Reserve shall be disbursed to Borrower for working capital for the Property.

Exhibit C

Disclosures

1. <u>City of Chicago v. L&B Partnership LLC, et. al., 14M1402825</u>, Circuit Court of Cook County, First Municipal District.

<u>Exhibit D</u>

Environmental Disclosure

To Borrower's knowledge, there has been no (1) violation of Hazardous Materials Laws at the Property (2) lawsuit brought or threatened, settlement reached, or government order relating to Hazardous Materials in, on, under or from the Property or any violation of Hazardous Materials Laws; (3) use, generation, refining, manufacture, transportation, transfer, production, processing, storage, handling, or treatment of any Hazardous Materials, in on, under, from, or affecting the Property; or (4) administrative claim, legal enforcement action or other claim related to Hazardous Materials in, on, under or from the Property or any violation of Hazardous Materials, except for those items contained in the following identified documents and reports:

- Phase I – ENVIRONMENTAL SITE ASSESSMENT, 1750 North Lawndale Avenue, Chicago, Illinois, ETS Project No. 17-1236A, dated December 1, 2017; Prepared for Mr. Joe Clapper, First Bank Financial Centre, 155 West Wisconsin Avenue, Oconomowoc, Wisconsin 53066; Prepared by ETS ENVIRONMENTAL & ASSOCIATES, LLC, 204 Dearborn Court, Suite 124, Geneva, Illinois 60134, (630) 513-4710

- Phase II – LIMITED SUBSURFACE INVESTIGATION of 1750 North Lawndale Avenue Chicago, Illinois; ETS Project No. 17-1236B dated January 5, 2018; Prepared for: Mr. Joe Clapper, First Bank Financial Centre, 155 West Wisconsin Avenue, Oconomowoc, Wisconsin 53066; Prepared by: ETS ENVIRONMENTAL & ASSOCIATES, LLC, 204 Dearborn Court, Suite 124 Geneva, Illinois 60134, (630) 513-4710

- 45-Day Report for 1750 North Lawndale Avenue, Chicago, Illinois; IEMA Incident No. 20180153; ETS Project No. 17-1236C; Prepared for Platform II Lawndale, LLC, prepared by ETS Environmental & Associates, LLC and dated March 2, 2018

Exhibit E

Litigation

1. City of Chicago v. L&B Partnership LLC, et. al., 14M1402825, Circuit Court of Cook County, First Municipal District.

2. Steve Siegel v. Scott Krone, et., al., 16-CH-1118, Circuit Court of Cook County, First Municipal District.

3. Alliant Credit Union v. Platform I 600 Waukegan, LLC, Scott Krone, et. al,. 2018-CH-02032, Circuit Court of Cook County, Chancery Division.

4. Krone v. Tresi, Limited Liability Company. 2018-CH-00668, Circuit Court of Cook County, Chancery Division.

<u>Exhibit F</u>

<u>Insurance Claims</u>

None

Exhibit G

Final Construction and Rehabilitation Budget
(See attached)



**Lawndale Proforma**
Hard Cost Budget

| No. | Item | Company | | Budget |
|-----|------|---------|---|--------|
| 02070 | Demolition | | $ | 150,000.00 |
| 02300 | Grading/Excavation | | $ | 20,000.00 |
| 02610 | Paving | | $ | - |
| 02700 | Underground | | $ | - |
| 02900 | Landscaping | | $ | - |
| 02910 | Fence | | $ | - |
| 03100 | Concrete | | $ | 75,000.00 |
| 04100 | Masonry | | $ | 75,000.00 |
| 05100 | Struct. Steel | | $ | 200,000.00 |
| 06100 | Carpentry Rough | | $ | 20,000.00 |
| 06125 | Material | | | |
| 06150 | Carpentry Finish | | $ | 10,000.00 |
| 06200 | Cabinets | | $ | 5,000.00 |
| 06225 | Stairs | | $ | - |
| 06250 | Granite | | $ | - |
| 06275 | Tops | | $ | 1,500.00 |
| 07100 | Siding | | $ | - |
| 07300 | Insulation | | $ | - |
| 07400 | Roofing | Replace | $ | 200,000.00 |
| 07500 | Gutters | | $ | - |
| 08300 | Garage Doors | | $ | 3,000.00 |
| 08400 | Doors/Hardware | | $ | 2,500.00 |
| 08500 | Windows | | $ | 150,000.00 |
| 08600 | Store front | | $ | 25,000.00 |
| 09100 | Drywall | | $ | 5,000.00 |
| 09150 | Painting | | $ | 75,000.00 |
| 09200 | Tile | Baths | | |
| 09275 | Tile Material | | | |
| 09275 | Wood | Condition | | |
| 09300 | Carpet | Office | | |
| 10100 | Fire Place | | $ | - |
| 10400 | Bath Accessories | | $ | 1,000.00 |
| 10500 | Storage Lockers | | $ | 400,000.00 |
| 11100 | Appliances | | $ | - |
| 13100 | Elevator | | $ | 80,000.00 |
| 15200 | Plumbing | | $ | 7,500.00 |
| 15250 | Fire Protection | | $ | 80,000.00 |
| 15300 | HVAC | | $ | 500,000.00 |
| 16100 | Electrical | | $ | 75,000.00 |
| 16200 | Sec. System | | $ | 45,000.00 |
| 17100 | Contingency | | $ | 500,000.00 |
| TOTAL | | | $ | 2,705,500.00 |

<u>Exhibit H</u>

<u>Final Construction Schedule</u>
<u>(See attached.)</u>



**CODA - Platform II Lawndale**
1750 N. Lawndale
Construction Schedule

| Date | Description |
|------|-------------|
| 5/20/2018 | Commence Demolition |
| 6/30/2018 | Complete Demolition |
| 7/5/2018 | Commence Concrete |
| 7/21/2018 | Complete Concrete |
| 7/24/2018 | Commence Mechanicals |
| 8/30/2018 | Complete Mechanicals |
| 9/5/2018 | Inspections |
| 9/22/2018 | Complete Inspections |
| 9/25/2018 | Commence Lockers |
| 11/3/2018 | Complete Lockers |
| 11/6/2018 | Commence Signage/Trim |
| 11/24/2018 | Complete Signage/Trim |
| 11/27/2018 | Final Inspections |
| 12/22/2018 | Issuance of CO |

<u>Exhibit I</u>

<u>Collateral Assignment of Facility Management Agreement</u>
<u>(See attached)</u>

## COLLATERAL ASSIGNMENT OF FACILITY MANAGEMENT AGREEMENT

THIS COLLATERAL ASSIGNMENT OF FACILITY MANAGEMENT AGREEMENT (this "**Agreement**") is made on
_____, 2018, between **PLATFORM II LAWNDALE, LLC**, an Illinois limited liability company ("**Owner**"),
**GREENLAKE REAL ESTATE FUND LLC**, a California limited liability company and/or assigns ("**Lender**") and
**CUBESMART ASSET MANAGEMENT, LLC**, a Delaware limited liability company ("**CubeSmart**").

### RECITALS

A.      On or about the date hereof, Platform II Lawndale, LLC (the "**Borrower**") and Lender entered
into that certain Promissory Note Secured by Mortgage ("**Note**") whereby Lender agreed to make a secured loan
(the "**Loan**") available to Borrower in the maximum amount of $6,250,000.00.

B.      The Note is secured by, among other things, a First Priority Mortgage, Security Agreement,
Assignment of Rents and Leases and Fixture Filing of even date herewith (the "**Mortgage**") encumbering real
property commonly known as 1750 N. Lawndale Ave., Chicago, Cook County, Illinois (Parcel Nos.: 13-35-319-015-
0000; 13-35-319-002-0000; 13-35-319-039-0000), as more particularly described in the Mortgage, (the "**Property**")
and other Loan Documents as such term is defined in the Note. Failure to list any collateral herein is not deemed to
be a waiver of such collateral.

C.      Owner and CubeSmart are parties to that certain Facility Management Agreement dated as of
even date herewith attached hereto as **Exhibit A**, whereby Owner employed CubeSmart to manage the facility
located on the Property (the "**Management Agreement**").

D.      Lender requires as a condition to the making of the Loan to Owner that Owner and CubeSmart
enter into this Agreement.  Capitalized terms not otherwise defined in this Agreement shall have the meaning
ascribe to them in the Note.

THE PARTIES TO THIS AGREEMENT AGREE AS FOLLOWS:

1.      **Assignment of Management Agreement.**  As additional collateral security for the Loan, Owner hereby
transfers, sets over and assigns to Lender and grants to Lender a security interest in all of Owner's right, title and
interest in and to the Management Agreement, said transfer constituting a present and absolute assignment to
Lender as of the date hereof; provided, however, Lender confers upon Owner the right to enforce the terms of the
Management Agreement so long as no Event of Default is continuing under any of the Loan Documents.  Owner
acknowledges that by accepting the assignment of Management Agreement under this Agreement, Lender does
not assume any of Owner's obligations under the Management Agreement.  Upon notice from Lender to
CubeSmart that an Event of Default has occurred under any of the Loan Documents: (a) CubeSmart shall no longer
take any direction from Owner with respect to the Property and shall only take direction from Lender, (b) any
funds payable by CubeSmart to Owner shall be remitted to Lender, (c) CubeSmart shall not enter into any
agreements for the sale of any interests in the Property without Lender's written consent, (d) Lender shall have the
right to terminate the Management Agreement without any fee or penalty and to replace CubeSmart with any
party selected by Lender and (e) Lender may, in its sole discretion, give notice to CubeSmart of its intent to enforce
the rights of Owner under the Management Agreement and may initiate or participate in any legal proceedings
respecting the enforcement of said rights.  CubeSmart shall fully cooperate with Lender in any transition of the
management of the Property by providing such materials, books and records and other information that may be
required for such transition.  This Agreement is one of the Loan Documents and secures payment and performance
by Owner of all obligations of Owner under the Loan Documents.

