# EXHIBIT 3

**OPERATING AGREEMENT**

**OF**

**Platform II Lawndale, LLC**

**An Illinois Limited Liability Company**

THIS OPERATING AGREEMENT ("Agreement") is made and entered into as of March 30, 2017, by and among SCOTT KRONE ("Krone"), and MARTIN TARADEJNA ("Taradejna") and those other parties who from time to time execute this Agreement or counterparts hereof; and

WHEREAS, the parties hereto desire to form a limited liability company on the terms and for the purposes set forth herein;

NOW, THEREFORE, in consideration of the respective mutual covenants and agreements herein contained and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.  DEFINITIONS

"Act" shall mean the Illinois Limited Liability Company Act, as amended from time to time.

"Affiliate" with regard to a Person, means a Person that is directly or indirectly controlled by, controlling or controlled with such Person. For purposes of this Agreement, "control" when used with respect to any Person means the power to direct the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. The term "Affiliates" and "affiliated" shall have correlative meanings.

"Assignee" means a Person to whom an Interest has been assigned or transferred in accordance with this Agreement, but which has not become a Substitute Member (and accordingly has no voting or management rights).

"Capital Account" shall mean the capital account of a Member maintained pursuant to Section 9 hereof.

"Capital Contribution" shall mean, with respect to any Member, the cash and fair market value (which value shall be determined by the Managers) of other property (net of any liabilities secured by any contributed property that the Company is considered to take subject to or assume under Section 752 of the Code) contributed to the capital of the Company pursuant to Section 8.1 hereof upon formation of the Company, or at any time thereafter in accordance with the terms of this Agreement.

"Capital Contribution Balance" shall mean, for each Member, the total Capital Contributions of such Member, less the cumulative distributions to such Member, if any, pursuant to Section 12.1 hereof (other than distributions made in accordance with Sections 12.1(a)(iv) and 12.1(b)(ii) hereof).

"Class A Members" shall mean Krone and Taradejna and their respective successors and assigns.

"Class B Members" shall mean those Members designated as Class B Members and listed as such on Exhibit A hereof, from time to time.

"Class D Members" shall mean those Members designated as Class D Members and listed as such on Exhibit A hereof, from time to time.

"Company" shall mean PLATFORM II - LAWNDALE, LLC the limited liability company created pursuant to this Agreement.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Interest" shall mean the interests of the Members in and to the Company and its assets as determined in accordance with the provisions of Section 7 hereof.

"Managers" shall mean Krone and Taradejna or any other Person who is selected as a Manager of the Company from time to time in accordance with the terms of this Agreement.

"Members" shall mean the Class A Members, Class B Members, and Class D Members from time to time and any Substitute Members or additional Members admitted in accordance with the terms hereof. The term does not include an Assignee except for the purposes of Sections 12.1 and 13.1.

"Net Cash Flow" shall mean, with respect to a particular period, the excess, if any, of (i) the sum of all cash received by the Company from any source during such period and the reserves on hand on the last day of the preceding period, over (ii) the sum of the cash expended during such period (including, without limitation, cash expended for operations, capital expenditures and payments of principal and interest on indebtedness (including loans made by Affiliates of Members and payments of principal and interest with respect to Member Loans) and the amount of cash reserves that the Manager reasonably deems advisable for anticipated future Company needs (including, without limitation, for operations, payment of maturing obligations or capital expenditures).

"Percentage Interest" shall mean that number of Interests owned by a Member divided by the total number of issued and outstanding Interests in the Company.

"Person" shall mean any individual, partnership, corporation, limited liability company, trust or other entity, or any government or political subdivision, or any agency, department or instrumentality thereof.

"Preferred Return" shall mean, Class D Member an amount that accrues at the per annum rate equal to ten percent (10%) on the amount of such Class D Member's outstanding Capital Contribution Balance from time to time. The Preferred Return shall be payable on a quarterly basis.

"Preferred Return Balance" shall mean the cumulative accrued Preferred Return of a Class D Member, less all amounts distributed by the Company to such Class D Member, if any, in payment thereof from time to time pursuant to Section 12.1(a)(i) hereof.

"Regulations" shall mean the federal income tax regulations promulgated under the Code.

"Substitute Member" shall mean a transferee of an Interest that succeeds to all of the rights, including the voting and management rights, of the transferor of such Interest pursuant to Section 15.1(e) hereof. Substitute Members shall be Members for all purposes hereunder.

"Units" shall mean the membership interests held by the Members from time to time.

2.    FORMATION

The parties do hereby form a limited liability company under the Act for the scope and purposes set forth herein and upon all of the terms and conditions hereof.

3.    NAME AND PLACE OF BUSINESS; AGENT FOR SERVICE OF PROCESS;

The name of the Company shall be "PLATFORM II - LAWNDALE, LLC". The principal place of business of the Company shall be 600 Waukegan Road, Suite 129, Northbrook, Illinois 60062, or at such other place or places as may be approved by the Managers from time to time. The registered agent and registered office of the Company shall be Jeffrey M. Galkin, Esq., 180 N. LaSalle Street, Suite 3200, Chicago, Illinois 60601, or such other agent or office as may be approved by the Managers from time to time. The Managers shall arrange for the prompt filing of Articles of Organization ("Articles"), and any amendments thereto as required by the Act.

4.    PURPOSE

The purpose of the Company shall be to directly or indirectly provide financing to, acquire, own, maintain, operate, manage, lease, build, develop, construct, hold for capital appreciation and current income, and sell the real estate described on Exhibit B attached hereto, and to engage in any and all general business activities related or incidental thereto.

5.    TITLE TO ASSETS

Any assets of the Company will be held in the name of the Company.

