# EXHIBIT 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


PLATFORM II LAWNDALE, LLC,     ) No. 22 B 07668
                              ) Chicago, Illinois
                              ) 1:00 p.m.
                 Debtor.     ) February 14, 2024


TRANSCRIPT OF PROCEEDINGS BEFORE THE
HONORABLE DEBORAH L. THORNE


APPEARANCES:

For the Debtor:         Mr. Gregory Jordan;

For Greenlake Real Estate
Fund:                 Mr. Adam Toosely;

For the U.S. Trustee:   Ms. Gretchen Silver;

Also present:          Mr. Scott Krone;


Court Reporter:        Amy Doolin, CSR, RPR
                       U.S. Courthouse
                       219 South Dearborn
                       Room 661
                       Chicago, IL  60604.

2

1                    THE CLERK:  Taking up this court's

2  1:00 o'clock set matters, Platform II Lawndale, LLC.

3                    THE COURT:  Good afternoon.  Okay.

4  Appearances, please.

5                    MR. JORDAN:  Good afternoon, Your

6  Honor.  Gregory Jordan on behalf of Platform II

7  Lawndale, the debtor.

8                    MR. TOOSLEY:  Adam Toosely.  I

9  represent Greenlake Real Estate Fund.

10                   I don't know if anyone is here for the

11 U.S. Trustee.

12                   THE COURT:  Well, they filed an

13 objection.

14                   Well, they're not here.  We'll proceed

15 without them, I guess.  If they come in, that would

16 be fine.

17                   If you expect them to be here, I can

18 take a break.

19                   MR. TOOSLEY:  So, Gretchen Silver, she

20 emailed Greg and I on Monday asking if we were

21 anticipating actual evidence to be presented today,

22 and I wrote back and said no, this was argument.

23                   THE COURT:  Yes.

24                   MR. TOOSLEY:  So, I don't know if that

25 meant she was still --

 1            THE COURT:  Well, she knew about it,

 2  so...

 3            MR. TOOSLEY:  And, Greg, have you

 4  talked to her?

 5            MR. JORDAN:  I have not spoken with

 6  her.

 7            THE COURT:  Okay.  Well, we'll

 8  proceed.

 9            MR. TOOSLEY:  So, I think there are a

10  few items that are up today.  The first one, we were

11  up in front of Your Honor a few weeks ago on my

12  motion to dismiss or convert.  At the time, Your

13  Honor granted the motion, but because we needed to

14  get the receiver appointed, the order allowed us to

15  get relief from stay and go back to state court and

16  get that.

17            That happened yesterday.  So the

18  receiver was reappointed yesterday in the foreclosure

19  suit.  Now, it's going to take a couple of days for

20  that to go into effect because the judge has to sign

21  off on the bond order --

22            THE COURT:  Right.

23            MR. TOOSLEY:  -- and the bond has to

24  be filed for it to happen.  But Mr. Samuels was

25  reappointed as the receiver yesterday in the Cook

1 County foreclosure action.  So that was one of the

2 steps we were hoping to have happen --

3             THE COURT:  Right.

4             MR. TOOSLEY:  -- so there wouldn't be

5 a gap in time between the dismissal and this idea of

6 the funds and where they were going to go, which was

7 the other thing that was kind of continued to today.

8 And then we filed a rule to show cause, and that was

9 all set for today.

10             THE COURT:  Right.  I've reviewed

11 that.  I reviewed the response that was filed, not by

12 Mr. Jordan, but by his client, the client's

13 principal.  It's my understanding that the money is

14 back in the account.

15             MR. JORDAN:  Mr. Krohn sent a screen

16 shot of the account, which I delivered to Mr. Toosely

17 and Ms. Silver, indicating the $44,000 that was

18 placed in the account earlier this month.

19             THE COURT:  Okay.

20             MR. TOOSLEY:  And so, yeah, I believe

21 that part of it is mooted.  I mean, we also had

22 raised the fact that there was all kinds of deadlines

23 that had been missed so that we could actually

24 adequately prepare for today's hearing.  And even

25 this alleged accounting didn't come until 3:30

1   yesterday afternoon.

2                     There was a response that was

3   filed 45 minutes ago, so...  And in that response,

4   there is an attack of my client, there is an   attack

5   of other counsel.  I mean, 45 minutes before the

6   hearing, I can't necessarily prepare for all of --

7                     THE COURT:  Well, I think some of

8   the response of Mr. Krone was outside the motion for

9   the rule to show cause.  And I skimmed it.  I did go

10  to the bottom line.  I saw the money had been

11  returned.  So, I did not certainly spend a lot of

12  time since I had an 11 this morning and had this at

13  1:00.

14                    I don't know where you want to go with

15  that.  I mean, obviously, there are folks in this

16  case that are unhappy with the way it turned out.  I

17  mean, that is --

18                    MR. TOOSLEY:  I know Mr. Soukenick

19  would like -- I mean, he's, obviously, not -- he

20  doesn't even have an appearance in this case, but

21  he's being attacked.  And now there's a federal court

22  pleading that attacks him and things like that that

23  was just filed 45 minutes ago.

24                    THE COURT:  I would say the federal

25  court pleading is hearsay all the way through.

1              MR. TOOSLEY:  Right.

2              THE COURT:  So, if somebody wants

3    to take that and go somewhere with it, you know,

4    they could do that, but it's hearsay.  I mean --

5              MR. TOOSLEY:  Right.  No, I know.  I

6    was just surprised to see 45 minutes before this

7    hearing --

8              THE COURT:  I don't know that Mr.

9    Jordan filed that.

10             MR. TOOSLEY:  No, I don't think --

11             MR. JORDAN:  I did not, Your Honor.  I

12   didn't think -- other than the last paragraph or so,

13   it wasn't germane to the issues, and I don't think it

14   moved matters forward in the case.  And I think the

15   last paragraph or two adequately addressed the

16   motion.  That's all I'll say.

17             THE COURT:  And that's my reading of

18   it as well, is that it was far beyond -- in fact, I

19   did not read all -- when I started to see where it

20   was going, it's way before this case.

21             And, Mr. Krone, I know that this is

22   a disappointing outcome for you.  I know that the

23   parties have worked hard in this case.  Before I

24   put this black robe on, I was involved in Chapter

25   11 cases, and believe me, they don't all turn out

1   the way we want them to.  Often the thunder or the

2   white knight just doesn't come through, whether it's

3   big cases or little cases, and it's very

4   disappointing.