2.      **Subordination of Management Agreement.**  The Management Agreement does not create an interest in real property or constitute covenants running with the Property.  The Management Agreement and any and all liens, rights and interests (including, without limitation, all rights to payment under the Management Agreement) owed or claimed by CubeSmart or held by CubeSmart in and to the Property are and shall be in all respects subordinate and inferior to: (i) Lender's right to payment under the Note and the other Loan Documents, and (ii) the liens and security interests created or to be created for the benefit of Lender and securing the repayment of the Note, including, without limitation, those created under the Mortgage.

3.      **Attornment.**  Upon an Event of Default that has not been timely cured as may be provided under any Loan Document, or foreclosure of the Mortgage or transfer of the Property in lieu of foreclosure, CubeSmart shall attorn to Lender and shall recognize Lender as "**Owner**" under the Management Agreement.  The Management Agreement shall continue in full force and effect and CubeSmart shall perform all CubeSmart's obligations under the Management Agreement directly to Lender, as if Lender were the "Owner" under the Management Agreement, unless Lender shall have elected to terminate the Management Agreement as provided in this Agreement.

4.      **Termination.**  At such time as the Loan is paid in full, this Agreement and all of Lender's right, title and interest hereunder with respect to the Management Agreement shall terminate.

5.      **Covenants.**

(a)      Owner hereby covenants with Lender that during the term of this Agreement, (i) Owner shall not transfer the responsibility for management of the Property from CubeSmart to any other person or entity without the prior written consent of Lender, (ii) Owner shall not terminate or amend any of the terms or provisions of the Management Agreement without the prior written consent of Lender, (iii) Owner shall promptly give Lender written notice of any notice or information that Owner receives which indicates that CubeSmart is alleging any default under the Management Agreement or is terminating the Management Agreement or that CubeSmart is otherwise discontinuing its management of the Property.

(b)      Owner agrees: (i) to pay and perform all obligations of Owner under the Management Agreement; (ii) to enforce the payment and performance of all obligations of any other person or entity under the Management Agreement; (iii) not to further assign, for security or any other purposes, its rights under the Management Agreement without Lender's prior written consent.

(c)      CubeSmart hereby covenants with Lender that during the term of this Agreement, (i) CubeSmart shall not transfer the responsibility of management to any other person or entity without the prior written consent of Lender, (ii) CubeSmart shall not terminate or amend any of the terms or provisions of the Management Agreement without the prior written consent of Lender, (iii) CubeSmart shall give Lender written notice at the same time given to Owner that CubeSmart is alleging any default under the Management Agreement or purporting to terminate the Management Agreement, and (iv) CubeSmart may not delegate responsibility under the Management Agreement to any third party without Lender's prior written consent.

(d)      Upon an Event of Default that is not cured, as may be provided under any Loan Document, CubeSmart and Owner covenant that no distributions to their respective members of any kind shall be made without the written approval of Lender, not to be unreasonably withheld. CubeSmart and Owner further covenant that Lender shall have the power and authority to direct the use of any and all excess funds of Manager and Owner in relation to the Property and the Management Agreement. CubeSmart and Owner covenant that any Operating Account set up through the Management Agreement or with relation to the Property shall be compatible with the use and operation of an ACH payment system. Upon Lender's request, Owner and CubeSmart will collaterally assign such Operating Account to Lender on such form acceptable to the financial institution holding such account and Lender.

(e)      Upon an Event of Default by Owner as defined under the Note, or by either CubeSmart or Owner under the Management Agreement, CubeSmart and Owner covenant that each party shall immediately provide written notice to Lender of such a default.

(f)      CubeSmart agrees to provide any reporting required pursuant to Sections 2.2 and 2.9 of the Management Agreement, including without limitation monthly reports and annual budgets, concurrently to Lender in accordance with the terms of Section 2.2 and 2.9 at such times as they are due to Owner.

(g)      CubeSmart and Owner agree that GreenLake Real Estate Fund LLC shall be an additional insured on any insurance policy required by the Management Agreement or otherwise maintained by either party in relation to the Property.

(h)      CubeSmart and Owner agree to send a copy of any notice sent to either Manager's Notice Address or Owner's Notice Address under the terms of the Management Agreement to Lender's notice address as provided in Section 7(b) of this Agreement.

**6.     Representations and Warranties.**

(a)      Owner represents and warrants to Lender, as of the date hereof, that: (i) the Management Agreement is in full force and effect and enforceable in accordance with its terms and no default by Owner or CubeSmart, or event which would constitute a default after notice or the passage of time, or both, exists with respect to the Management Agreement; (ii) the copy of the Management Agreement attached hereto as **Exhibit A** is a complete and correct copy of the Management Agreement; and (iii) Owner has not assigned any of its rights under the Management Agreement.

(b)      CubeSmart represents and warrants to Lender, as of the date hereof, that: (i) the Management Agreement in full force and effect and enforceable in accordance with its terms and no default by Owner or CubeSmart, or event which would constitute a default after notice or the passage of time, or both, exists with respect to the Management Agreement; (ii) the copy of the Management Agreement attached hereto as **Exhibit A** is a complete and correct copy of the Management Agreement; and (iii) CubeSmart has not assigned any of its rights under the Management Agreement.

**7.     Miscellaneous.**

(a)      _No effect on Mortgage._  Nothing in this Agreement shall be deemed to change, in any manner, the provisions of the Mortgage as between Lender and Owner or to waive any right that Lender may now have or later acquire against Owner by reason of the Mortgage.

(b)      _Notices._  Any notice, demand, request, consent, approval, or communication that any party desires or is required to give to another party or any other person shall be in writing and either served personally or sent by prepaid U.S, first-class mail, fax or e-mail at the address set out below.  Any party may change its address by notifying the other parties of the change of address.  Notice shall be deemed communicated within two (2) business days from the time of mailing, if mailed as provided in this paragraph.

Loan No. 1744LawndaleIL
GreenLake/Platform II Lawndale, LLC
Collateral Assignment of Property Management Agreement
Page 3 of 9

9693189.4

| If to CubeSmart | _____ | with copies to: |
| | _____ | _____ |
| | _____ | _____ |
| | P: _____ | _____ |
| | E: _____ | P: _____ |
| | | E: _____ |

If to Borrower:    Platform II Lawndale, LLC
                   600 Waukegan Rd., Ste 129
                   Northbrook, IL 60062
                   Attn: Scott Krone
                   (O) 847-272-77775 x 1
                   (M) 847-651-7373
                   (E) skrone@codamg.com

with copies to:

LEVIN GINSBURG
180 N. LaSalle St.,
Suite 3200
Chicago, Illinois 60601-2800
Attention: Jeffrey M. Galkin
P: (312)368-0100
E: jgalkin@lgattorneys.com

If to Lender:      GreenLake Real Estate Fund LLC
                   1416 El Centro Street, Suite 200
                   South Pasadena, California 91030
                   Attention: Hugeng Shieh
                   P: 626-529-1080
                   E: hshieh@greenlakefund.com

with copies to:

Sandberg Phoenix & von Gontard
600 Washington Ave., 15th Floor
St. Louis, MO 630101
Attention: Anthony Soukenik
P: (314) 231-3332
E: Asoukenik@sandbergphoenix.com

(c)     Successors.  This Agreement shall be binding on and inure to the benefit of the parties and their successors and assigns.

(d)     No Modifications Unless in Writing.  This Agreement and the Management Agreement contain all of the agreements and understandings between the parties relating to the management of the Property by CubeSmart and the obligations of Owner in connection with Management Agreement. This Agreement shall not be amended, changed or modified in any way unless in writing executed by Owner, Lender and CubeSmart. Owner, Lender and CubeSmart shall not have waived or released any of their rights hereunder unless in writing and executed by Owner, Lender and CubeSmart.

(e)     Attorneys' Fees.  If any action or proceeding is commenced by any party to enforce their rights under this Agreement or to collect damages as a result of the breach of any of the provisions of this Agreement, the prevailing party in such action or proceeding, including any bankruptcy, insolvency or appellate proceedings, shall be entitled to recover all reasonable costs and expenses, including, without limitation, reasonable attorneys' fees and court costs, in addition to any other relief awarded by the court.

(f)     Jurisdiction.  OWNER AND CUBESMART, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, (I) SUBMITS TO PERSONAL JURISDICTION IN THE STATE OF ILLINOIS OVER ANY SUIT, ACTION OR PROCEEDING BY ANY PERSON ARISING FROM OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, (II) AGREES THAT ANY SUCH ACTION, SUIT OR PROCEEDING MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION SITTING IN ILLINOIS, (III) SUBMITS TO THE JURISDICTION OF SUCH COURTS, AND, (IV) TO THE FULLEST EXTENT PERMITTED BY LAW, AGREES THAT IT WILL NOT BRING ANY ACTION, SUIT OR PROCEEDING IN ANY FORUM OTHER THAN COOK COUNTY, ILLINOIS (BUT NOTHING HEREIN SHALL AFFECT THE RIGHT OF LENDER TO

BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM). OWNER AND CUBESMART FURTHER CONSENT AND AGREE TO SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER LEGAL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY REGISTERED OR CERTIFIED U.S. MAIL, POSTAGE PREPAID, TO THE OWNER AT THE ADDRESS FOR NOTICES DESCRIBED HEREIN, AND CONSENTS AND AGREES THAT SUCH SERVICE SHALL CONSTITUTE IN EVERY RESPECT VALID AND EFFECTIVE SERVICE (BUT NOTHING HEREIN SHALL AFFECT THE VALIDITY OR EFFECTIVENESS OF PROCESS SERVED IN ANY OTHER MANNER PERMITTED BY LAW).