6.    DURATION OF THE COMPANY

The term of the Company shall commence on the filing of the Articles and shall expire only on the first to occur of the following events:

(a)    written consent of the Managers to terminate the Company; or

(b)    the sale or disposition of all of the Company's assets in accordance with the terms of this Agreement.

Notwithstanding anything contained herein to the contrary, the death or legal incompetency of an individual Member, or the bankruptcy, liquidation, dissolution, cessation to exist as a legal entity of a Member which is not an individual, shall not cause the termination or dissolution of the Company and the business of the Company shall continue.

7.    LIMITED LIABILITY COMPANY INTERESTS

The respective initial percentage Interests of the Members in and to the Company are as shown on Exhibit A hereto and made a part hereof. If, pursuant to the terms of the agreement, a Member contributes additional funds or property to the capital of the Company in excess of such Member's initial contribution, or if new Members are admitted in accordance with this Agreement, the respective percentage Interests of the Members shall be adjusted proportionately to be in the ratio of their then existing adjusted Capital Accounts.

8.    CAPITAL CONTRIBUTIONS; LOANS

8.1    Capital Contributions; Additional Members.  As of the date hereof, each Member has contributed to the Company's aggregate capital the amount set forth opposite such Member's name on Exhibit A hereto.  With the consent of the Managers, a Member may make additional Capital Contributions in excess of such Member's initial Capital Contribution.  If the Company admits a Person (other than an original Member or a Substitute Member) as a Member, the Person shall contribute to the Company such Capital Contribution as shall be determined by the Managers.  The Company may require such Person to make other payments prior to the admission of such Person as a Member, including payments to reimburse the Company for the costs and expenses incurred by the Company in connection with the admission of such Person. The Managers shall have the right from time to time to update Exhibit A to reflect the current Capital Contributions of the Members.  No additional Capital Contributions beyond the initial Capital Contributions shall be made without the consent of the Managers.

8.2    No Other Additional Obligations.  No Member shall have any obligation to make any additional contribution to the Company or to guarantee any indebtedness of the Company except upon the agreement of all the Members.

8.3    Intent of Section 8.  This Section 8 is not intended to create any third party beneficiary rights or to be for the benefit of (i) any creditor (other than a Member) of the Company or any Member, or (ii) any other Person (other than a Member) to whom any debts, liabilities or obligations are owed by, or who otherwise has a claim against, the Company or any Members, and no such creditor or other Person shall obtain any rights under the provisions of

this Section 8 or shall by reason of the provisions of this Section 8 make any claim in respect of any of the aforesaid debts, liabilities or obligations (or otherwise) against the Company or any Member.

8.4    Withdrawal of Capital.    No Member shall have any right to withdraw or make any demand for withdrawal of such Member's Capital Contribution or the capital interest reflected in such Member's Capital Account.

8.5    Loans by Members.    If, at any time or from time to time, the Managers determine that it is necessary or advisable for the Members to make loans to the Company (all such loans being collectively referred to herein as "Member Loans"), they shall notify the Members, of the amount which they have determined the Company should borrow from the Members.    Each Member shall have the right, but not the obligation, to lend such Member's pro rata share of any such desired borrowing based upon such Member's percentage Interest, provided, that if some Members do not make Member Loans, then other Members may make Member Loans in proportion to the percentage Interests of the Members who agree to make Member Loans.    All Member Loans shall bear interest at a floating rate per annum equal to the rate from time to time announced by The Northern Trust Company, or any successor thereto, as its prime lending rate (however designated) plus 3% per annum, or at such other rate as may be approved by the Managers, and shall otherwise be made upon terms and conditions satisfactory to the Managers and the Members making the Member Loans.    Member Loans shall not constitute an increase in the Member's Capital Account or percentage Interest.    All Member Loans shall be repaid according to the priority established for cash distributions in Sections 12.1 and 13.1.

9.    CAPITAL ACCOUNTS

Individual Capital Accounts shall be maintained separately for each Member in accordance with Regulations Section 1.704-1(b)(2)(iv).    No interest shall be paid or shall accrue on the Capital Accounts.

10.    MANAGEMENT OF BUSINESS

10.1    Management.

(a)    Manager Authority.    The business and affairs of the Company shall be directed and managed by the Managers and the Managers shall have the full, complete and exclusive authority, power and discretion to take any and all actions and make any and all decisions regarding the Company's business without the consent or vote of the Members.    Without limiting the foregoing, the Managers shall have full, complete and exclusive authority, power and discretion to take any and all actions and make any and all decisions regarding the matters described in Section 15-1(c) of the Act without the consent or vote of the Members.    At such times as there shall be more than one Manager, any action or decision by the Managers on behalf of the Company shall require the approval of all of the Managers.    No Member, in his or her capacity as a Member, shall have the right, power or authority to act for or bind the Company, all such right, power and authority being vested in the Managers.    Each Manager only shall be required to

devote such time to the management of the business of the Company as he deems necessary to promote the interests of the Company.

(b)     Professional Engagements.  Subject to the provisions of Section 10.1 (a) and (d), the Managers may engage on behalf of, and at the expense of, the Company, such persons, firms or corporations as the Managers shall deem advisable for the conduct and operation of the business of the Company, including without limitation lawyers, accountants, investment bankers, engineers, consultants, and purveyors of other services or materials, on such terms and for such compensation or costs as he, in his discretion, shall determine.

(c)     Services by Managers and Members.  The Managers may, on behalf and at the expense of the Company, engage or otherwise permit any Manager, another Member or an employee or affiliate of any of them to render or provide, and pay them or any of them, reasonable and customary compensation for rendering or providing, products, services and/or financial accommodations to or for the benefit the Company only upon terms as to which the Managers agree, provided however the Managers shall not accept management fees for the day to day operations of the property of the Company, or compensation for any services that would be customarily be provided by a property or asset manager.