5                    But where do we go from here?

6                    MR. TOOSLEY:  So, I think that we have

7   the open issue of I want to say at the end of January

8   it was about -- there was about 304,000 in the

9   account, according to my math.

10                   And, Greg, you can correct me if I'm

11  wrong --

12                   MR. JORDAN:  Minimally.  I recall it

13  being $305,000 --

14                   MR. TOOSLEY:  So --

15                   MR. JORDAN:  -- when I did the math,

16  because I couldn't figure out how it would be that

17  there was $295,000 in equity contributions.  When

18  you add up the money in the account, there was what

19  I thought was $305,000.  And I know that the debtor

20  is cash flow positive when it's not making cash

21  collateral payments, and so the whole thing has

22  confused me.  And I talked to Mr. Krone, and we

23  have not reached any kind of consensus on the

24  numbers.

25                   MR. TOOSLEY:  So, what was filed

1  yesterday afternoon was a claim without any detail at

2  all of who these investors are, other than just

3  generically referencing trusts, that they had put

4  $295,000 into this thing.  And it actually is

5  referenced at the top of this document as equity

6  contributions for the plan.

7              THE COURT:  Right.

8              MR. TOOSLEY:  But they go back to

9  September of '22.  And the plan, obviously, Your

10 Honor knows, was not even done until October of '23.

11 These are actual monies that were paid -- I don't

12 know if Your Honor remembers these discussions --

13 because there was always -- there was not enough

14 money to make adequate protection payments.

15             THE COURT:  Right.

16             MR. TOOSLEY:  So these people made

17 contributions to be able to allow this bankruptcy

18 case to proceed.  They're asking in this document,

19 from what I can understand, to overturn all of

20 those prior orders, and, therefore, have these

21 people get their money paid back, when the whole

22 reason why the bankruptcy case continued on was

23 because they needed that money to make adequate

24 protection payments.  Those weren't equity

25 contributions for the plan.

1          I'm happy to put pen to paper --

2          THE COURT:  Well, no, I looked at -- I

3     skimmed it.  And I, frankly, wasn't sure exactly what

4     I was looking at, but --

5          MR. TOOSLEY:  But I did the math.  In

6     November, I was able to match up about 150,000 of

7     equity contributions that came in after the date of

8     the confirmation.

9          THE COURT:  Okay.  But let me stop you

10    for a minute and ask a question.

11         MR. TOOSLEY:  Sure.

12         THE COURT:  The cash collateral

13    orders that were entered and your client's lien

14    extends to accounts receivable, as well as accounts

15    receivable turned into cash.  But if Joe Schmo

16    provides some money to help make the adequate

17    protection payment, that payment I think becomes

18    yours.  But let's say there's extra money, I don't

19    know how that becomes part of your collateral.

20    That's what I'm missing.

21         MR. TOOSLEY:  Right.  But they didn't

22    -- they stopped -- so, there was only four adequate

23    protection payments made.

24         THE COURT:  Right.

25         MR. TOOSLEY:  And then Your Honor

1   ordered them, and they just didn't make them.

2                    THE COURT:  Okay.

3                    MR. TOOSLEY:  Right?  So that was part

4   of the motion to dismiss.

5                    So, since January of '23, they have

6   been using cash collateral without making any

7   adequate protection payments at all.  So -- and

8   then they also were supposed to be escrowing taxes,

9   and we've come to learn that it's between 4 and

10  $500,000 of taxes that are outstanding at the moment

11  as well.

12                   THE COURT:  Cook County taxes?

13                   MR. TOOSLEY:  Yes.  And so we have now

14  potentially an issue of, you know, they should have

15  gone to adequate protection, which they didn't.  We

16  have an issue of two attorneys are claiming that

17  they're entitled to be paid.  We have the issue of

18  real estate taxes, and we have an issue of equity

19  investments either pre- or post-date of the

20  confirmation of the plan.

21                   I think that when we had talked last

22  time, I had indicated that to the extent that people

23  were posting funds -- this, again, was the very first

24  time yesterday at 3:30 I learned that these were

25  equity contributions from some unknown equity people

1  that was used to cover these adequate protection

2  payments.

3            We just assumed it was Mr. Krone that

4  was covering the delta.  We didn't -- it was never in

5  any reports or any other filings or anything that

6  there was any reference at all to these other

7  investors.

8            There's not any claims filed by these

9  other investors or anything.  Like as far as this --

10  we're just learning for the first time, this chart of

11  just unknown trusts and things like that, that was

12  filed, like I said, at 3:30 yesterday.  But they

13  allegedly started in September, were infusing cash,

14  and somehow that that should be -- if that money is

15  theirs, and they get paid back for all that time, it

16  would have the actual effect of overturning the prior

17  adequate protection payment orders because we would

18  lose it at the end, right?  So...

19            THE COURT:  I would like to take a

20  recess.  I want Mr. Smith to call the U.S. Trustee's

21  office.  I think they should be here.  This is a

22  little bit more -- I would like their input.

23            So, why don't we take a five-minute

24  recess.  They're in the building.  They should be

25  able to --

1            MR. TOOSLEY:  I can run down there,

2   too, if --

3            THE COURT:  No.

4            MR. JORDAN:  If you want, I can

5   call Ms. Silver right now.  I have her cell phone

6   number.

7            THE COURT:  Yes, let Mr. Smith call

8   her, and I'll just sit here.

9            MR. JORDAN:  Okay.  That's fine.

10           (Brief recess.)

11           THE CLERK:  Recalling Platform II

12   Lawndale, LLC.

13           THE COURT:  Well, thank you for coming

14   down, Ms. Silver.

15           MS. SILVER:  There's nothing --

16           THE COURT:  Well, I guess we could --

17   as you know, this case is problematic.

18           MS. SILVER:  Right.

19           THE COURT:  And we were just

20   hearing -- there was a rule to show cause.  The money

21   has been returned that that was based upon.  However,

22   yesterday, I don't know how many operating reports

23   were filed, quite a few.

24           I understand from what was said before

25   you got here that there were $295,000 in equity

1  contributions that were made, that are held in an

2  account somewhere, but there are 400 to $500,000 in

3  property taxes that are unpaid.