(g)     Dispute Resolution Through Binding Arbitration. In case of any claims, disputes or other matters in question between the parties hereto (a "Party" or the "Parties") arising out of this Agreement, the aggrieved Party shall give written notice to the other Parties and the Parties will agree to negotiate in good faith to resolve their dispute ("Dispute Notice"). If the Parties agree, an independent third-party mediator may be retained to assist in the resolution of the dispute, each Party to pay their pro rata and equal share of the cost of the mediator and their own attorneys' fees and other costs, if any. In the event the Parties are unable to resolve their controversy within forty-five (45) calendar days of the Dispute Notice, then the controversy shall be decided by arbitration before an agreed-upon arbiter with the American Arbitration Association. In the event the Parties cannot agree to a single arbiter, then each Party may select an arbiter and the arbiters selected shall select an arbiter from the American Arbitration Association to arbitrate the claims raised in the Dispute Notice. Unless otherwise agreed to by the Parties, the arbitration will occur at the offices of Sandberg, Phoenix & von Gontard, P.C. in O'Fallon, Illinois. The arbitration shall be conducted in conformance with the Illinois Uniform Arbitration Act. The arbitration decision shall be final and binding on the Parties. Notice of demand for arbitration shall be filed in writing with the American Arbitration Association within ninety (90) calendar days of the Dispute Notice. This agreement to arbitrate shall be specifically enforceable under the prevailing Illinois arbitration law. Judgment may be entered upon the arbitration award in accordance with applicable law in any court having jurisdiction thereof, and shall be final and binding on each and all of the Parties and their respective heirs, personal representatives, successors, and assigns.

Notwithstanding the foregoing, in the event the Lender initiates non-judicial proceedings for foreclosure, judicial proceedings for foreclosure or other non-judicial or judicial remedies under the Loan, including, without limitation, actions for specific performance or injunctive relief, at the Lender's election in its sole discretion, claims against the Borrower may be joined and determined in the litigation and without regard to the rights of arbitration in this Section.

(h)     This Agreement may be executed in any number of counterparts, each constituting an original, but all together one and the same instrument. Delivery of an executed counterpart of a signature page of this Agreement by email shall be effective as delivery of a manually executed counterpart of this Agreement.

**[SIGNATURE PAGES ATTACHED]**

Loan No. 1744LawndaleIL
GreenLake/Platform II Lawndale, LLC
Collateral Assignment of Property Management Agreement
Page 5 of 9

9693189.4

IN WITNESS WHEREOF, the undersigned have executed this Collateral Assignment of Hotel Management Agreement as of the date first above written.

<u>THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.</u>

<u>LENDER:</u>

**GREENLAKE REAL ESTATE FUND LLC,**
a California limited liability company,

By:   GreenLake Investment Management LLC,
a California limited liability company, Its Manager

By: _____
Peter Chang, Manager

| |
|---|
| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |

STATE OF _____   )
                                                        ) §
County of _____   )

On _____, 2018, before me, _____a Notary Public, personally appeared Peter Chang who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _____ that the foregoing paragraph is true and correct

WITNESS my hand and official seal.

_____
Signature of Notary

(Affix seal here)

Loan No. 1744LawndaleIL
GreenLake/Platform II Lawndale, LLC
Collateral Assignment of Property Management Agreement

Page 6 of 9

9693189.4

IN WITNESS WHEREOF, the undersigned have executed this Collateral Assignment of Hotel Management Agreement as of the date first above written.

<u>THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.</u>

<u>BORROWER:</u>

**PLATFORM II LAWNDALE, LLC,**
an Illinois limited liability company


By: _____
    Scott Krone, Manager


> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.


STATE OF _____ _____      )
                                     )  §
County of _____          )

On _____, 2018, before me, _____a Notary Public, personally appeared _____who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _____ that the foregoing paragraph is true and correct

WITNESS my hand and official seal.


_____
Signature of Notary

                                          (Affix seal here)

IN WITNESS WHEREOF, the undersigned have executed this Collateral Assignment of Hotel Management Agreement as of the date first above written.

THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.

CUBESMART:

CUBESMART ASSET MANAGEMENT, LLC,
a Delaware limited liability company,

By: _____
Name: _____
Title: _____

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

STATE OF _____  )
                                )  §
County of _____  )

On _____, 2018, before me, _____a Notary Public, personally appeared _____ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _____ that the foregoing paragraph is true and correct

WITNESS my hand and official seal.

_____

Signature of Notary

(Affix seal here)

Loan No. 1744LawndaleIL
GreenLake/Platform II Lawndale, LLC
Collateral Assignment of Property Management Agreement

9693189.4

**EXHIBIT A**
FACILITY MANAGEMENT AGREEMENT

*[Attached hereto]*

## FACILITY MANAGEMENT AGREEMENT

**THIS FACILITY MANAGEMENT AGREEMENT** (this "**Agreement**") dated as of the _____ day of _____, 2018 ("**Effective Date**") is by and between **CUBESMART ASSET MANAGEMENT, LLC**, a Delaware limited liability company ("**Manager**"), and **PLATFORM II LAWNDALE, LLC**, an Illinois limited liability company ("**Owner**"). Each of Owner and Manager shall individually be referred to as a "**Party**" and collectively as the "**Parties**".

### BACKGROUND:

A.       Owner owns the land (the "**Land**") and will own those certain under-development self-storage facility improvements (the "**Improvements**") identified and described on **Exhibit A** attached hereto.  The Land and the Improvements located thereon, when built, are herein individually and collectively referred to as the "**Property**"; and

B.       Owner desires to engage the services of Manager to manage, lease, operate, maintain, and repair the Property for and on behalf of Owner, all in accordance with, and subject to, the terms and provisions of this Agreement.

**NOW, THEREFORE,** in consideration for the mutual covenants herein contained and for other good and valuable consideration, the receipt, adequacy, and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

### ARTICLE 1

### Employment of Manager; Term

**1.1       Employment**.  Owner hereby appoints Manager, and Manager hereby accepts such appointment, as an independent contractor, with sole and exclusive right to lease, operate, maintain, manage, and repair the Property, and Manager agrees, for and in consideration of the Management Fee (as defined in Section 4.1 below), to perform its obligations hereunder with due diligence, in an efficient and proper manner, and in accordance with the terms and conditions set forth in this Agreement.  Manager shall be, at law, an independent contractor, and this Agreement shall not create any employment relationship, either express or implied, or any relationship of principal and agent, between Manager (or any Person employed by Manager) and Owner.

**1.2       Term.**  Except for any Pre-Term Services that may be elected by Owner during the Development Period (as defined in Section 4.5), the services of Manager hereunder shall commence the day a certificate of occupancy is issued for the Property so long as Owner has provided Manager at least fifteen (15) days advance notice thereof, or as agreed between the Parties ("**Commencement Date**"), and, unless sooner terminated as expressly permitted pursuant to Article 5 hereof, shall continue in full force and effect until the date that is three (3) years following the Commencement Date (the "**Initial Term**").  After the expiration of the Initial Term, this Agreement shall automatically renew for successive terms of one (1) year each (each a "**Renewal Term**", and the Initial Term and each Renewal Term shall collectively be referred to as the "**Term**"), unless and until terminated in accordance with Article 5 below.

**1.3       Owner Acknowledgement**.  Owner acknowledges that Manager is in the business of managing self-storage facilities both for its own account and for others.  It is hereby expressly agreed that Manager and its affiliates may continue to engage in such activities, may manage facilities other than those presently managed by it (whether or not such other facilities

may be in direct or indirect competition with Owner) and may, in the future, engage in other business which may compete, directly or indirectly, with activities of Owner.

## ARTICLE 2

### Duties and Authority of Manager

**2.1    General Duties and Authority.** During the Term, Manager agrees to lease, operate, maintain, manage, and repair the Property in a high-quality manner in keeping with the standards maintained by other high-quality self-storage properties of similar kind and location, all of which shall be done with due diligence and in good faith. Subject to the restrictions, limitations, and rights set forth in this Agreement, Manager shall have the authority to fully and completely supervise the Property, and supervise and direct the business and affairs associated or related to the daily operation thereof.

**2.2    Budget and Limitations on Authority.**

(a)    Not less than sixty (60) days prior to the beginning of each Fiscal Year during the Term, Manager shall prepare an annual Budget for Owner's approval with respect to the management, care, protection, repair, maintenance, leasing, and operation of the Property; provided, however, that the first such Budget shall be prepared by Manager within thirty (30) days after the Commencement Date applicable to the Property; provided, however that Manager has received from Owner all records reasonably required by Manager to prepare the Budget. The term "**Budget**" shall mean a statement setting forth the estimated revenues, occupancies, lease terms and rate increases, capital improvements, and all aspects of the anticipated expenses to be incurred in the operation, ownership, management, and leasing of the Property including, without limitation, salaries and all other operating expenses. Owner shall have fifteen (15) days in which to review the budget and if, in the sole discretion of Owner, a revised budget is required, Manager shall have fourteen (14) days from receipt of notice from Owner to submit a revised proposed budget to Owner which addresses those items deemed unacceptable by Owner in Owner's notice to Manager. A final, approved, and certified Budget shall be submitted to Owner no later than thirty (30) days prior to the commencement of each Fiscal Year. Budgets shall be prepared, submitted, and certified by Manager in accordance with the terms of this Agreement. Owner may, with the prior written approval of Manager, revise the Budget at any time during a Fiscal Year. Manager shall implement the Budget.

(b)    The Budget shall also include a summary of all space in the Property, together with a designation of all vacancies (hereinafter called the "**Rent Roll**").