(d)     Fees Payable to the Managers; Reimbursement of Expenses.  No salaries or compensation other than as set forth in this Agreement shall be paid to any Manager for services provided to the Company by such Manager in his capacity as Manager hereunder; provided, however, that the Company shall pay or reimburse each Manager and his Affiliates for expenses of every kind incurred on behalf of the Company to the extent permissible by law and consistent with Section 10.1(a), provide however the Managers shall not accept management fees for the day to day operations of the property of the Company, or compensation for any services that would be customarily be provided by a property or asset manager.

(e)     Tax Matters Member.  Scott J. Krone is hereby appointed the "Tax Matters Member" of the Company which shall be the equivalent of the "Tax Matters Partner" referred to in Sections 6221-6231 of the Code, and Krone shall serve in such capacity for all purposes pursuant to such Code Sections.  The Company shall not be obligated to pay any fees or other compensation to the Tax Matters Member in his capacity as such, provided that the Company shall reimburse the Tax Matters Member for any and all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) sustained by him in his capacity as Tax Matters Member.

(f)     Removal, Resignation and Replacement of Managers.

(i)     Any Manager may resign at any time by providing written notice thereof to the other Manager.

(ii)     Except as provided in Section 35-45(6) of the Act, no Manager otherwise may be removed, with or without cause.

(iii)    In the event any Manager shall die, become legally incapacitated, resign or be removed in accordance with this Agreement (or as provided in Section 35-45(6) of the Act, then the remaining Manager or Managers shall be the sole Manager or Managers of the Company and shall have the exclusive right and obligation to manage the Company as described in Section 10.1(a) hereof. In the event all Managers shall be removed in accordance with the terms of this Agreement, resign, die or become legally incapacitated, the Members shall have the right to appoint a new Manager or Managers.

(g)    Officers. The Managers shall have the right to appoint one or more officers of the Company (which may be any Manager or Affiliates thereof) to perform such duties upon such terms as the Managers may specify in their discretion from time to time.

(h)    Other Activities. Notwithstanding anything to the contrary contained herein, any Manager, Member and officer (and any Affiliate thereof) may engage and possess an interest in any other business venture or property of any nature, kind or description whether or not similar to or competitive with any business venture or property of the Company and shall have no obligation to offer the Company or any other Member an opportunity to participate in or share the profits, distributions or fees therefrom, and the engagement in or possession of an ownership interest in any such business venture or property shall not be deemed to constitute a breach of fiduciary duty to the Company or to the other Members.

10.2    Indemnification; Etc.

(a)    The Company shall, to the extent permitted by law, indemnify and hold harmless the Managers and any officers of the Company against any losses, judgments, liabilities or expenses incurred in settling any claim or incurred in any finally adjudicated legal proceeding, including reasonable attorneys' fees and/or amounts paid in settlement of any claims sustained by him, in each case arising from or relating to management of the Company, provided that the same did not result from actions or inactions of such Managers (or officer) which were outside the scope of authority conferred on such Managers (or officer) or constituted grossly negligent or reckless conduct, intentional misconduct or a knowing violation of law.

(b)    Expenses incurred in defending a civil or criminal action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by the Managers (or officer) to repay such amount if it shall ultimately be determined that the Managers (or officer) are not entitled to be indemnified by the Company.

(c)    The indemnification provided by this Section shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled under any statute, agreement, vote of Members or otherwise, both as to action in an official capacity and as to action in another capacity while holding such office.

(d)     Company shall have the power to purchase and maintain insurance on behalf of the Managers and Company officers against any liability asserted against them or incurred by them in such capacity or arising out of their status as such, whether or not the Company would have the power to indemnify them against such liability under the provisions of this Section 10.2.

(e)     The provisions of this Section 10.2 shall continue as to a person who has ceased to be a Manager (or officer) as to claims arising out of activities related to his prior position and shall inure to the benefit of his heirs and personal or legal representatives.  The provisions of this Section 10.2 also shall survive the liquidation, dissolution and termination of the Company and the termination of this Agreement and shall be binding on the Company's successors and assigns.

(f)     <u>Other Persons Covered</u>.  The provisions of this Section 10.2 shall apply in all respects to the Tax Matters Member designated pursuant to Section 10.1(f) and to former managers of the Company.

(g)     <u>Liability of Managers and Officers</u>.  No Manager (or officer) shall have any liability to the Company or the Members as the result of any action or omission arising from or relating to the management of the Company,   including any error of judgment or failure to use due care, provided that the same did not result from actions or inactions of such Manager (or officer) which were outside the scope of authority conferred on such Manager (or officer) or constituted grossly negligent or reckless conduct, intentional misconduct or a knowing violation of law.

(h)     <u>Ratification or Authorization of Actions</u>.  Any conduct which otherwise would constitute a breach of a Manager's fiduciary duties to the Company or the Members shall not constitute such a breach if ratified or authorized by Members holding a majority of the Units held by all disinterested Members after full disclosure of all material facts.

## 11.    <u>BOOKS AND RECORDS; REPORTS</u>

11.1    <u>Maintenance</u>.  The Managers will keep complete and accurate books of account and other records of the Company at the office of the Company, showing the assets, liabilities, costs, expenditures, receipts, profits and losses of the Company.  The books and records will include provisions for separate Capital Accounts for each Member, and the computation of depreciation, if any, on an accelerated basis (unless otherwise agreed to by the Members or required by law).  Such books and records will be kept and maintained on the accrual basis in accordance with generally accepted accounting principles consistently applied and shall also contain such information as required by the Regulations issued under Section 704(b) of the Code.  Such books and records will be made available for examination at any time by any Member or its representatives.  Any Member or such Member's representatives will have the right to make copies of such books and records and to extract therefrom such information as it may desire.

11.2   <u>Reports</u>.   The Managers shall cause to be prepared, at the expense of the Company, the reports described in this <u>Section 11.2</u>.