4          MS. SILVER:  Post-petition?

5          MR. TOOSLEY:  Not all post-petition.

6          THE COURT:  Right.  I know that, you

7  know, there was, obviously, an attorney who worked to

8  reduce the property taxes.  And that motion to pay

9  him -- he's here today -- was up last time.  And I

10  don't have an objection to paying that.  I think it's

11  a benefit to the estate.  However, at this point

12  there is now a receiver back in state court.  This is

13  a pretty big mess.

14          We have two -- we have applications

15  for payment of attorney's fees.  I don't see --

16  there's questions about the equity contributions, who

17  do those belong to.  And so I thought the U.S Trustee

18  might want to provide some insight.

19          MS. SILVER:  Well --

20          THE COURT:  And it may be hard because

21  everything was filed in the last 24 hours.

22          MS. SILVER:  Right.  Gretchen Silver

23  from the U.S. Trustee's office.

24          To add to the frustration and

25  complications of this case, we're post-confirmation,

1  which --

2              THE COURT:  Yes, we are.

3              MS. SILVER:  -- limits my ability to

4  participate.  The U.S. Trustee's participation in

5  Chapter 11 is very limited post-confirmation, and

6  none of these issues are on the post-confirmation

7  participation list.

8              THE COURT:  What about the attorney's

9  fees?

10             MS. SILVER:  Well, the attorney's fees

11  as they relate to pre-confirmation time periods, you

12  know, they're administrative expenses.  They should

13  have been, you know, estimated and built in to the

14  confirmation hearing and part of the feasibility

15  consideration.

16             So, in that sense, even those are --

17  my participation is limited.  I looked at those.  I

18  didn't see anything out of the ordinary, but at the

19  time I reviewed them, honestly, I didn't know all

20  this other stuff was going on here.

21             THE COURT:  None of us did.  But

22  certainly I didn't.

23             Well, I guess I will hear from the

24  parties.  I have --

25             MS. SILVER:  Isn't there a motion from

1  one of the lenders or the secured creditor to dismiss

2  or something?

3          MR. TOOSLEY:  That was granted three

4  weeks ago.

5          MS. SILVER:  Ah.

6          THE COURT:  Right.  The receiver is

7  back in place.

8          MS. SILVER:  Well, yes, I mean, my

9  ability to participate in very limited.  So, although

10  I am happy to, you know, give you a personal opinion,

11  I don't think that's really meaningful.

12          THE COURT:  You may lack authority,

13  but I have a lot of respect for you.

14          MR. TOOSLEY:  Although it is

15  post-confirmation, the confirmation was never

16  effective because there was not a closing.  So, it

17  was always -- there was language that we talked

18  about back and forth at the time, what to put in

19  that knowing that the closing wasn't an absolute

20  given as of the date of confirmation.  So, although

21  we are post-confirmation, it has never become

22  effective.

23          So, that is the additional --

24          THE COURT:  I believe this could be

25  used as a law school exam --

1          MR. TOOSLEY:  Exactly.  I think that,

2    you know, from my perspective this is a major issue

3    between the fees, the real estate taxes.  We're just

4    learning about some unknown investors that we've

5    never seen before.  It's never been in any budgets.

6    It's never been in any operating reports.  It was not

7    in the plan about these people being paid back.  And

8    we're just learning at 3:30 the day before this

9    hearing who they -- allegedly they're just trust

10   names.

11          I need some time to dig into this

12   for us to do it, and I don't want to waste the

13   court's time anymore knowing that we already have

14   a receiver back in place, and the dismissal here

15   is going to impact how quickly that foreclosure

16   can go forward.  But it's just that I can't in 22

17   hours prepare for something when these were due three

18   weeks ago.  Right?  I mean, like, the operating

19   reports were supposed to be done by the 24th or

20   something.

21          THE COURT:  Right.

22          MR. TOOSLEY:  The accounting was

23   supposed to be done by February 1st, and what was

24   filed yesterday wasn't even an accounting.  So,

25   you know, we haven't been able to really investigate.

1  These people, we're hearing about them for the very

2  first time yesterday at 3:30.  And so for us to be

3  able to say -- and even the budgets that were done

4  every month, at the bottom where it talked about

5  equity, it said to be determined at some later

6  date.

7           We didn't know that they were going to

8  these investors -- again, not identified anywhere at

9  any point in this case -- and asking them to make up

10  that delta on the adequate protection payments.

11  Right?

12           So, it's just -- it's hard because

13  we're scrambling last-minute.  And that was the whole

14  point in setting today's date, and the deadlines in

15  them, so that we wouldn't.

16           THE COURT:  Believe me, I have

17  trouble.  But I'm just -- what I really am

18  questioning -- and I don't know whether Mr. Jordan

19  or you or anyone else has any thoughts -- I'm not

20  really sure what the purpose of this case remaining

21  open is.

22           We wanted to get the receiver in

23  because there is nothing from the building to benefit

24  this estate at this point, is my understanding.  Your

25  client is probably under water.  These property

1   taxes, which we didn't know about a couple weeks

2   ago --

3          MR. TOOSLEY:  The issue is that

4   we were afraid, and based on communications it's

5   a really good -- especially when they had one

6   for 44,000 -- that if we don't have -- if there's

7   any delta here as far as determining where these

8   funds go, that they will not be there by the time

9   it's passed over to the receiver.  They will

10  have --

11          THE COURT:  So, what claim does your

12  client have to them, though?  That's another problem

13  that I don't know the answer to.  I mean, I thought

14  I understood your lien.  It was a lien on

15  receivables, on real estate.  It wasn't on folks

16  walking in that simply wanted to be equity when your

17  client is taken out.

18          MR. TOOSLEY:  Which, again, we just

19  learned about for the very first time yesterday.

20  Because we knew -- when we were here three weeks

21  ago, we were told that there was an equity infusion

22  to make up the delta post-confirmation as to the

23  closing, which we -- the math had showed it to be

24  about 150,000.  And then it wasn't until we just

25  got these most recent operating reports in

1  yesterday that now all of a sudden we're hearing

2  it's $295,000.

3          I even went through the actual

4  operating reports for those months.  They're also not

5  showing on the bank accounts.  They don't match up

6  with what was filed yesterday.  So, I don't even -- I

7  don't know who these people are, and it doesn't match

8  up with the actual documents that were filed in this

9  case.