(c)    The expenses which Manager is authorized to incur and pay on behalf of Owner hereunder shall in all respects be limited to those expenses set forth in the Budget for the Fiscal Year during which such expenses are paid. The foregoing notwithstanding, if an Emergency occurs necessitating repairs the cost of which would have the effect of exceeding the Budget by more than those limitations as provided below, and Manager is unable to communicate promptly with Owner, then Manager may order and contract for such Emergency repairs, with the cost thereof being included as a Reimbursable Expense for the purposes of this Agreement, and Manager shall promptly thereafter notify Owner of any such expenses and the nature of the Emergency.

(d)    Notwithstanding any other provision of this Agreement, the authority granted to Manager for the expenditure or disbursement of funds, for the making of contracts on behalf of Owner, for the hiring or employment of vendors, suppliers, contractors, subcontractors, and employees, for the entering into leases, or for the incurring of liabilities with respect to the

2

management, care, protection, maintenance and/or operation of the Property, without in each instance first obtaining the prior specific written approval of Owner, shall be limited to:

1.      the sums expressly pre-approved in the Budget and subject to the terms and conditions of the Budget approval;

2.      unbudgeted repair, replacement, and maintenance expenses not to exceed One Thousand Dollars ($1,000.00) for each unbudgeted repair, replacement, or maintenance item;

3.      unbudgeted utility and Taxes;

4.      expenditures for an Emergency not to exceed Ten Thousand Dollars ($10,000.00) for each Emergency; and/or

5.      expenditures required under Owner approved Leases.

The following provisions of this Agreement are subject to the foregoing limitations unless expressly and specifically stated otherwise.

**2.3    Renting of the Property; Inquiries; Complaints**. Manager shall bill and make a diligent effort to collect the Rents and, subject to the Budget, disburse therefrom the reasonable and necessary expenses of operations, upkeep, and maintenance of the Property, including compensation of Manager and all payments due Owner pursuant to this Agreement. Manager shall advertise available storage space in the Property which may include the use of signs, the internet, direct mail, electronic mail and other forms of advertising. Owner grants to Manager the sole and exclusive right to conduct all leasing activity with respect to the Property to rent vacant storage space to Lessees on terms and conditions reasonably satisfactory to Owner. Manager is hereby authorized to enter into Leases for storage space with Lessees on behalf, in the name, and for the account of Owner, and to collect Rents from Lessees provided that:

(a)     All Leases shall be on Manager's form of lease, which form of lease may be revised by Manager from time to time to, among other things, account for changes to the applicable state's self-storage statutes.

(b)     Owner agrees to use a customer point of sale system, as may be determined by Manager from time to time, in its sole discretion, as the site operating software, the expense of which (including without limitation any cost or expense to upgrade, from time to time, the software) shall be a site operating expense.

(c)     Owner acknowledges that the Property may contain property for rent that is used for uses other than self-storage including, without limitation, residential, retail, office, industrial, manufacturing, and other non-storage uses (collectively, **"Non-Storage Uses"**). Manager's duties under this Agreement for Non-Storage Uses are limited to only those duties as are specifically agreed to between Owner and Manager.

Manager shall deal with all inquiries relating to the Property. Manager shall also receive, consider, and handle complaints relating to the operation and repair of the Property, of all Lessees, or parties to other agreements affecting the Property, and of customers and invitees of the Property.

**2.4    Repair, Maintenance and Improvements**. Subject to the Budget and the other rights and limitations set forth in this Agreement, Manager shall make, install, and execute, or supervise and have control over the making, installation, and execution, of all decisions

3

concerning the acquisition of furniture, fixtures, and supplies for the Property, and the purchase, lease or other acquisition of the same on behalf of Owner. Subject to the Budget and the other rights and limitations set forth in this Agreement, Manager shall make, install, and execute, or supervise and have control over the making, installation, and execution of, all alterations, repairs, replacements, equipment, and installations necessary to maintain the Property in a clean, safe, and orderly condition or as required by Applicable Law or Insurance Requirements, or as directed to be made or installed by Owner; provided, however, that no such alterations, repairs, replacements, equipment, or installations shall be made by Manager without Owner's prior written approval, unless specifically included in the Budget or otherwise expressly permitted in this Agreement. Upon the written request of Owner, Manager shall, on behalf of Owner, negotiate and contract for, and supervise the installation of, all capital improvements related to the Property subject to payment of the compensation described in Section 4.4 below.

**2.5    Personnel.**    Manager shall select all vendors, suppliers, contractors, subcontractors, and employees with respect to the Property, and shall hire discharge and supervise all labor and employees required for the operation and maintenance of the Property; all such acts shall be on behalf of Owner. Manager shall procure and maintain, at Owner's expense, worker's compensation, disability and other insurance and fringe benefits, as may be customary or as may be required by Applicable Law or Insurance Requirements covering all of Manager's employees employed at the Property. Any employees so hired shall be employees of Manager or affiliates of Manager, and shall be carried on the payroll of Manager or its affiliates. Manager shall comply with all Applicable Laws applicable to the hiring, employment, and termination of employment of such employees, including without limitation wage and hour laws. Such employees may be employed on a full-time or part-time basis. Employees may include, but will not be limited to, on site resident managers, on-site assistant managers, relief managers, maintenance personnel, and other individuals located, rendering services, or performing activities at the Property in connection with its operation and management. The cost of employing such persons shall be in accordance with the Budget. Some or all of such persons may be simultaneously engaged for the account of Owner and by or for the account of Owners of other self-storage facilities managed by Manager, some of which may be affiliates of Manager. Manager will allocate the cost of these personnel among all such owners, including Owner, on an equitable basis. Manager shall be responsible for disbursement of funds in payment of all expenses incurred in connection with the operation of the Property, and Owner shall not be required to employ personnel in such disbursement. Manager shall not be separately reimbursed for the time of its executive officers or regional managers devoted to Owner's affairs or for the other overhead expenses of Manager.

**2.6    Agreements.**    Manager shall negotiate on behalf of Owner and submit for Owner's execution such agreements which Manager deems necessary or advisable for the furnishing of utilities, services, concessions, and supplies, for the maintenance, repair, and operation of the Property, and such other agreements which may benefit the Property or be incidental to the matters for which Manager is responsible hereunder, provided that all of the foregoing shall be in accordance with the Budget, expressly permitted in this Agreement, or otherwise expressly approved in writing by Owner.

**2.7    Other Decisions.**    Subject to the Budget and the other rights and limitations set forth in this Agreement, Manager shall make all decisions in connection with the daily operation, management, repair, maintenance, and leasing of the Property.

**2.8    Regulations and Permits.**    Subject to the Budget and the other rights and limitations set forth in this Agreement, Manager shall cause all things to be done, on behalf of Owner, at the Property necessary to comply with all Applicable Laws which may include applying for, and attempting to obtain and maintain, on behalf of Owner, all licenses and permits

4

required by Applicable Law or advisable (in Manager's reasonable commercial judgment) in connection with the ownership, use, management, and operation of the Property.

**2.9     Records and Reports of Disbursements and Collections; Accounting and Record Keeping**.  Manager shall cause to be prepared and/or delivered to Owner the following reports, statements, and/or documents:

(a)     on or before thirty (30) days after the close of each calendar quarter, and on or before thirty (30) days after the close of every month, Manager shall provide Owner with monthly reports in substantially the form as set forth on **Exhibit B** attached to this Agreement;

(b)     upon Owner's written request, and on or before ninety (90) days after the close of the Fiscal Year, all documents, invoices, and/or statements accumulated during the prior year on behalf of Owner; and

(c)     a monthly and year to date occupancy report including vacancies.

Manager shall establish, maintain, and supervise at the Property such bookkeeping and record keeping as shall be necessary to provide to Owner the information required by this Agreement. Manager shall keep proper records in conformity with the accounting principles generally accepted in the United States of America, and shall retain all supporting documentation including, without limitation, all cancelled checks and all employment records, consistent with Manager's document retention practices and policies.  The books, records and accounts shall be maintained at Manager's office and shall be made available to Owner at Manager's Office and delivered to Owner via e-mail for examination and audit by Owner or its representatives upon reasonable prior notice to Manager.  Manager agrees to cooperate reasonably with Owner and its designated representatives in connection with the completion of any audit performed by or on behalf of Owner.  Manager agrees to remediate any findings of material weakness or significant deficiencies that are reported in Owner's review or audit and shall fully implement any reasonable recommendations of Owner's audit or report.  Upon termination of this Agreement and payment of all fees, expenses, and reimbursements owed to Manager under this Agreement, Manager shall make all such records available during Manager's regular business hours to Owner for copying at Owner's sole expense.

**2.10     Bank Accounts; Deposits**.

(a)     At Owner's sole cost and expense, Manager shall deposit in a banking institution selected and approved by Manager and in an account entitled "Deposit Account of [Owner]" (the "**Operating Account**"), the Rents and all other sums received by Manager in connection with the Property.  Expenses paid by Manager pursuant to and in accordance with the Budget shall be paid solely from the Operating Account.  No Segregated Security Deposits (as defined below) shall be paid from the Operating Account (it being understood that returns of all Segregated Security Deposits shall be paid solely from the Security Deposit Account, as defined below).

Manager's performance under this Agreement is explicitly subject to Owner, prior to the Commencement Date, providing to Manager the sum of Twenty Five Thousand Dollars ($25,000.00), which Manager shall deposit into the Operating Account as an initial deposit.

(b)     If security deposits or other funds are required by Applicable Law to be held in a segregated account (the "**Segregated Security Deposits**"), such Segregated Security Deposits shall be held in a banking institution selected and approved by Owner in a separate special account (the "**Security Deposit Account**").

5

(c)    Monies held by Manager for Owner's account shall in no event be commingled with Manager's own funds or with funds held by Manager for the account of other Persons and shall promptly be deposited in the Operating Account.

(d)    Manager shall reconcile all bank accounts on a monthly basis and forward such reconciliations and all supporting documentation, including copies of bank statements, to Owner within thirty (30) days after the end of each calendar quarter and within thirty (30) days after the close of every other month.