(a)   <u>Annual Report</u>.   Within 120 days after the end of each fiscal year, there will be distributed to the Members an annual report which shall include a balance sheet as of the end of such fiscal year, together with a profit and loss statement, a statement of the source and application of funds and a statement of changes in partners' capital for such year.   Such financial statement shall be prepared in accordance with generally accepted accounting principles and, if requested by the Managers, shall be accompanied by an auditor's report containing an opinion of the independent certified public accountants which is not qualified due to Company imposed scope limitations.

(b)   <u>Tax Information</u>.   Within 75 days after the end of each fiscal year, there will be distributed to the Members all information necessary for the preparation of each Member's Federal, state and other tax returns.

(c)   <u>Regulatory Reports</u>.   As may be prescribed by statute, rule or regulation, all required reports shall be filed with the United States Securities and Exchange Commission or other Federal or state regulatory authorities.

(d)   <u>Quarterly Report</u>.   The Managers shall furnish quarterly reports to the Members which shall update the Members on the progress of construction and the current financial status of the Company.

11.3   <u>Fiscal Year of Company</u>.   The fiscal year of the Company shall end on December 31 of each year, unless the Members elect otherwise.

12.   <u>DISTRIBUTIONS; FEES</u>

12.1   <u>Distributions</u>.  All Net Cash Flow shall be distributed as follows:

(a) In the event the Net Cash Flow is attributable to (i) the sale of the Property, or (ii) any refinance (exclusive of construction financing) of the Property which results in the disbursement of loan proceeds (net of customary transaction and closing expenses) in excess of the proceeds necessary to satisfy any existing indebtedness, such Net Cash Flow shall be distributed as follows:

(i)   <u>first</u>, to the Class D Members in proportion to and to the extent of their respective Preferred Return Balances until they have been reduced to zero;

(ii)   <u>next</u>, to the Class D Members in proportion to and to the extent of their respective Capital Contribution Balances until they have been reduced to zero;

(iii)   <u>next</u>, to the Class A Members and Class B Members in proportion to their respective Percentage Interests until such time as the Capital Contribution Balances of the Class B Members have been reduced to zero; and

(iv)   the remainder, (w) fifty-four percent (54%) to the Class A Members in proportion to their respective Percentage Interests, (x) twenty-six and thirteen one hundredths percent (26.13%) to the Class B Members in proportion to their respective Percentage Interests, (y) nineteen and eighty-seven one hundredths percent (19.87%) to the Class D Members in proportion to their respective Percentage Interests.

(b)   In the event the Net Cash Flow is attributable to any source other than as set forth in Section 12(a) above, then the Net Cash Flow shall be distributed as follows:

(i)   first, to the Class D Members in proportion to and to the extent of their respective Preferred Return Balances until they have been reduced to zero; and

(ii)   the remainder, (w) fifty-four percent (54%) to the Class A Members in proportion to their respective Percentage Interests, (x) twenty-six and thirteen one hundredths percent (26.13%) to the Class B Members in proportion to their respective Percentage Interests, (y) nineteen and eighty-seven one hundredths percent (19.87%) to the Class D Members in proportion to their respective Percentage Interests.

The Company shall make distributions of Net Cash Flow to the Members in amounts determined in accordance with the provisions of this Section at such intervals as the Managers may determine.  The Members acknowledge that the Class A Members shall pay the Class D Members a portion of any distributions otherwise payable to the Class A Members in accordance with Sections 12.1(a)(iv) and 12.1(b)(ii) in an amount equal to the any such distributions which are attributable to a Percentage Interest owned by the Class A Members equal to one percent (1%).  Notwithstanding anything contained herein, the Class D Members acknowledge that any distributions otherwise payable to the Class D Members in accordance with Sections 12.1(a)(iv) and 12.1(b)(ii) (as modified by the preceding sentence) shall be reduced by any Preferred Returns previously paid to the Class D Members and that such amount shall be distributed to the Class A Members and Class B Members in proportion to their respective Percentage Interests.

13.   DISSOLUTION/LIQUIDATION

13.1   Dissolution, Winding Up, Liquidation and Distribution of Assets.

(a)   The Company shall dissolve and terminate its existence upon the occurrence of any of the following events:

(i)   The occurrence of the events described in Section 6 hereof; or

(ii)   The entry of a decree of judicial dissolution under the Act by a court of competent jurisdiction.

Notwithstanding the foregoing or anything else in this Agreement, upon dissolution the Company may remain in existence for a reasonable period of time to permit an orderly winding-up of the Company's business and affairs.

(b)    Upon dissolution of the Company, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting, if any, until the date of dissolution. The Managers shall proceed to wind up the affairs of the Company in accordance with this Section 13.1.

(c)    If the Company is dissolved and its affairs are to be wound up, the Managers shall:

(i)    Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Managers may determine to distribute any assets to the Members in kind),

(ii)    Allocate any profit or loss resulting from such sales to the Members' Capital Accounts in accordance with Sections 9 and 14 hereof,

(iii)    Discharge all liabilities of the Company, other than liabilities to Members for Member Fees, Member Loans or distributions, and establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the Capital Accounts of the Members, the amounts of such reserves shall be deemed to be an expense of the Company),

(iv)    Distribute liquidation proceeds to the Members with outstanding Member Loans (pro rata in proportion to the outstanding principal balance of such loans) until such Member Loans are repaid in full (with such payments being first applied to accrued interest and then to principal), and

(v)    Distribute the remaining assets in the following order:

(1)    If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Managers. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members shall be adjusted to reflect such deemed sale in accordance with Section 12(a) above.

(2)    The positive balance (if any) of each Member's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed to the Members, either in cash or in kind, as determined by the Managers, with any assets distributed in kind being valued for this purpose at their fair market value as determined pursuant to the preceding Section 13.1(c)(v)(1). Any such distributions to the Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations.