10          MR. JORDAN:  Your Honor, can I

11  speak --

12          THE COURT:  Yes.

13          MR. JORDAN:  -- to those issues?

14          First off, I don't know -- you know, I

15  certainly have done my best to obtain from the debtor

16  the contact information for the various investors.

17  There is Exhibit F to the disclosure statement, a

18  list of investors who were going to be investing in

19  the fund.

20          In fact, at the disclosure statement

21  hearing -- I'm sorry, combined hearing -- there was

22  commentary with regard to Mr. Krone's percentage,

23  even though he wasn't putting money in, why was

24  getting it.

25          THE COURT:  Right.  I remember that.

1          MR. JORDAN:  All that.  So, the fact

2    that there were these investors, and the fact that I

3    believe it was a total of -- and I could be wrong,

4    but it's about $923,000 when you add up the amount of

5    money that Greenlake was going to receive, the delta

6    between what they needed to receive and what -- the

7    loan that the debtor was going to obtain from Red

8    Oak -- which has, obviously, has not occurred or we'd

9    be in a much happier state.

10          With regard to the real estate taxes,

11    that issue has come up over and over and over again.

12    It came up at the last hearing.  It came up at the

13    confirmation hearing.  That is not news, the fact

14    that the debtor has substantial real estate taxes

15    that Mr. Martin got reduced, but they're still

16    substantial.

17          Again, I'm not here to tell you that

18    there are $295,000 in the debtor's

19    debtor-in-possession account that are investors

20    funds.  In fact, I would say without doing any great

21    analysis, there is virtually no way that there's

22    $295,000 of investor funds in there because of the

23    fact that the debtor ran positive and -- cash flow

24    positive if it wasn't making its cash collateral

25    payments.

1            How much is in there?  I think Mr.

2    Toosely said maybe a hundred and a half.  That would

3    make sense.  You know, the monies that were put in

4    after the confirmation hearing, probably $150,000 is

5    not unreasonable.  But they are in the debtor's

6    account.  They're not -- there's no restrictions on

7    their use.  So, I don't know.  The court will have to

8    decide what to do with those.

9            With regard to all the other

10   reporting, you know, we have provided the information

11   that the debtor has provided to us and filed it when

12   we received it.

13                  MR. TOOSLEY:  So, that's --

14                  MR. KRONE:  Your Honor, may I please

15   respond?

16                  THE COURT:  Somebody is going to have

17   to put you on as a witness if you're going to --

18                  MR. KRONE:  I'm happy to be one.

19                  MR. TOOSLEY:  Right.  There have

20   been filings by the corporate entity twice, not by

21   their represented counsel, in violation of the

22   rules.

23                  THE COURT:  Right.

24                  MR. TOOSLEY:  And so there is an

25   attorney present for the debtor.

1          THE COURT:  Right.  Yes, your attorney

2   is here.  If he wants to put you on or if Mr. Toosley

3   wants to put you on as an adverse witness, that's

4   fine.  But you -- and you don't have an attorney

5   here, and my understanding is you're not an attorney,

6   but you were a principal of the debtor.

7          MR. KRONE:  Your Honor, I'm the one

8   who filed the reports, and I'm just trying to find

9   out how to file the reports accurately.  And I made

10  extensive efforts to reach out to the courts and the

11  bankruptcy departments in order to know best how to

12  do that.

13         THE COURT:  Well, you have an attorney

14  who could tell you how to do that.

15         MR. KRONE:  I know, but there was a

16  discussion about our receipts, and I was trying to

17  reflect that problem, and he would not answer those

18  questions, which is why I --

19         THE COURT:  Well, I don't really

20  want to have that discussion here in front of me.

21  That's a discussion between you and your counsel.

22  And if you have a problem with him, that's something

23  you have to take care of.  I'm not taking care of

24  that.

25         MR. KRONE:  My point is that all of

1   these payments line up with the people that are in

2   the --

3              THE COURT:  And I don't know if you

4   didn't hear me before.  I understand that you really

5   want to tell me something.  You've got a lawyer here

6   who can put you on, put you under oath so he can

7   question you.  But, you know, it's unwieldy --

8              MR. KRONE:  I request that my attorney

9   put me on the stand.

10              MR. TOOSLEY:  I mean, my only concern

11   about doing this is that, one, these were just

12   disclosed yesterday.  I haven't had any chance to

13   look at them, and I'm not ready to necessarily move

14   forward.  I was in a dep all morning, so I didn't

15   have a chance to really -- and then we have new stuff

16   that came forward.

17              I know that counsel said only the end

18   of it, 45 minutes before the hearing, was critical

19   to what we're talking about, but it was critical to

20   what we're talking about.  So, that's the reason

21   why --

22              THE COURT:  I mean, you know, at

23   this point, this is post-confirmation.  We have a

24   plan that did not go effective.  That's a basis to

25   dismiss this case.  I don't see any reason to convert

1 | it.  I think that would be a terrible burden on a
2 | Chapter 7 trustee.  There is a receiver down the
3 | street.
4 | We still have an issue, unfortunately,
5 | about this cash.  Mr. Toosley's client is going to
6 | have whatever claim he has down the street or here.
7 | I don't think -- it is what it is.  I was hoping to
8 | enter orders on fees today before I dismiss the case,
9 | not that I know where people are going to collect
10 | them from, but I was going to do that just to tidy up
11 | the docket.
12 | MR. TOOSLEY:  The request was that
13 | they get paid out of these monies, which I know that
14 | Your Honor mentioned last time, you know, you're not
15 | sure that that's part of your --
16 | THE COURT:  Where the money comes from
17 | -- you know, all I can say is this is what the
18 | fees -- this was the fee request.  I'm either
19 | approving it, cutting it, denying it, making some
20 | decision about it.
21 | What the source of that is, if I
22 | dismiss this case, is something maybe the state court
23 | has to decide.  I don't know.  I don't know what's in
24 | the state court other than the building and maybe
25 | some receivables, rents, but a lot of claims against

1  it.

2           If anybody thinks I'm missing

3  something entirely, please tell me.

4           MR. TOOSLEY:  I don't.  I mean, like I

5  said, it's just because we have -- it's 305,000 that

6  we have four different people reaching out their

7  hands to.  And, like I said, this is -- in a

8  situation with a court-appointed receiver pre-filing.