(e)    It is agreed that Manager shall not be held liable in the event of the bankruptcy or failure of a depository.  Subject to the Budget, or as otherwise expressly permitted in this Agreement or as otherwise approved by Owner in writing, Manager shall disburse funds from the Operating Account on behalf of Owner in such amounts, and at times, as disbursement of such revenues for payment of expenses is required in accordance with the Budget and this Agreement.  Manager shall not be obligated to make any advance to or for the account of Owner, or to pay any sums relating to any Property, except out of funds held in the Operating Account.

(f)    If any lender requires Owner to establish accounts different than those set forth in this Section 2.10, Manager shall cooperate with Owner and lender with respect to establishing such accounts.  The cost of any such accounts shall be an expense of the Property.

**2.11    Disbursements**.  Pursuant to the Budget, or as expressly permitted in this Agreement, or as otherwise authorized by Owner in writing, Manager shall pay from the Operating Account the following items to the extent of Gross Revenues collected for the Property: (a) all expenses incurred through operating, renting, servicing, maintaining, or repairing the Property, including without limitation, expenses for all services rendered by professionals, such as attorneys, accountants, engineers, architects, collection agents, and tax advisors; (b) at Owner's request and provided that Owner provides Manager with all necessary and appropriate information and documentation, all sums due to lenders on loans secured by or otherwise affecting the Property, including amounts due for interest, amortization of principal, and allocation to reserves or escrow funds; and (c) all Taxes.  If at any time the funds in the Operating Account are insufficient to pay all of the expenses which Manager is required or permitted to pay pursuant to this Agreement, Manager shall give Owner notice of the need for additional funds and, in the event that Owner fails to furnish sufficient funds, Manager shall have no liability whatsoever for any consequences arising from such failure by Owner including, without limitation, Manager's failure to make any payments required hereunder.

**2.12    Collection**.  Manager shall direct the collection and billing of all accounts receivable due to Owner with respect to the Property, and shall be responsible for establishing and implementing policies and procedures to minimize the amount of bad debts and delinquent accounts receivable.

**2.13    Legal Action**.  With Owner's written permission, Manager shall cause to be instituted on behalf of and in the name of Owner (or, at Manager's option, in the name of Manager), any legal actions or proceedings that Manager deems necessary or advisable in the normal course of business related to the Property.  The expense of such legal action shall be a reimbursable expense paid out of the Operating Account.

**2.14    Insurance**.

(a)    At all times during the Development Period, Owner shall maintain, through insurance companies reasonably acceptable to Manager, a Builder's Risk Policy and Owner's Interest Liability policy insuring the Property.  The Owner shall also ensure each contractor working on the Improvements, or generally at the Property, maintains commercially

reasonable insurance in favor of the Owner for the duration of such contractor's work on the property.

(b)    At all times during the Term, Owner shall maintain, through insurance companies reasonably acceptable to Manager, the following minimum insurance:

1.    Commercial General Liability covering bodily injury and property damage with minimum limits of $1,000,000 each occurrence and $2,000,000 general aggregate, including premises liability, tenant's legal liability, and sale and disposal endorsements, which insurance shall name Manager, CubeSmart, CubeSmart Asset Management, LLC and CubeSmart, L.P. (collectively, the "**Additional Insured Parties**") as additional insureds.

2.    Commercial Automobile Liability covering owned, hired, and non-owned vehicles with limits of at least $1,000,000 combined single limit (bodily injury and property damage), which insurance shall name the Additional Insured Parties as additional insureds.

3.    Umbrella Insurance limit not less than $5,000,000 each occurrence.

4.    "All Risk" Property Insurance on all property owned by Owner.

5.    Such other insurance as Owner shall, from time to time, be required to maintain pursuant to the provisions of the Leases, Insurance Requirements, or Applicable Law, or as Manager shall reasonably require.

Each of the above Owner's policies of insurance shall be primary and non-contributory to any liability insurance carried by Manager whose insurance(s) shall be excess and non-contributory for claims and losses arising out of the performance of this Agreement. Prior to the Commencement Date, and no later than thirty (30) days after each renewal thereof, Owner shall furnish to Manager certificates of insurance evidencing Owner's compliance with the foregoing insurance requirements. Such certificates shall provide that no cancellation, non-renewal, or material change in coverage can take effect unless thirty (30) days' prior written notice is furnished to Manager.

(c)    At all times during the Term, Manager shall maintain, through insurance companies reasonably acceptable to Owner, the following minimum insurance:

1.    Commercial General Liability covering bodily injury and property damage with minimum limits of $1,000,000 each occurrence and $2,000,000 general aggregate, including premises liability, tenant's legal liability, and sale and disposal endorsements, which insurance shall name Owner as an additional insured.

2.    Commercial Automobile Liability covering owned, hired and non-owned vehicles with limits of at least $1,000,000 combined single limit (bodily injury and property damage), which insurance shall name Owner as an additional insured.

3.    Umbrella Insurance limit not less than $5,000,000 each occurrence.

4.    Workers' Compensation as required by all Applicable Laws and Employer's Liability coverage with a limit of not less than $1,000,000.

5.    Professional Liability Insurance with minimum limits of $2,000,000 each event and in the aggregate.

6. Such other insurance as Manager shall, from time to time, be required to maintain pursuant to Applicable Law, or as Owner shall reasonably require.

Upon the request of Owner, Manager, at Owner's sole cost and expense, shall furnish and maintain thereafter a Fidelity bond in an amount equal to the Gross Revenue of the Property for one (1) month, to protect Owner against misapplication of rentals by Manager's employees and agents. Such Gross Revenue shall be determined on the basis of a fully leased up facility at the then current rentals. The cost of such Fidelity bond shall be treated as an expense of the Property.

(d) <u>Notification of Claim</u>. Each Party shall promptly notify the other after it receives notice of any claim, loss, damage, or injury, and neither Party shall take any action (such as admission of liability) that bars the other from obtaining any protection afforded by any applicable insurance policy.

**2.15  Taxes**. It is expressly understood that all real estate taxes, personal property taxes and all other taxes, water and sewer charges, and other assessments assessed to, or levied upon, the Property (individually and collectively, **"Taxes"**) are the sole responsibility of Owner, and to the extent known and reasonably estimated by Manager, shall be accounted for in the Budget. At Owner's request, Manager shall assist Owner with Owner's hiring of a consulting firm to seek abatement of property taxes as necessary, and with Owner's preparation of all personal property tax valuations and payments.

**2.16  Restrictions**. Notwithstanding anything to the contrary set forth in this Agreement, Manager shall not be required to do, or cause to be done, or be in any way responsible for, anything for the account of Owner (i) which may not be commenced, undertaken, or completed because of insufficient funds of Owner, or (ii) which may not be commenced, undertaken, or completed because of acts of God, strikes, governmental regulation or laws, insurrection, acts of war, terrorism, economic disruption, or other types of events beyond Manager's reasonable control whether similar or dissimilar to the forgoing.

**2.17  Limitations on Manager's Authority**. Notwithstanding anything to the contrary set forth in this Agreement, Manager shall not, without obtaining the prior written consent of Owner, (i) rent storage space in the Property by Leases or agreement for a term in excess of one year, (ii) alter the building or other structures of the Property, in any material manner; or (iii) enter into any other agreements affecting the Property that exceed one year unless same are terminable on thirty (30) days' notice at the will of Owner without penalty, payment, or surcharge.

**2.18  Shared Expenses**. Certain economies may be achieved with respect to certain expenses to be incurred on behalf of Owner hereunder if materials, supplies, insurance, or services are purchased by Manager in quantity for use not only in connection with the Property, but in connection with other properties managed by Manager. Manager shall have the right to purchase such materials, supplies, insurance, or services in its own name, and charge Owner a pro rata share of the cost thereof; provided, however, that (a) the quality of such materials, supplies, insurance or services shall be not less than would be otherwise available if purchased directly for Owner, and (b) the pro rata cost of such purchase to Owner shall not result in expense greater than would otherwise be incurred at competitive prices and terms available in the area where the Property is located, and (c) Manager shall give Owner access to such records, at the Property or by email, so that Owner may review any such expenses incurred.

**2.19  Compliance with Law**. Manager shall cause all such acts and things to be done in and about the Property as shall be required by Applicable Law and Insurance Requirements; provided, however, that Manager shall not, without the prior consent of Owner, make any

alterations or repairs so ordered or so requested, if not included in the Budget, or otherwise expressly permitted in this Agreement.

**2.20    Liens**. Manager shall promptly notify Owner of any lien, claim of lien, encumbrance, or charge placed or filed upon or against the Property, any part thereof, or the income therefrom of which Manager has knowledge. If Owner has made available to Manager sufficient funds to pay the same, and if Owner so directs Manager, Manager shall pay such claim and cause the same to be cancelled.

**2.21    Service Contracts**. Manager shall comply with all of the terms, conditions, and obligations of the Service Contracts, and shall not violate the terms, conditions and obligations of the Leases, unless by the terms thereof Owner would be excused from complying therewith.

**2.22    General**. Subject to the Budget and the provisions of this Agreement, Manager shall perform any and all things in and about the Property pertaining to the management, leasing, maintenance, repair, and operation thereof customarily performed by managers of properties similar in scope.

## ARTICLE 3

### Duties of Owner; Confidential Information; Trademarks

**3.1    Duties of Owner**. Owner hereby agrees to cooperate with Manager in the performance of its duties under this Agreement and, to that end, Manager shall have the right to use an on-premises office designated by Owner (if there is an on-site office at the Property) for performance of Manager's duties hereunder. Owner shall provide Manager access to all files, books, and records of Owner relevant to the Property, and to execute such documents or instruments as both Owner and Manager deem necessary or advisable to enable Manager to fulfill its duties under this Agreement.