(d)      Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person or entity for any purpose whatsoever.

(e)      Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

(f)      The Managers shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

13.2      Articles of Dissolution.      When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets of the Company have been distributed, articles of dissolution as required by the Act, shall be executed in duplicate and filed with the Illinois Secretary of State.

13.3      Effect of Filing of Articles of Dissolution.      Upon the filing of articles of dissolution with the Illinois Secretary of State, the existence of the Company shall cease, except for the purpose of suits, other proceedings and appropriate action as provided in the Act. The Managers shall have authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

13.4      Return of Contribution Nonrecourse to Other Members.      Except as provided by law or as expressly provided in this Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of his or her Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the Capital Contribution of one or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

14.      ALLOCATION OF TAXABLE INCOME AND LOSSES

14.1      Profits and Losses Defined.      "Profits" and "Losses" means, for each taxable year of the Company (or other period for which Profit or Loss must be computed), the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

(a)      all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss; and

(b) any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss; and

(c) any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss; and

(d) gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes; and

(e) in lieu of the depreciation, amortization, or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

(f) notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 14.3 hereof shall not be taken into account in computing Profit or Loss.

14.2    Allocations.  Except as provided in Section 14.3, Profits and Losses shall be allocated to the Members in proportion to their respective Percentage Interests; provided that if any Member Fees are payable to any Member under Section 12.1, such Member shall be allocated for tax and book purposes items of gross income equal to the amount of Member Fees distributed to such Member.

14.3    Special Allocation Rules.

(a) Regulatory Allocations.  Notwithstanding Section 14.1, allocations of Profits and Losses shall be made consistent with the qualified income offset and minimum gain chargeback provisions of the Regulations promulgated under Section 704(b) of the Code.

(b) Loss Limitation.  No Member shall be allocated Losses or deductions if the allocation causes the Member to have an Adjusted Capital Account Deficit (as defined below).  Any allocation of Loss or deduction that cannot be made to a Member by reason of this Section 14.3(b) shall be made to such Members that have positive Capital Account balances in accordance with their relative balances.  If any Members are allocated an amount of Loss or deduction by reason of the previous sentence, subsequent Profits of an equal amount shall be allocated to such Members as soon as possible.  "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in the Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i) the deficit shall be decreased by the amounts which the Member is obligated to restore or is deemed obligated to restore pursuant to Regulation Section 1.704-1(b)(2)(ii)(c); and

Page 13

(ii)    the deficit shall be increased by the items described in Regulation Sections 1.704-1(b)(2)(ii)-(d)(4), (5), and (6).

(c)    <u>Target Capital Account Balances</u>.  The tax allocation provisions of this Agreement are intended to produce final Capital Account balances that are at levels ("Target Final Balances") which would permit liquidating distributions that are made in accordance with such final Capital Account balances to be equal to the distributions that would occur under <u>Section 12.1</u> hereof.  To the extent that the tax allocation provisions of this Agreement would not produce the Target Final Balances, the Members agree to take such actions as are necessary to amend such tax allocation provisions to produce such Target Final Balances.  Notwithstanding the other provisions of this Agreement, allocations of income, gain, loss and deduction shall be made prospectively as necessary to produce such Target Final Balances and, to the extent such prospective allocations would not affect such result, the prior tax returns of the Company shall be amended to reallocate income, gain, loss, and deduction to produce such Target Final Balances.

15.    <u>TRANSFERS OF INTERESTS; WITHDRAWAL</u>

15.1    <u>Member Transfers</u>.

(a)    <u>Limitations on Transfer</u>.  Except as set forth in <u>Section 15.1(b)</u> hereof, no Member shall sell, exchange, transfer, give, encumber, assign, pledge, mortgage, hypothecate or otherwise dispose of, voluntarily or involuntarily, directly or indirectly (each, a "Transfer"), all or any part of his Interest to any Person, without the approval of all of the Managers.

(b)    <u>Permitted Transfers</u>.  Notwithstanding anything to the contrary set forth in <u>Section 15.1</u>, a Member may, upon notice to but without the prior consent of the other Members, transfer all or part of his Interest to a trust for the benefit of such Member or any member of such Member's family, so long as the original Member is the trustee of such trust with full voting power with respect to all matters relating to the Company.

(c)    <u>Transfers on Death</u>.  Upon the death of a Member, or a former Member who is a trustee of a trust Member pursuant to <u>Section 15.1(b)</u> hereof, (i) his entire Interest shall thereafter be held, by his estate or otherwise, as an Assignee rather than a Substitute Member (unless the Managers agree otherwise), and (ii) the Company may purchase the Interest of the deceased Member or a portion thereof from the estate of such deceased Member if there is agreement as to the purchase price to be paid for such Interest (or portion thereof) between the estate of the deceased Member and the Company.  The Company may, but shall not be obligated to, carry key man insurance on each of its Members in amounts deemed to be sufficient by the Managers to help fund such purchases.

(d)    <u>Right of First Offer</u>.  If at any time a Member desires to Transfer its Interest to any Person (other than any party to which a Transfer is permitted pursuant to <u>Section 15.1(b)</u> or <u>(c)</u> above), the transferring Member shall first send to each of the other Members a notice (a "First Offer Notice") of the transferring Member's desire to

Transfer, which First Offer Notice shall set forth the terms on which the transferring Member is willing to Transfer its Interest. The other Members shall then have the right, exercisable by written notice sent to the transferring Member within ten (10) business days after such First Offer Notice, to elect to purchase the Interest to be transferred on the terms and conditions set forth in the First Offer Notice (with closing of such sale to occur thirty days after the purchasing Member's notice of its agreement to purchase, or, if later, on a date specified in the First Offer Notice). If more than one Member timely exercises such right of first offer, the Members that have so exercised such right shall be entitled to purchase the Interest to be transferred in proportion to their respective percentage Interests in the Company as of the date of the proposed Transfer. If no Member timely exercises such right of first offer, then the Member which wishes to Transfer may sell its Interest to any Person for no less than 98% of the purchase price set forth in the First Offer Notice. If (i) the transferring Member proposes to sell its Interest for less than 98% of the proposed price set forth in the First Offer Notice, or (ii) the transferring Member does not execute a binding contract to sell its Interest within 180 days after delivery of the First Offer Notice, then in either such case the transferring Member shall again be obligated to first offer its Interest to the other Members in accordance with the terms of this Section prior to selling or offering to sell its Interest.