9           THE COURT:  And now he's back.

10           MR. TOOSLEY:  And now he's back, sort

11  of, almost, because he hasn't got his bond approved

12  yet.

13           But, like I said, it's just we --

14  we're not in a -- our client just did not want these

15  funds to disappear, is what we assume will happen as

16  soon as -- because this was, you know, theoretically

17  part of this proceeding.  And, like I said, we're

18  learning now allegedly that they weren't cash

19  collateral.  They were equity infusions.

20           But to Mr. Jordan's point, they

21  haven't made an adequate protection payment in a

22  year.  The property was cash flow positive.  So, how

23  can there only be 10,000?  The difference between 305

24  and 295, like, that doesn't logical sense as to how

25  that could possibly happen.  But, you know, I'm

1   learning all of this within 24 hours.

2             THE COURT:  As well as I am.

3             MR. JORDAN:  Your Honor --

4             THE COURT:  Yes.

5             MR. JORDAN:  -- one thing that I think

6   might be appropriate, each of the investors were

7   prepetition investors.  So, they were in --

8             THE COURT:  I thought --

9             MR. JORDAN:  I'm sorry?

10            THE COURT:  I thought that there were

11  investors that were coming on as you approached the

12  new financing.  Maybe I was --

13            MR. JORDAN:  No, they're all --

14  they're just existing investors who are putting in

15  additional funds to maintain their interest in

16  Platform.

17            THE COURT:  Okay.

18            MR. JORDAN:  And I would, of course,

19  argue that, you know, they had -- you know, they had

20  an interest in having, you know, the fees for Jordan

21  & Zito approved.  And I would continue to have that.

22            But one of the things that I don't

23  think there is any doubt is that Mr. Martin's firm

24  has benefited the debtor, has benefited Greenlake,

25  has benefited the investors to give them a chance to

1    reorganize.  And I see no reason why Mr. Martin's

2    firm should not be paid out of the funds that are

3    held.

4              Now, of course, again, I think that

5    our firm's fees should be approved as well, and I

6    think that we have provided benefit to the estate.

7    But, you know, Mr. Krone filed an objection to our

8    fee application.  No one has filed an objection to

9    Mr. Martin's firm's --

10             THE COURT:  Well --

11             MR. JORDAN:  -- I think at the very

12   least they should get paid.

13             THE COURT:  And the last time we were

14   here on Mr. Martin's fees, I approved them, but we

15   didn't have a source for payment.  I don't know that

16   I'm going to ever know what the source for payment

17   should be in this, but I definitely am willing to

18   enter an order approving his fees.  I mean, he

19   does --

20             MR. TOOSLEY:  I think we all said that

21   last time.

22             THE COURT:  And I wasn't sure why that

23   was on the docket, frankly.  I don't know.  Maybe

24   somebody needs to submit an order, and I will get it

25   on the docket.

1          MR. TOOSLEY:  I think the whole

2   objection last time —— not objection, per se —— was

3   just the open issue.

4          THE COURT:  Right.

5          MR. TOOSLEY:  The request was that it

6   be paid from these funds, which is still what Mr.

7   Jordan is saying now, which I'm not sure —— if

8   there's not even like an analysis as to where the

9   funds came from we can —— how we can direct ——

10          THE COURT:  Well, perhaps what has to

11   be done —— I'm not really jumping up and down for joy

12   about this problem —— but I would need to see the

13   agreement —— again, the agreement with your client ——

14   what was the lien.  I would have to go back and look

15   at that.

16          What was the agreement with these —— I

17   mean, your client has been around since —— this money

18   has been around.  There must be some documents that

19   talk about who has an interest in it or who doesn't.

20          MR. TOOSLEY:  Like I said, we're just

21   learning, again for the first time, that these

22   prefiling investors were the ones who were making up

23   this delta.  There's only like five adequate

24   protection payments that were made.  Right?

25          THE COURT:  Right.

1          MR. JORDAN:  There was six, I think,

2    yeah.

3          MR. TOOSLEY:  Five-and-a-half.  I

4    think one was like a half of one or something.

5    Right?  So, you know, this is -- literally not a

6    single document filed in this case identified that

7    that's where they came from, not even the budgets or

8    anything like that.  So, this was -- this is just

9    brand-new where we're trying to -- I don't know.

10         THE COURT:  I, frankly, don't

11   understand why this wasn't in the disclosure

12   statement.  The disclosure statement should have

13   provided enough information so that everybody,

14   including this court, could evaluate whether or not

15   there was a feasible plan and what were the

16   constraints of that plan.

17              I mean, I always knew that there were

18   investors, but I had a different impression of when

19   they were coming in and what they were there for.

20   And now to find way post-confirmation that this is

21   here, this pot of money is here that people knew

22   about, but I didn't know about, certainly the

23   creditors of this estate that voted on this plan

24   didn't know about, I mean --

25              MR. TOOSLEY:  So, we would have

1  brought this to the court's attention back at the

2  time if we knew that there was a chance that they

3  were going to claim to claw it back or that it was

4  these investors particularly as to how they were

5  coming up with the funds.  Right?

6              And, you know, we -- Mr. Jordan and I

7  started negotiating an agreement as to the plan, you

8  know, almost a year ago now.  Right?

9              THE COURT:  I know.  I just looked at

10  his time records.

11              MR. TOOSLEY:  So, we had a lot of

12  conversations while we were trying to work it out.

13  And assuming that we had been able to do the plan,

14  we, obviously, wouldn't be here today for a lot of

15  different issues.  There wouldn't be an issue of

16  payment of fees.

17              THE COURT:  Right.

18              MR. TOOSLEY:  There wouldn't be an

19  issue of any of this stuff, his would have got

20  paid --

21              THE COURT:  Right.

22              MR. TOOSLEY:  -- our amounts from that

23  initial closing.  So, I mean, a lot of this stuff

24  probably wasn't contemplated amongst Mr. Jordan and I

25  because we were putting all of our eggs in the basket

1  that this plan was going to be consummated.

2                THE COURT:  I'm quite aware of that.

3                MR. JORDAN:  Your Honor, I mean, we

4  were under the understanding, an understanding that

5  debtor had the funds to -- from its investors to make

6  the make loan work.