**3.2    Confidential and Proprietary Information**.

(a)    For the purposes of this Agreement, the term Confidential and Proprietary Information shall mean: information of any type in any form that is disclosed to or observed or obtained by one Party from the other Party in the course of, or by virtue of, this Agreement, including, without limitation, all information regarding one Party's business, how it operates its business or affairs and its business plans, any abstracts of those plans, the fees that it charges or how it offers its services, products, costs, marketing strategies, projections, historical or pro-forma financial information, customer insurance information or strategies, operations and business results relating to the past, present or future of the business activities of such Party, and any other information which is a trade secret under Applicable Law, and the physical embodiments or expressions of such information in any tangible form, including any written or machine readable expressions of such information (collectively, with the Manager Confidential and Proprietary Information (defined below) the "**Confidential and Proprietary Information**"). The Parties each further agree to maintain the confidentiality of such Confidential and Proprietary Information and upon the termination of this Agreement, return same to the other Party, including, but not limited to, documents, notes, memoranda, lists, computer programs, manuals, and any summaries of such Confidential and Proprietary Information. Neither Party shall reveal the Confidential and Proprietary Information to any third party and shall not use the Confidential and Proprietary Information for any purpose other than its performance under this Agreement.

(b)    Additionally, any Confidential and Proprietary Information disclosed by Manager, specifically related to its self-storage operational trade processes or terms of its

9

proposed management services hereunder, including, without limitation, (i) amount, terms, thresholds and all other information surrounding the Management Fee or any other fees charged to Owner pursuant to Section 4 of this Agreement, (ii) the CubeSmart's Policy and Procedures Manual or other written rules and regulations, (iii) all Manager lease forms and all other legal or operation documents used by Manager in the performance of its duties hereunder, (iv) all Manager proprietary revenue management data including techniques, feasibility and market study analysis, customer profiles, customer lists, sales estimates, (v) Manager construction or development specs or other architectural, landscaping or signage designs created by CubeSmart, site plan reviews, Manager Trademarks and CubeSmart Signage (each, as defined herein), (vi) all accounting and pro-forma budgeting analysis performed by Manager and the amount of CubeSmart's proposed management fee structure with Company (vii) names of employees of Manager, and techniques and methods of training employees in the self-storage business, all of which have been developed and/or acquired through the expenditure of time, money, and effort, shall be referred to hereunder as "**Manager Confidential and Proprietary Information**".  The Manager Confidential and Proprietary Information will remain the sole and exclusive property of the Manager Parties, and the Owner Parties each disclaim any and all right, title and interest in and to the Manager Confidential and Proprietary Information.  The Owner Parties each agree that the Manager Confidential and Propriety Information constitutes a valuable asset of the Manager Parties, and the unauthorized disclosure or improper use of any Manager Confidential and Proprietary Information by the Owner Parties would cause irreparable damage and harm to the Manager Parties.  Accordingly, in the event of a breach of this Section 3.2 or any other mis-use of Manager Confidential and Propriety Information by any Owner Party, money damages would not be a sufficient remedy, and the Manager Parties shall each be entitled to, and the Owner Parties hereby consent to the entry of, an injunction restraining such breach.  Such remedy shall not be deemed to be the exclusive remedy for any breach of this Section 3.2; but shall be in addition to any and all other remedies available at law or in equity to the Manager Parties. The Owner Parties shall each defend, protect, indemnify, and hold the Manager Parties harmless from and against any and all claims, actions, suits, liabilities, losses, damages, costs, and expenses, including, without limitation attorney's fees and expenses, court costs and out of pocket expenses, which are incurred by any of the Manager Parties in connection with any breach by any Owner Party of any of its agreements or obligations under this Section 3.2.

(c)      Confidential and Proprietary Information shall not include (i) information which is or becomes publicly available without breach of this Agreement by the party receiving such information, or (ii) is rightfully received by the party receiving such information from a third party without breach of any contractual or other obligations of confidentiality, or (iii) is developed by the party receiving such information independently from the Confidential and Proprietary Information and not in breach of this Agreement.

3.3      **Use of Trademarks, Service Marks and Related Items, Signage.**  Manager shall manage and operate the Property under any name, trade name, or franchise created or selected by Owner and agreed to by Manager.  Any franchise, trade name, trademark, designs, service marks, or other trade or service names or items created or registered by any Manager Party (each individually, a "**Manager Trademark**", collectively, and inclusive with the Manager Signage (defined below) the "**Manager Trademarks**") shall be and remain the sole and exclusive property of such Manager Party, and the Owner Parties hereby disclaim any and all right, title or interest in or to any Manager Trademark, and nothing in this Agreement shall be construed to convey any title or ownership rights to the Manager Trademarks to Owner.  Owner shall not use the Manager Trademarks, in whole or in part, and shall not copy, reproduce or distribute the Manager Trademarks in any form (either for advertising, to a lender party or otherwise) except as expressly permitted in writing by Manager for each specific instance of use.

10

**3.4    CubeSmart Branding**.  At Owner's option and expense, and with Manager's consent, Manager shall replace the signage at the Property with "CubeSmart" signage (collectively, "**Manager's Signage**") and thereafter manage and operate the Property under the name of "CubeSmart" during the Term.  Owner acknowledges that the name CubeSmart is a Manager Trademark and that Owner has no right to copy, expand, or otherwise use the CubeSmart name except as expressly provided for in this Agreement.  Commencing upon Manager's rebranding of a Property as a CubeSmart facility, Manager grants to Owner a non-exclusive, limited, revocable license to use the Manager's Signage and CubeSmart name solely in connection with the operation of the Property and solely during the Term ("**License**").  If Manager determines, in Manager's sole discretion, that Owner is not approving funds sufficient to maintain a Property in the condition and manner similar to other CubeSmart facilities, Manager shall have the right to immediately revoke the License, remove Manager's Signage, and replace Manager's Signage with Owner's signage.  Any License granted to Owner hereunder shall be automatically revoked and terminated upon the expiration or earlier termination of this Agreement, and Owner shall have no further rights to use any Manager Trademark, including, without limitation, the CubeSmart name and Manager's Signage.  If Manager's Signage is not removed within ten (10) days after the termination of this Agreement, Manager shall have the right, but not the obligation, to enter the Property and remove Manager's Signage, which right shall survive the termination of this Agreement.

## ARTICLE 4

## Compensation of Manager

**4.1    Monthly Management Fee**.  (a) Commencing on the Commencement Date and continuing during the Term, Owner shall pay to Manager, for the services herein provided by Manager, a management fee equal to the greater of five percent (5%) of the Gross Revenue or Two Thousand Dollars ($2,000.00) per month (the "**Management Fee**").  The term "**Gross Revenue**" shall mean all revenue of Owner (whether received by Owner or by Manager on behalf or for the account of Owner) arising from the Property including, without limitation, rental payment for leases of space in the Property (excluding sales taxes, refunds, and returned checks), and revenue from ancillary sources such as revenue for additional services provided to customers for a fee, vending machines or concessionaire revenues, revenue from lock and box sales, administrative and late fees, parking rents or fees, truck rental commissions, and other retail sales at the Property.  Gross Revenues shall not include: (i) interest accrued on accounts maintained by Manager for or on behalf of Owner, (ii) applicable excise, sales, occupancy and use taxes, or similar government taxes, duties, levies, or charges, (iii) prepaid rent or security deposits until taken into account as rent; (iv) any funds paid by tenants of the Property representing proceeds from fire or other casualty losses; (vi) any condemnation (including transfers in lieu of or under threat of condemnation) or insurance proceeds paid to Owner in connection with a claim; (vii) any proceeds arising out of awards, settlements, or any other disposition of any lawsuit or legal proceedings, except to the extent that the net amount of such proceeds remaining, after accounting for all costs and expenses (including attorneys' fees) in obtaining such proceeds represents gross revenues from the Property on which Manager would otherwise be entitled to the management fee; (viii) rebates, discounts, or credits of a similar nature, or (ix) proceeds of any sale, financing, or refinancing of the Property or any portion of the Property or any other capital assets and other items not in the ordinary course of the Property's operations, or income derived from securities or other property acquired and held for investment.  No leasing commissions are payable by Owner to Manager. The Management Fee shall be paid monthly.  The Management Fee for each month shall be paid to Manager from the Operating Account not later than the fifth (5th) day of the following month, and shall be calculated on the basis of the Gross Revenue for the preceding month.  If there are insufficient funds in the Operating Account to pay all or a portion of the Management Fee when such Management Fee is due and payable, then Owner shall promptly deposit such funds into the

Operating Account to pay the Management Fee when such fee is due and payable. A late fee of five percent (5%) of any unpaid Management Fee shall be paid by Owner if the Management Fee is paid to Manager after the fifth (5th) day of any month.

(b)     It is understood and agreed that the foregoing compensation will not be reduced by the cost to Owner of those employees and independent contractors engaged in connection with the operation and maintenance of the Property, including, but not limited to, the categories of personnel specifically referred to in Section 2.5. Except as otherwise expressly provided in this Agreement, it is further understood and agreed that Manager shall not be entitled to additional compensation of any kind in connection with the performance by it of its duties under this Agreement. It is understood and agreed that the monthly payment to be made hereby may in some months be inaccurate to the extent of net deposits and that said inaccuracies will be corrected no less often than annually.

**4.2     Sales Center**. Manager shall provide sales and customer service support through Manager's national sales center. Owner agrees that all telephone calls, TTDY calls, and emails to the Property shall be answered or responded by Manager's sales center staff (collectively, "**Sales Center Services**"). Owner shall pay to Manager a fee of Three Hundred Ninety-Nine Dollars ($399.00) for each Property for each month of the Term for the Sales Center Services, which fee shall be due and payable by Owner to Manager when the Management Fee is paid.