(e)     Terms of Transfer. An Assignee admitted in accordance with this Section 15.1 will be a Substitute Member if, but only if, the Managers approve the admission of such Assignee as a Substitute Member, in which case such Substitute Member shall succeed, to the extent attributable to the Interest transferred, to the status as Member, Capital Accounts, Capital Contributions, rights, powers, restrictions, liabilities and obligations of the transferor Member. In all other cases (including a transfer following the death of a Member), the Assignee shall not be a Substitute Member, but shall be entitled only to the allocations of income, gains, losses, deductions and credits and distributions of Company assets attributable to the Interest or portion thereof but shall not have any other rights, including any voting or management rights, hereunder. The effective date of a Transfer shall be the closing date with respect to any Transfer. Notwithstanding the foregoing, neither the Company nor any Member other than the transferor Member shall incur any liability for Company allocations and distributions made in good faith to the transferor Member until the written instrument of Transfer satisfactory to all of the Members has been received by the Company and recorded on its books and the effective date of the Transfer has passed.

(f)     Notwithstanding anything herein to the contrary, a Member shall not sell, assign, exchange or otherwise transfer his or her Interest unless such proposed sale or exchange is, in the opinion of counsel to the Company, an exempt transaction under any applicable federal and state securities laws.

15.2     Withdrawal of Members.  Except as otherwise specifically permitted by this Agreement, no Member shall be entitled to withdraw from the Company.

15.3     Additional Members.  The Company may admit any Person (in addition to the original Members and any Substitute Members) as a Member upon the approval of the

Managers. The initial Capital Contribution required of an additional Member shall be in an amount determined by the Managers pursuant to Section 8.1.

16.    NOTICES

All notices to the Members under this Agreement shall be in writing and shall be (i) delivered by personal service, (ii) delivered by courier service, (iii) telecopied or (iv) sent by certified or registered mail, postage prepaid, return receipt requested, to the Members at the addresses and fax numbers provided to the Company at the time such Member becomes a Member. Except as otherwise expressly set forth herein, each notice shall be effectively given when delivered at such address or fax number. Any notice given by telecopier, facsimile or similar means shall be confirmed by hard copy delivered as soon as possible. Rejection or other refusal to accept a notice or the inability to deliver a notice because of a changed address or fax number of which no notice was given as provided herein shall be deemed to be receipt of the notice sent. By giving to the other parties notice thereof, the parties hereto and their respective permitted successors and assigns shall have the right from time to time and at any time during the term of this Agreement to change their respective addressee or address for notices, and each shall have the right to specify as its address for notices any other address within the United States of America.

17.    NO PARTITION

No Member shall have the right to partition any property of the Company during the term of this Agreement nor shall any Member make application to any court or authority having jurisdiction in such matter or commence or prosecute any action or proceeding for partition of any property of the Company and the sale thereof. Upon any breach of the provisions of this Section by any Member, the other Member(s), in addition to all rights and remedies at law and in equity the Member(s) may have or claim, shall be entitled to a decree or other restraining order enjoining such application, action or proceeding.

18.    CONFIDENTIALITY

The Members agree that Company's business, operating, marketing, leasing and development plans or projections, trade secrets, books and records are confidential and shall not be disclosed to any third party without the Managers' prior written consent; provided, however, that any Member may disclose any such materials if so required by law or to such party's attorneys, accountants and other professionals subject to such professionals' duties not to further disclose such materials.

19.    REPRESENTATIONS AND WARRANTIES REGARDING INVESTMENT

19.1    Investment Intention; No Resales. Each Member hereby represents and warrants that such Member is acquiring his Interest pursuant to this Agreement for investment solely for such Member's own account and not with a view to, or for resale in connection with, the distribution or other disposition thereof in violation of the Securities Act of 1933, as amended (the "Securities Act"). Each Member agrees and acknowledges that such Member will not, directly or indirectly, offer, transfer, sell, assign, pledge, hypothecate or otherwise dispose of his Interest, or solicit any offers to purchase or otherwise acquire or take a pledge of his Interest,

unless (a) such transfer, sale, assignment, pledge, hypothecation or other disposition is pursuant to an effective registration statement under the Securities Act and has been registered under all applicable state securities or "blue sky" laws, or (b) such Member shall have furnished the Company and the Managers with an opinion of counsel, which opinion of counsel shall be reasonably satisfactory to the Managers, to the effect that no such registration is required because of the availability of an exemption from registration under the Securities Act and all applicable state securities or "blue sky" laws.

19.2   <u>Accredited Investor</u>.   Each Member, acting as individual, hereby represents and warrants to the Company and the other Members that such Member is an "accredited investor" as that term is defined in Rule 501 of Regulation D under the Securities Act.