7                And that was disclosed in the

8  disclosure statement, saying that the debtor had --

9  in Section 13, the debtor has obtained funds from

10  investors and a commitment for a post-confirmation

11  loan from a third-party lender, Red Oak Capital

12  Holdings.

13                And we listed the investors with the

14  percentages that they had.  And, frankly, it just

15  turned out that the debtor didn't have all the funds,

16  and it didn't have all the -- didn't have the

17  commitment, the solid commitment, that we all thought

18  that the debtor had.

19                But we didn't -- you know, we didn't

20  brush this issue aside in the disclosure statement.

21  It was in there.  It was disclosed.  The individual

22  investors or trusts or entities, whatever, were

23  disclosed in Exhibit F with their percentages.  So,

24  you know, I mean, we're here because it just didn't

25  fund.

1          THE COURT:  But that equity -- maybe I

2   was a poor reader.  My understanding was that that

3   equity was being contributed for the financing to

4   take out Greenlake.

5          MR. TOOSLEY:  Correct.

6          MR. JORDAN:  And it was, absolutely a

7   hundred percent true.

8          THE COURT:  And it was never intended

9   to be part of the cash-collateral collateral because

10  it was new -- I mean, I guess I didn't realize it had

11  been there before.

12         MR. TOOSLEY:  That's what I thought,

13  that was all new.

14         THE COURT:  But be that as it may, it

15  still probably wouldn't have been your collateral.  I

16  really haven't looked at your agreements recently,

17  and I will go back and look at them.

18         MR. TOOSLEY:  And this was part of our

19  argument -- we had an oral argument in front of Your

20  Honor October when we objected to the use of cash

21  collateral prior to the confirmation of the plan,

22  because I said every month that they don't make an

23  adequate protection payment -- they're trying to use

24  that money to pay us, right --

25         THE COURT:  Right.

1          MR. TOOSLEY:  -- to bridge that gap.

2          So, this was always -- the timing

3    could have easily been brought up, like, oh, no, you

4    know, that gap -- the money we have in on our account

5    is investor funds; it's not your cash collateral.  At

6    no point did they say when we objected to the use of

7    cash collateral that it wasn't our cash collateral,

8    it was the investor funds.

9          So, that would have been the perfect

10   opportunity in October when we objected to the use of

11   cash collateral to say this isn't your cash

12   collateral; this is an investor fund.  At no point

13   was there ever a claim that this money in the

14   accounts wasn't our cash collateral prior to the

15   confirmation of the sale.  At no point did it say,

16   this is investor funds; this is not your cash

17   collateral.

18          MR. JORDAN:  I don't think at any

19   point did anyone say it was.  It just didn't come up.

20   And so, I mean, to the extent that, you know, there

21   was something out there at the time -- you know,

22   around the time of the hearing -- I should probably

23   look to see what numbers have changed from the

24   initial report I filed.  But there was one that was

25   filed yesterday.

1           And I believe there were -- you know,
2    there should have been $150,000 in the --
3    approximately 150 -- the report I just pulled up,
4    which I think is an older one, one fifty-seven four
5    forty-two -- in monies in the debtor account.  I
6    don't think anybody thought that the debtor was
7    making that type of profit during 2023.

8                So, Greenlake -- I mean, Greenlake and
9    I, we all had a sense that there was monies there.
10   However, I thought that there was more monies that
11   were being held outside of the debtor-in-possession
12   account to fund the Greenlake amount under the plan,
13   and it turned out there wasn't.

14               MR. TOOSLEY:  It would have been nice
15   at some point in the budget to show -- I mean, there
16   was no real estate taxes being paid.  There was no
17   adequate protection.  So there wouldn't have been any
18   equity.

19               The chart that was filed yesterday
20   goes all the way back to September '22, you know,
21   right after this bankruptcy was filed.  And so at no
22   point had it been disclosed in anything I have ever
23   seen that all of this money was coming in from these
24   individuals or particular investors during the course
25   of this case.

1          Now, if it's true that this was

2    happening -- and maybe there's an issue of whether or

3    not our loan documents and our security interest

4    covers all of it -- but we've been kind of put on the

5    spot the day before the hearing to take this position

6    without actually having even -- I was always under

7    the impression, like Your Honor said, that there was

8    going to be a cash infusion post-confirmation to

9    cover a delta to allow for the closing, and not for

10   these pre-confirmation amounts that were --

11          Mr. Jordan I think is right, there was

12   a disclosure that the investors were going to need to

13   come up with some funds, but it didn't show -- unless

14   I'm misreading the --

15          THE COURT:  My recollection -- and we

16   probably shouldn't all be testifying about

17   recollection -- but that Mr. Krone was working to get

18   new investors in and was protective of those

19   investors.  I remember that as being a very -- you

20   know, that that was part of -- you want to call it

21   the delta -- that was the delta that was being raised

22   to get to the effective date.

23          And apparently that happened, but

24   the effective date hasn't happened.  I never viewed

25   it as that was going to be money that would go to

1  Greenlake, except for in the sense that Red Oak was

2  going to come back and was going to be able to take

3  you out.  So that was kind of the flow of it.

4              What do we do now with this case that

5  is in shambles, where there is already a receiver

6  down the street, who will presumably get his bond,

7  start to work on liquidating the property through the

8  foreclosure, whatever --

9              MR. TOOSLEY:  The foreclosure order

10  entered yesterday said that we cannot move on Count I

11  until the dismissal.  So, the receiver is in place --

12              THE COURT:  Until the --

13              MR. TOOSLEY:  -- so there's no moving

14  -- like, I can't set the foreclosure sale or anything

15  until that happens.

16              THE COURT:  I mean, I --

17              MR. TOOSLEY:  So, like, I just want to

18  be --

19              THE COURT:  No, that's good.

20              MR. TOOSLEY:  -- transparent.

21              THE COURT:  The other issues that are

22  before me today, I am going to grant an order for Mr.

23  Martin's fees.  I think that --

24              And, frankly, although there is an

25  objection to Mr. Jordan's fees, I looked through

1  them.  Mr. Jordan has the most reasonable billing

2  rate in Chicago, for the most part.  Although he's

3  not pushing work down to an associate at a lower

4  billing rate, he's very efficient.  I was about to

5  criticize him on doing his own fee application, but

6  he spent an hour -- 1.7 hours, on it.  And I can tell

7  you, I've done a lot of fee applications.  They take

8  a lot longer than that.  So he's an expert.