**4.3     Tenant Insurance/Protection Program**. Manager shall offer to all customers of the Property any tenant insurance/protection program that is used by Manager for its owned and/or other managed properties ("**Insurance/Protection Program**"). Fifty percent (50%) of any revenue derived from the Insurance/Protection Program at the Property shall be income to the Property. The owner of this Insurance/Protection Program shall assume all risk associated with the implementation and operation of the Insurance/Protection Program.

**4.4     Capital Improvements**. If Owner elects, Manager will supervise and oversee capital repairs and improvements at a cost of eight percent (8%) of the total cost of the project for any projects in excess of Twenty Thousand Dollars ($20,000.00). No fee shall be owed by Owner for projects costing less than Twenty Thousand Dollars ($20,000.00).

**4.5     Pre-Term Services**. If Owner elects, Manager will supervise and oversee certain development tasks as designated by Owner, (the "**Pre-Term Services**") prior to the Commencement Date hereof (that time period before the certificate of occupancy is issued for the Property shall be referred to hereunder at the "**Development Period**"). To the extent such Pre-Term Services are elected by Owner, (i) the Parties agree the Development Period, and the Pre-Term Services, shall be governed by the terms in this Agreement as if it was part of the Term and (ii) the Pre-Term Services shall be performed at Manager's sole cost and expense, except to the extent (a) Owner terminates this Agreement, or (b) the Property is sold by Owner, in either case, prior to the Commencement Date, Owner shall reimburse Manager for the value of all Pre-Term Services performed by Manager, up to Twenty Thousand Dollars ($20,000.00).

## ARTICLE 5

### Default and Termination

**5.1     Event of Default**. Each of the following occurrences shall be deemed to be an "**Event of Default**" under this Agreement:

(a)     Any failure of Manager to perform any of its material or financial obligations (excluding those obligations referenced in Section 5.1(b) below) under this Agreement, which failure is not cured within thirty (30) days after delivery of written notice

thereof to Manager; provided, however, if such failure is capable of cure but cannot be cured within such thirty-day period, then, so long as Manager has commenced and is diligently pursuing the cure of such failure within such thirty-day period, the thirty-day period shall be extended for an additional reasonable period of time to permit Manager to cure such failure.

(b)     Any failure of Owner to pay the Management Fee and any other sums due and owing to Manager, or required to be deposited in the Operating Account under or pursuant to this Agreement, which failure is not cured within five (5) days after written notice thereof to Owner. The foregoing notwithstanding, Manager shall not be required to deliver a written notice of Owner's failure under this paragraph more than two (2) times in any Fiscal Year.

(c)     Any failure of Owner to perform any of its obligations (excluding those obligations referenced in Section 5.1(b) above) under this Agreement, which failure is not cured within thirty (30) days after written notice thereof to Owner, provided, however, if such failure is capable of cure but cannot be cured within such thirty-day period, then so long as Owner has commenced and is diligently pursuing the cure of such failure within such thirty-day period, the thirty-day period shall be extended for an additional reasonable period of time to permit Owner to cure such failure.

**5.2     Automatic Termination.** Notwithstanding anything contained herein to the contrary, this Agreement shall terminate upon the occurrence of any of the following events (except as to rights and obligations which shall have accrued prior thereto):

(a)     the dissolution or termination of the corporate existence of the Manager;

(b)     cessation of Manager's authority to do business; or

(c)     the bankruptcy, insolvency, or assignment for the benefit of the creditors of Owner or Manager.

**5.3     Termination by Owner.** Owner shall have the right to terminate this Agreement (except as to rights and obligations which shall have accrued prior thereto) upon the occurrence of any one or more of the following events:

(a)     upon thirty (30) days' prior written notice to Manager if an Event of Default by Manager occurs beyond any applicable notice and cure period; or

(b)     (i) during the Initial Term, or (ii) upon a sale or transfer of the Property to any person or entity other than Manager or an Affiliate of Manager, so long as (x) Owner provides thirty (30) days' prior written notice to Manager and (y) Owner pays to Manager a termination fee ("**Termination Fee**") in the amounts set forth below:

| Year of Initial Term | Termination Fee Due to Manager |
|---|---|
| Year 1 | $40,000.00 |
| Year 2 | $30,000.00 |
| Year 3 | $20,000.00 |

; or

(c)     any time after the expiration of the Initial Term, by delivering to Manager at least sixty (60) days' prior written notice thereof.

**5.4     Termination by Manager.** Manager shall have the right to terminate this Agreement (a) upon thirty (30) days' prior written notice to Owner if an Event of Default by

Owner occurs beyond any applicable notice and cure period or (b) without cause upon giving Owner at least sixty (60) days' prior written notice thereof.

**5.5     Termination Upon Destruction or Condemnation.**   This Agreement shall terminate upon the date of any damage or destruction of the Property which, in Owner's reasonable opinion, materially affects the continued operation of the Property, and Owner elects to close or discontinue operating the affected Property as a self-storage facility.  This Agreement shall terminate upon the date of any conveyance to or taking by any authorized entity by eminent domain of the Property or any portion thereof which, in Owner's reasonable opinion, materially affects the continued operation of the Property as a self-storage facility after such taking. Notwithstanding the foregoing, if this Agreement covers multiple Properties, then this Agreement shall terminate only with respect to the Property affected by any such damage, destruction, or eminent domain taking; but shall continue in full force and effect with respect to all other Properties.

**5.6     Duties Upon Termination.**   At the expiration or earlier termination of this Agreement:

(a)     Manager's authority to draw against the funds in the Operating Account will be terminated forty-five (45) days after expiration or earlier termination of this Agreement.

(b)     Owner will assume full liability for all existing financial obligations for the Property which were incurred prior to said termination by the Manager pursuant to, and in accordance with, the terms of this Agreement.

(c)     Each Party shall continue to be liable for its respective obligations which have accrued up to and including the termination date, and shall promptly pay to the other all amounts due the other Party under the terms of this Agreement. Such payment shall be made as soon after the effective date of termination as such amounts are determinable. Upon termination of this Agreement for any reason, the Manager shall deliver the following to Owner at Owner's Notice Address:

(1)     A final accounting reflecting the balance of income and expenses on the Property as of the date of termination, to be delivered within forty-five (45) days after such termination;

(2)     All monies of Owner held by Manager and/or in any bank account (including, without limitation, the Operating Account) and any and all monies due Owner which are received by Manager after termination, to be delivered within forty-five (45) days after such termination;

(3)     All keys or access cards, records, contracts, leases, receipts for deposits, unpaid bills, and other papers or documents which pertain to the Property or to this Agreement as Owner may reasonably request, to be delivered immediately;

(4)     Manager shall forthwith surrender and deliver to Owner any space in the Property occupied by Manager; and

(5)     Manager shall forthwith surrender and deliver to Owner all books and records with respect to Rents, Reimbursable Expenses, vacancies, deposits, fees, charges and all other receipts and disbursements related to the Property, the management, operation, maintenance, and repair thereof including, without limitation, all budgets, rent rolls, occupancy reports, cash flow statements, invoices, and canceled checks.

(d)     Manager shall, at Owner's expense, furnish all such information and take all such action as Owner shall require in order to effectuate an orderly and systematic termination of Manager's duties and activities under this Agreement. Such action shall include the issuance of any representation letters or other documents requested by Owner in order to assist with the completion of any financial audits with respect to the Property. In addition, Manager shall, at Owner's expense, assign all licenses, permits, and other agreements, if any, to Owner which Manager has entered into or obtained for the benefit of Owner or the Property. Manager hereby grants a power of attorney to Owner to endorse any checks received in connection with the Property and hereby assigns to Owner, effective upon the date of such termination, any and all rights Manager may have in and to the Property records.

### 5.7   Indemnification.

(a)     Owner hereby agrees to indemnify, defend and hold the Manager Parties harmless from and against any and all costs, expenses, reasonable attorneys' fees, suits, liabilities, judgments, damages, and claims (collectively, "**Claims**") in connection with the management of the Property (including the loss of use thereof following any damage, injury, or destruction), arising from any cause except for the willful misconduct, gross negligence, or fraud on the part of any Manager Party. The Manager Parties shall not be liable for any error of judgment or for any mistake of fact or law, or for anything which it may do or refrain from doing hereafter, except in cases of its willful misconduct, gross negligence, or fraud.

(b)     Manager hereby agrees to indemnify and hold the Owner Parties harmless from and against any and all Claims in connection with the operation and/or management of the Property arising from the willful misconduct, gross negligence, or fraud of any Manager Party.

The provisions of this Section 5.7 shall survive the expiration or earlier termination of this Agreement.

## ARTICLE 6

### No Interest in Real Property; No Partnership; Property of Owner

**6.1     Not Real Property**. This Agreement shall not be deemed at any time to be an interest in real estate or a lien of any nature or kind against the Property or Owner's interest therein. The rights of Manager created hereby shall at all times be subject and subordinate to all deeds to secure debt, deeds of trust, mortgages, and the like, now or hereafter encumbering all or any portion of the Property, and to all extensions thereof. This clause shall be self-operative, and no further instrument of subordination shall be required from Manager. If requested by any mortgagee or by Owner, Manager shall execute promptly any commercially reasonable document that Owner, or any mortgagee, may reasonably request to effect such subordination.

**6.2     No Partnership**. Manager's relationship to Owner is strictly and solely that of an independent contractor for Owner. Nothing contained in this Agreement shall be deemed or construed to create a partnership or joint venture between Owner and Manager, and nothing contained herein shall be deemed or construed to obligate Owner for or on account of any debts or obligations of Manager other than debts or obligations incurred by Manager for the benefit of Owner in accordance with the provisions of this Agreement.