19.3   <u>Units Unregistered</u>.   Each Member acknowledges and represents that such Member has been advised that (a) the offer and sale of the Interests have not been registered under the Securities Act in reliance upon the exemption from registration afforded by Sections 3(b) and/or 4(2) thereof and Regulation D thereunder; (b) the Interests must be held indefinitely and such Member must continue to bear the economic risk of the investment in the Interests unless the offer and sale of such Interests is subsequently registered under the Securities Act and all applicable state securities laws or an exemption from such registration is available; (c) there is no established market for the Interests and it is not anticipated that there will be any public market for the Interests in the foreseeable future; (d) Rule 144 promulgated under the Securities Act is not presently available, nor expected to become available, with respect to the sale of any securities of the Company, and the Company has made no covenant to make such Rule available; (e) when and if Interests may be disposed of without registration under the Securities Act in reliance on Rule 144, such disposition can be made only in limited amounts in accordance with the terms and conditions of such Rule; (f) if the Rule 144 exemption is not available, public offer or sale without registration will require the availability of an exemption under the Securities Act; (g) a restrictive legend in the form heretofore set forth shall be placed on the certificates, if any, representing the Interests; and (h) a notation shall be made in the appropriate records of the Company indicating that the Interests are subject to restrictions on transfer.

19.4   <u>Additional Investment Representations</u>.   Each Member further represents and warrants that (a) in making such Member's decision to purchase the Interests hereby subscribed for, such Member has relied upon independent investigations made by such Member and, to the extent believed by such Member to be appropriate, such Member's own financial, tax and other advisors; (b) such Member has been given the opportunity to examine all documents and to ask questions of, and to receive answers from, the Managers concerning the terms and conditions of the purchase of the Interests and to obtain any additional information which such Member has provided to the Company and the Managers concerning such Member and such Member's financial position is true, complete and correct as of the date of this Agreement.

19.5   <u>No Broker or Finder</u>.   Each Member represents and warrants that such Member has not engaged any broker or finder in connection with this Agreement or the transactions contemplated hereby.

20.   <u>MISCELLANEOUS</u>

20.1   <u>Governing Law</u>.   This Agreement shall be construed and interpreted in accordance with the laws of the State of Illinois.

20.2   <u>Section 754 Election</u>.   The Managers shall have the power, but not the obligation, to cause the Company to make such income tax elections, including elections pursuant to Section 754 of the Code, in order to adjust the basis of Company property as described in Sections 734 and 743 of the Code, as the Managers may deem appropriate.

20.3   <u>Headings</u>.   Section headings and subheadings thereunder are for convenience of reference only and shall be given no legal effect in the interpretation of this Agreement.

20.4   <u>Counterparts</u>.   This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument.

20.5   <u>Severability</u>.   In the event any part or provision of this Agreement is invalid for any reason, the remainder of this Agreement shall continue and be deemed to be in full force and effect.

20.6   <u>Number and Gender</u>.   Whenever required by the context, the singular number shall include the plural, and any gender shall include all genders.

20.7   <u>Transactions with Affiliates</u>.   Each Member acknowledges that the Members and their Affiliates have interests in various entities which may from time to time provide goods or services to the Company.   Accordingly no transaction between the Company and an entity in which one or more of the Members has an interest shall be void or voidable as a result of such interest of the Members and no Member shall incur liability to the Company or other Members for failing to disclose any such interest to the Company or other Members.

20.8   <u>Power of Attorney</u>.   Each Member hereby makes, constitutes and appoints the Managers with full power of substitution and resubstitution, its true and lawful attorney for it and in its name, place and stead and for its use and benefit, to sign, execute, certify, acknowledge, file and record all instruments amending or cancelling the Articles, as and to the extent required under the Act and applicable law, and to sign, execute, certify, acknowledge, file and record such other agreements, instruments or documents as may be necessary or advisable (a) to reflect the exercise by the Managers of any of the powers granted to it under this Agreement, or (b) which may be required of the Company or of the Members by the laws of the State of Illinois or any other jurisdiction, to the extent consistent with the Agreement.   Each Member authorizes such attorney-in-fact to take any further action which such attorney-in-fact shall consider necessary or advisable in connection with any of the foregoing, hereby giving such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite or advisable to be done in and about the foregoing as fully as such Member might or could do if personally present, and hereby ratifying and confirming all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof.   The power of attorney granted pursuant to this Section: (a) is a special power of attorney coupled with an interest, is irrevocable, and shall survive the bankruptcy, death, adjudication of incompetency or insanity, or dissolution of any Person granting such power; (b) may be executed by such attorney-in-fact by listing all of the Members executing any agreement, certificate, instrument or document with the single signature of any

such attorney-in-fact acting as attorney-in-fact for all of them; and (c) shall survive the delivery of an assignment by a Member of its Interest in the Company (except that where the purchaser, transferee or assignee thereof has the right to be, or is admitted as, a Substitute Member, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling such attorney-in-fact to execute, acknowledge and file any such agreement, certificate, instrument or document necessary to effect such substitution).

20.9   Amendments.   Except as otherwise required by law, this Agreement may be amended only by the unanimous vote of the Members.

20.10   Binding Effect.   Except as otherwise expressly provided herein, each and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

[signature page to follow]

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

CLASS A MEMBERS:                    CLASS B MEMBERS:

_____             [see attached pages]
SCOTT J. KRONE

_____
MARTIN TARADEJNA

CLASS D MEMBERS:

Franzen Commercial Solutions, LLC, a
_____ limited liability company

by: _____
Its: _____

# EXHIBIT A

| Members | Address | Capital Membership Contribution | Interest |
|---|---|---|---|
| **Class A Members** | | | |
| Scott Krone | 600 N. Waukegan, #129 Northbrook, IL 60062 | | 27.00% |
| Martin Taradejna | 2405 N Sheffield #14004 Chicago, IL 60614 | | 27.00% |
| **Class B Members** | | | |
| Provident Trust Group, LLC Fbo Craig S Mueller | 8880 W Sunset Road Suite 250 Las Vegas, NV 81948 | $100,000.00 | 3.65% |
| Equity Trust Company Custodian FBO Z119296 | P.O. Box 451340 Westlake, OH 44145 | $100,000.00 | 3.65% |
| Polycomp Trust Company Fbo Joshua Eimerbrink | 3000 Lava Ridge Court, Ste 130 Roseville, CA 95661 | $ 75,000.00 | 2.90% |
| Polycomp Trust Company Fbo Kathy Eimerbrink | 3000 Lava Ridge Court, Ste 130 Roseville, CA 95661 | $ 75,000.00 | 2.90% |
| Polycomp Trust Company Fbo Donald W. Eimerbrink | 3000 Lava Ridge Court, Ste 130 Roseville, CA 95661 | $ 50,000.00 | 1.79% |
| Marble Leadership Partner Inc. 401K plan | | $100,000.00 | 3.65% |
| Cama SDIRA LLC Fbo Carolina Yan IRA | 122 East Butler Ave, Suite 100 Ambler, PA 19002 | $ 50,000.00 | 1.79% |
| Hardy Hodges | P.O. Box 345 Ross, CA 94957 | $ 75,000.00 | 2.9% |
| FCBO Richard Davis IRA734652 | | $ 75,000.00 | 2.9% |
| Coda Holding | 600 Waukegan Rd Ste 129 Northbrook, IL 60062 | $300,000.00 | |
| **Class D Members** | | | |
| Franzen Commercial Solutions LLC | Melissa Osorio Franzen 4730 S Fort Apache Road Ste 300 Las Vegas, NV 89147 | $500,000.00 | 19.87 |

## EXHIBIT B

### PLATFORM II - LAWNDALE, LLC

Legal Description

PARCEL 1: ALL OF LOTS 2 TO 8, BOTH INCLUSIVE; LOT 40 (EXCEPT THE SOUTH 16.00 FEET THEREOF); LOTS 41 TO 45 (EXCEPT THAT PART OF SAID LOTS 42, 43, 44 AND 45 CONVEYED TO CHICAGO AND PACIFIC RAILROAD COMPANY); ALSO THE NORTH-SOUTH VACATED ALLEY, LYING EAST OF AND ADJOINING LOT 40 (EXCEPT THE SOUTH 16.00 FEET THEREOF) AND LOTS 41 TO 45 AND WEST OF AND ADJOINING LOTS 2 TO 6 AND LOT 7 (EXCEPT THE SOUTH 16.00 FEET THEREOF), ALL IN BLOCK 3 IN SUBDIVISION OF THE SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 35, TOWNSHIP 40 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, (EXCEPT THE EAST HALF OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SAID SECTION AND EXCEPT RAILROAD), IN COOK COUNTY, ILLINOIS.

PARCEL 2: ALL THAT PART OF THE SUBDIVISION OF THE SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 35, TOWNSHIP 40 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, (EXCEPT THE EAST HALF OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SAID SECTION) AND (EXCEPT RAILROAD WHICH IS DESCRIBED AS FOLLOWS):

COMMENCING AT THE NORTHWEST CORNER OF LOT 2 IN BLOCK 3 OF SAID SUBDIVISION, WHICH CORNER IS THE BEGINNING OF 14 DEGREE CURVE TO THE LEFT WITH ITS TANGENT ALONG THE NORTH LINE OF SAID LOT 2; THENCE WESTERLY ALONG SAID 14 DEGREES CURVE, A DISTANCE OF 11.00 FEET TO A POINT IN THE SOUTHEASTERLY BOUNDARY LINE OF THE PROPERTY OF THE GRANTORS: HENRY A. SCANDRETT, WALTER J. CUMMINGS AND GEORGE I. HAIGHT, NOT AS INDIVIDUALS BUT SOLELY AS TRUSTEES OF THE PROPERTY OF THE CHICAGO, MILWAUKEE, ST. PAUL AND PACIFIC RAILROAD COMPANY, AS SHOWN ON A PLAT MARKED "EXHIBIT A" ATTACHED TO AND MADE A PART OF WARRANTY DEED DATED OCTOBER 21, 1891, FROM MARY A. REID TO THE CHICAGO AND PACIFIC COMPANY, A PREDECESSOR OF SAID GRANTORS, WHICH DEED WAS FILED FOR RECORD IN THE RECORDER'S OFFICE OF COOK COUNTY, ILLINOIS ON OCTOBER 24, 191 AND RECORDED IN BOOK 3856 OF RECORD ON PAGE 91 AND THE TRUE POINT OF BEGINNING OF THE LAND TO BE DESCRIBED; THENCE CONTINUING WESTERLY ALONG SAID 14 DEGREE CURVE FOR A DISTANCE OF 86.86 FEET TO THE BEGINNING OF AN 11 DEGREES, 28 MINUTES CURVE TO THE LEFT AND TANGENT TO SAID 14 DEGREE CURVE AT SAID LAST MENTIONED POINT; THENCE WESTERLY ON SAID 11 DEGREES, 28 MINUTES CURVE TO THE LEFT, A DISTANCE OF 117.56 TO A POINT IN THE NORTH PROLONGATION OF THE WEST LINE OF NORTH RIDGEWAY AVENUE, DISTANT 581.72 FEET NORTH OF INTERSECTION OF SAID STREET LINE WITH THE NORTH LINE WABANSIA AVENUE; THENCE SOUTH ALONG THE NORTH PROLONGATION OF THE WEST LINE OF SAID NORTH RIDGEWAY AVENUE, A DISTANCE OF 91.52 FEET TO A POINT IN THE AFOREMENTIONED SOUTHEASTERLY BOUNDARY LINE OF SAID GRANTORS PROPERTY; THENCE NORTHEASTERLY ALONG SAID BOUNDARY LINE TO THE POINT OF BEGINNING, ALL IN COOK COUNTY, ILLINOIS.

COMMONLY KNOWS AS: 1750 N. LAWNDALE AVE., CHICAGO, ILLINOIS.