9            And the fact that it's not a happy

10  outcome in the case doesn't mean he didn't do the

11  work.  It is what it is.

12            MR. TOOSLEY:  We didn't object to his

13  fees.  We were just thinking about where --

14            THE COURT:  I know.  Mr. Krone

15  objected his lawyer's fees.

16            If you think that Mr. Jordan did

17  something wrong in this case, that's not in front of

18  me.  You can bring that in your own action, if you

19  want to file an action for malpractice or whatever.

20  But what I've seen, he's entitled to his fees.  Now,

21  how is he going to get paid his fees?  I don't know.

22            MR. KRONE:  Your Honor, there's

23  personally $23,000 that shows a previous balance.

24  There's no invoicing to support $23,000 --

25            THE COURT:  That was for pre-petition,

1   I think.

2              MR. KRONE:  No, it was basically we

3   hired him on the 11th.  His billing started on the

4   13th.  And we paid him $33,000 as an earnest --

5              THE COURT:  Retainer.

6              MR. KRONE:  -- as a deposit, which

7   means that there's $23,000 that -- there was $56,000

8   billed in two days?  We don't have any evidence of

9   any invoicing for that amount of money or $23,000.

10  All of a sudden it just appears, previous balance,

11  $23,000.

12             MR. JORDAN:  I didn't --

13             MR. KRONE:  He never accounted for

14  it.

15             MR. JORDAN:  I don't even know what

16  he's talking about.

17             THE COURT:  Okay.  This is what I'm

18  going to do because at this point this is not

19  efficient.

20             Mr. Krone and Mr. Jordan, I want you

21  to make sure that everybody is on the same page for

22  whatever -- as I understand, a retainer was provided.

23  And I thought Mr. Jordan was -- I could be completely

24  wrong -- was applying a pre-petition invoice to that

25  before the case was filed.  If that's not right, then

1  the accounting on the fees should definitely make

2  sense.  And if it's not making sense to you, maybe

3  it's not making sense to me.

4            MR. JORDAN:  It was, Your Honor.  It

5  was applied right before the petition was filed.

6            MR. KRONE:  We don't have any --

7            MR. JORDAN:  Something like $6,000, I

8  don't --

9            MR. KRONE:  Then how is it $56,000

10 since --

11           THE COURT:  Mr. Jordan.

12           MR. JORDAN:  Yes, ma'am.

13           THE COURT:  Right now it doesn't seem

14 like you and Mr. Krone are like best buddies.  But

15 you need to sit down.  And before I enter this order,

16 sit down and explain to him -- show him your invoices

17 that are pre-petition so that he understands the

18 accounting, and then I can enter an order that makes

19 sense.

20           If there is not an invoice that covers

21 that pre-petition amount that you set off -- that's

22 often what happens.  Somebody gets an invoice -- the

23 lawyers are going to make sure that they're paid

24 their pre-petition amount before they start the

25 post-petition work.  But it certainly should make

1   sense to everybody.  And so I want the numbers to

2   make sense.  If they don't --

3                MR. KRONE:  He's represented $6,000,

4   but yet 33 was paid, and then there was a previous

5   balance of 23.

6                THE COURT:  Okay.

7                MR. KRONE:  That's a huge gap.

8                THE COURT:  Okay.  I agree.  Sit down

9   and figure that part out.  And then if you need me to

10  make a decision on that, I will.  But I don't want to

11  make it based on people yelling numbers out and --

12               MR. KRONE:  -- show you what I'm --

13               THE COURT:  Well --

14               MS. SILVER:  The other thing is

15  because fees are one of the things that a bankruptcy

16  court does have continuing jurisdiction over the case

17  after the dismissal, it could be --

18               THE COURT:  So, that's right, it's

19  clear that I can do that.

20               MS. SILVER:  Mr. Martin's fees --

21               THE COURT:  Right.

22               MS. SILVER:  -- and send the rest of

23  it back to state court.

24               THE COURT:  I mean, that works for me.

25  But I do want Mr. Jordan and Mr. Krone to sit down

1  and see if this makes sense.  If it doesn't, then

2  I'll have a separate hearing or you can submit it on

3  papers, and we can figure this out.

4                I have a lot of respect for both of

5  you.  I know you tried hard in this case.  I know Mr.

6  Jordan has worked hard.  I know it's not the outcome,

7  but I think -- why don't you guys take a crack at

8  trying to do that, and then I'm happy to get

9  involved, and I'll enter an order accordingly.  Ms.

10 Silver is absolutely right, I have jurisdiction on

11 that.

12                Mr. Martin, you'll have your fees

13 approved today so you don't have to come see me

14 anymore.

15                MR. MARTIN:  Thank you.

16                THE COURT:  I just need the order for

17 that.  And then I can enter an order dismissing the

18 case so that the receiver can ago ahead.  I know that

19 there is a lot of other issues that we could spend a

20 long time trying to figure out.  I'm going to defer

21 to --

22                Who is the state court judge?

23                MR. TOOSLEY:  Judge Marian --

24                MR. JORDAN:  Perkins.

25                MR. TOOSLEY:  Judge Perkins.

1            THE COURT:  I'm sure she's delighted

2   to have this issue in front of her.

3            MR. TOOSLEY:  Well, I guess if the

4   money is gone, then the issue won't be in front of

5   her.

6            THE COURT:  Yeah, I don't know.  I

7   mean, I guess -- you know, in retrospect, if the

8   property taxes weren't being paid, I wish somebody

9   had shouted that loudly to me, because I would

10  have -- you've got to pay them.  And if there's not

11  enough money there, then why was this, you know --

12           MR. TOOSLEY:  From our perspective at

13  that point, we were getting paid our adequate

14  protection, so we weren't going to be fighting over

15  the months every month because --

16           THE COURT:  Looking back in the

17  rearview mirror, it's not all great.

18           MR. TOOSLEY:  -- it was showing on the

19  reports every month that they were setting it aside,

20  so I wasn't --

21           THE COURT:  Yes.

22           MR. TOOSLEY:  -- double-checking to

23  see if the --

24           THE COURT:  Well, let's do this.  I am

25  going to enter the order today dismissing the case.