**6.3     Property of Owner**. Except for personal property owned by Manager and located in Manager's office at the Property, all property located in, at, or upon the Property, whether real, personal, or mixed, including all leases, contracts and funds, is, shall be, and remains the property of Owner (excluding property of tenants). Owner shall at all times have the right to enter upon the Property and to inspect same.

## ARTICLE 7

### Definitions

All terms used in this Agreement which are not defined in this Article 7 shall have the meanings set forth elsewhere in this Agreement. As used in this Agreement, the following terms shall have the following meanings (such meanings to be applicable to both the singular and plural form of the terms defined):

7.1    "**Affiliate**" means, with respect to a Person, another Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the Person in question. The term "**control**" as used in the preceding sentence means, with respect to a Person that is a corporation, the right to exercise, directly or indirectly, more than fifty-one percent (51%) of the voting rights attributable to the shares of the controlled corporation, and, with respect to a Person that is not a corporation, the possession, directly or indirectly, of the power to direct, or cause the direction of, the management or policies of the controlled Person.

7.2    "**Applicable Law**" shall mean all building codes, zoning ordinances, laws, orders, writs, ordinances, rules, and regulations of any Federal, state, county, city, borough, or municipality, or of any division, agency, bureau, court, commission, or department thereof, or of any public officer or official having jurisdiction over or with respect to the Property.

7.3    "**Emergency**" shall mean an event requiring action to be taken prior to the time that approval could reasonably be obtained from Owner in order to comply with Applicable Law, any Insurance Requirement, or this Agreement, or to preserve the Property (or any part thereof), or for the safety of any employees, tenants, occupants, customers, licensees, or invitees thereof, or to avoid the suspension of any services necessary to the employees, tenants, occupants, customers, licensees, or invitees thereof.

7.4    "**Fiscal Year**" shall mean the calendar year.

7.5    "**Insurance Requirements**" shall mean the requirements of any insurance policies from time to time in effect in respect of the Property, or of any insurance carriers or boards of fire underwriters or similar insurance rating organizations having jurisdiction in respect of the Property.

7.6    "**Leases**" shall mean all written or oral leases, subleases, tenancies, and other occupancy agreements, whether or not of record, for the use, enjoyment, or occupancy of any storage space in or on the Property by Lessees.

7.7    "**Lessees**" shall mean all tenants, lessees, and other occupants of storage space in the Property under Leases.

7.8.    "**Manager's Notice Address**" shall mean the following address(es) or such other address(es) as Manager may give notice thereof to Owner in writing:

CubeSmart
5 Old Lancaster Road
Malvern, PA 19355
Attn: Vice President – Third Party Management

16

Required Copy to:

CubeSmart
5 Old Lancaster Road
Malvern, PA 19355
Attn: Chief Legal Officer

**7.9** "**Manager Party**" shall mean Manager and Manager's members and Affiliates, and each of their respective directors, officers, and employees.

**7.10** "**Owner's Notice Address**" shall mean the following address(es) or such other address(es) as Owner may give notice thereof to Manager in writing:

600 Waukegan Road, Suite 129
Northbrook, IL 60062

**7.11** "**Owner Party**" shall mean Owner and Owner's members and Affiliates, and each of their respective directors, officers, and employees.

**7.12** "**Person**" shall mean any corporation, partnership, limited liability company, limited partnership, association, co-tenancy, joint venture, individual, trustee, business trust, real estate investment trust, banking association, federal or state savings and loan institution, or any other legal or corporate entity.

**7.13** "**Reimbursable Expenses**" shall mean the sum of any expenses for which Owner is expressly obligated to reimburse Manager under this Agreement, any expenses which Manager incurs at the express direction of Owner, and all expenses incurred by Manager in the performance of its duties under this Agreement and authorized by any Budget, or expressly authorized under this Agreement, including, without limitation, utility expenses, supplies, materials, legal fees (to the extent expressly authorized by Owner), payroll for on-site employees, and disbursements; but excluding all office, accounting, management, and administrative expenses applicable to Manager's office overhead, payroll and employment benefits for Manager's district vice president of operations, and any other employees of Manager that are not employed at or allocable to the Property, and Manager's normal operating expenses incurred in its accounting and reporting activities. As used in this Section 7.13, "payroll for on-site employees" shall include wages, salaries, social security payments, bonuses, fringe benefits, and related employee payroll, costs, taxes, and expenses so long as such payroll costs have been authorized by a Budget.

**7.14** "**Rents**" shall mean all rents and other payments received under Leases.

**7.15** "**Service Contracts**" shall mean any contract or agreement for the maintenance, operation, or repair of the Property, but expressly excluding this Agreement.

## ARTICLE 8

### Miscellaneous

**8.1** **Assignment**. Neither this Agreement nor any right hereunder shall be assignable by Owner or Manager, by operation of law or otherwise, and any attempt to do so shall be void, except that each Party shall be permitted to assign this Agreement to its Affiliate. In the event of an assignment by either Owner or Manager, the Party assigning this Agreement shall provide the other Party with a true, correct, and complete copy of the documents evidencing such

17

assignment, including reasonable evidence of the assigning Party's compliance with the provisions of this Section 8.1.

    **8.2**    <u>Headings</u>.  The headings contained herein are for convenience of reference only, and are not intended to define, limit, or describe the scope or intent of any provision of this Agreement.

    **8.3**    <u>Governing Law</u>.  The validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the Parties hereunder shall be governed by the internal laws of the State or Commonwealth in which the Property is located, without regard to its conflicts of law provisions.

    **8.4**    <u>Notices</u>.  Any notice required or permitted herein to be given in writing shall be personally delivered, or by delivery through a recognized, national overnight courier service, to the Owner's Notice Address or to the Manager's Notice Address, as applicable.

    **8.5**    <u>Severability</u>.  Should any term or provision hereof be deemed invalid, void, or unenforceable either in its entirety or in a particular application, the remainder of this Agreement shall nonetheless remain in full force and effect and, if the subject term or provision is deemed to be invalid, void, or unenforceable only with respect to a particular application, such term or provision shall remain in full force and effect with respect to all other applications.

    **8.6**    <u>Successors</u>.  This Agreement shall be binding upon and inure to the benefit of the respective Parties hereto and their permitted assigns and successors in interest.

    **8.7**    <u>Arbitration</u>.  If at any time during the term of this Agreement any dispute, difference, or disagreement shall arise upon or in respect of this Agreement, and/or the meaning or construction hereof, every such dispute, difference and disagreement shall be referred to a single arbiter agreed upon by the Parties hereto, or, if no single arbiter can be agreed upon, an arbiter or arbiters shall be selected in accordance with the rules of the American Arbitration Association and such dispute, difference, or disagreement shall be settled by arbitration in accordance with the then prevailing Commercial Rules of the American Arbitration Association. The decision of the arbiter or arbiters shall be final, conclusive, and binding upon the Parties and a judgment may be obtained thereon in any court having jurisdiction.  Arbitration shall be held in the Commonwealth of Pennsylvania and in the County of Chester.  Owner and Manager shall each pay one-half (1/2) of the cost and expense of such arbitration and each shall separately pay for its own attorneys' fees and expenses.

    **8.8**    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

    **8.9**    <u>No Waiver</u>.  No failure by Owner or Manager to insist upon the strict performance of any covenant, agreement, term, or condition of this Agreement, or to exercise any right or remedy in the event of a breach hereunder, and no acceptance of any funds from Manager or Owner during the continuance of any such breach, shall constitute a waiver of any such breach or of any such covenant, agreement, term, or condition.  No covenant, agreement, term, or condition of this Agreement to be performed or complied with by Manager or Owner, nor any breach thereof, shall be waived, altered or modified except by a written instrument executed by Owner and Manager. No waiver of any breach shall affect or alter this Agreement, but each and every covenant, agreement, term, and condition of this Agreement shall continue in full force and effect with respect to any other existing or subsequent breach thereof.

**8.10   No Representation**.   Manager acknowledges that Owner has made no representations with respect to the Property, its income, expenses, operation, or the benefits that may accrue to Manager hereunder.

**8.11   Estoppel Certificates**.   Each Party hereto agrees, upon demand of the other, to execute and deliver to the other Party, a certificate stating that this Agreement is unmodified and in full force and effect (or, if this Agreement has been modified, that the same is in full force and effect as modified and stating such modifications), whether or not to the knowledge of such Party there exists any default hereunder, and such other matters as the other Party may reasonably request.

**8.12   No Third Party Beneficiaries**.   There shall be no third party beneficiaries under this Agreement, and no Person other than Manager and Owner shall be entitled to rely on any provision of this Agreement.

**8.13   No Broker Commission**.   If Owner is represented by any broker or any other third party agent, Owner is responsible for all commission fees or other payment to such agent, and agrees to indemnify and hold Manager harmless from all claims by such broker or anyone claiming a commission is due as a result of the execution of this Agreement.

[BALANCE OF PAGE INTENTIONALLY BLANK; SIGNATURES FOLLOW]

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement as of the date first above written.

OWNER:

**PLATFORM II LAWNDALE, LLC**

By: _____
     Name:  Scott Krone
     Title:   Manager

MANAGER:

**CUBESMART ASSET MANAGEMENT, LLC**

By: _____
     Name: Guy Middlebrooks
     Title: Vice President – Third Party Management

## EXHIBIT "A"

### Property Address

### 1750 N. Lawndale, Chicago, IL 60647

## EXHIBIT "B"

### FORM OF MONTHLY REPORT

Exhibit J

Construction and Renovation Specifications and Plans
(See attached)







































BUILDING REMODEL
1750 N. LAWNDALE AVENUE
CHICAGO, ILLINOIS 60647

DANIEL LESUS ARCHITECTS, P.C.
1033 Holly Circle    P: 847.550.0972
Lake Zurich, IL 60047    F: 847.550.1075
dlarchitectspc.com

A2.0