1    I will set -- let's set a hearing out in two weeks

2    over the fees.

3                    MR. JORDAN:  Can we do that in three

4    weeks, Your Honor?  I'm going to be in Baltimore on

5    trial for a week starting next Tuesday.

6                    THE COURT:  I just want to make sure

7    that you and Mr. Krone have the time to --

8                    MR. JORDAN:  That's why I said three

9    weeks, because I don't want to rush it when I'm

10   coming back.

11                   MR. KRONE:  The 6th, Your Honor?

12                   THE CLERK:  Yes, March 6th.

13                   THE COURT:  March 6th.

14                   MR. KRONE:  Are we going to do that at

15   1:00 o'clock again?

16                   THE COURT:  I think that makes sense.

17   I hate to -- I have set a lot of things over to the

18   6th today.

19                   (Discussion with the court.)

20                   THE COURT:  I mean, I can do 11:00

21   o'clock, too.

22                   MR. KRONE:  I am fine with either

23   time.

24                   THE COURT:  Yes, 11:00 is fine.  Why

25   don't we do it at 11:00, with the caveat that you

1    might have to wait a couple minutes.

2                   MR. TOOSLEY:  So, the order from today

3    is going to say that we're dismissing the bankruptcy

4    case --

5                   THE COURT:  And I'm retaining

6    jurisdiction over the fees.  We'll continue those to

7    the 6th.

8                   MR. MARTIN:  And, Your Honor -- this

9    is David Martin -- are you looking for an order from

10   me regarding our fees --

11                  THE COURT:  Yes, from either you or

12   Mr. Jordan.

13                  MR. TOOSLEY:  There was a proposed

14   order, I think, attached to your application.

15                  THE COURT:  Let me see.

16                  MR. MARTIN:  Yeah, I thought there

17   was.

18                  MR. TOOSLEY:  I don't think they

19   accept any motions anymore without a proposed order.

20                  THE COURT:  Well, we don't, but we

21   do.

22                  MR. TOOSLEY:  Right.

23                  THE COURT:  They should all be in this

24   fillable form so that I --

25                  MR. MARTIN:  It was filed I think back

1  in December, right?

2  MR. JORDAN:  Right.

3  THE COURT:  If you can find it.  We'll

4  get the order on the docket.

5  MR. TOOSLEY:  And then the rule to

6  show cause is just denied as moot or...

7  THE COURT:  Do you want to just

8  withdraw it?

9  MR. TOOSLEY:  Yeah, it's probably

10  easier to just withdraw it.

11  MR. KRONE:  I'll withdraw my response.

12  THE COURT:  I can also mark it as

13  moot.  Maybe that makes it easier.

14  MR. TOOSLEY:  Either way is fine.

15  THE COURT:  Hearing concluded, I'll do

16  that.

17  MR. TOOSLEY:  Perfect.

18  THE CLERK:  So, Mr. Jordan's fees go

19  over to 3/6 at 11:00?

20  THE COURT:  Right.

21  MS. SILVER:  Your Honor, the U.S.

22  Trustee had no issue with his fee application.

23  THE COURT:  So, you don't have to -- I

24  appreciate you coming this afternoon.

25  MR. TOOSLEY:  So, do you want Mr.

1   Jordan to draft the other order on the dismissal

2   or...

3                THE COURT:  I think that I have a

4   motion to dismiss here.  Let me just look at the

5   order.  I want to make sure the state court can

6   follow it.

7                MR. TOOSLEY:  We changed it around

8   last time --

9                THE COURT:  Right.

10               Okay.  So I have concluded that --

11   yes, I think I can use this order.  Well, this is the

12   question.  And this order says, upon the

13   re-appointment of the receiver, all funds held in the

14   debtor's bank account should be turned over to the

15   receiver.

16               MR. TOOSLEY:  Which is -- that was

17   part of the reason why we were continuing it --

18               THE COURT:  Right.

19               What I don't know is where the 150,000

20   -- I don't know that that's part of the -- your

21   client's collateral.  I haven't made a finding on

22   that.  I have my doubts.

23               MR. JORDAN:  Your Honor, I think even

24   if it's not a part of their collateral, it's just a

25   receiver holding it.  I don't know who else is going

1 | to hold it because --

2 | THE COURT:  That may not really make

3 | sense.  I mean, you would have every right to argue

4 | it's not yours -- or it's not his when -- you know,

5 | before the state court.  So, that makes it cleaner

6 | for the state court.

7 | So, I'm just going back to this order

8 | to see if it will work.  I will take out the

9 | shortened notice, since I think we've gone way beyond

10 | that.

11 | The motion is granted.  The above

12 | captioned bankruptcy is hereby -- it's got a lot of

13 | herebys, and we don't really need those -- is

14 | dismissed with prejudice, but -- well, we had this,

15 | that it would stay active until the time the

16 | court-appointed receiver is re-appointed.  I suppose

17 | we can do that if he's not until his bond is there.

18 | I mean, I -- so that's back.

19 | Then the debtor is precluded from

20 | spending the funds on hand unless otherwise approved

21 | as part of the cash collateral.  You can take that

22 | out because we're not going to deal with cash

23 | collateral anymore.

24 | State that the bankruptcy court

25 | retains jurisdiction on the fees.  I think that's

1   all we need here.  And that should be easy enough.

2   I want to make sure -- state courts are very

3   reluctant --

4                    MR. TOOSLEY:  Extremely.

5                    And I want to apologize to Mr. Martin.

6   It's probably partially my fault, along with Mr.

7   Jordan, that we didn't conclude the hearing last

8   time, and you're having to hear it again.  So, I

9   should have --

10                   MR. MARTIN:  Thank you.

11                   THE COURT:  So, the only jurisdiction

12   I'm retaining is Mr. Jordan's fees.

13                   MR. TOOSLEY:  Perfect.

14                   THE COURT:  Okay.  I think that does

15   it.

16                   (Which were all the proceedings had in

17                   the above-entitled cause, February 14,

18                   2024, 1:00 p.m.)

19   I, AMY B. DOOLIN, CSR, RPR, DO HEREBY CERTIFY
     THAT THE FOREGOING IS A TRUE AND ACCURATE
20   TRANSCRIPT OF PROCEEDINGS HAD IN THE ABOVE-
     ENTITLED CAUSE. /S/

21

22

23

24

25