IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| Platform II Lawndale LLC, | ) | Case Number: 22-07668 |
| Debtor, | ) | |
| | ) | Judge Deborah L. Thorne |

**REPLY IN SUPPORT OF MOTION TO RECONSIDER IN PART
ORDER DISMISSING BANKRUPTCY CASE**

Now come Scott Krone; Mercury Capital Management, an Individual Retirement Account; and Yellow Hat Capital LLC ("Plan Investors"), and for their Reply in support of their Motion to Reconsider in Part Order Dismissing Bankruptcy Case ("Motion") state as follows:

**I. The Dismissal Order**

Greenlake Real Estate Fund LLC ("GreenLake") filed a Response to the Motion. The Response seeks simply to keep this Court's order dated February 14, 2024 dismissing this case ("Dismissal Order") in place, and argues that the Court made no error of "apprehension," as opposed to "reasoning," citing *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir.1990). To begin, what the Seventh Circuit meant by its comparison of apprehension to reasoning is not clear. Miriam Webster's online dictionary defines "apprehension" as, "2: an understanding of something." Relevant meanings from dictionary.com are, "the faculty or act of apprehending or understanding; perception on a direct and immediate level. 4. a view, opinion, or idea on any subject." Britannica.com adds, "[somewhat old-fashioned]: the act of noticing and understanding something." Surely, mistake, manifest injustice, and inequity are subsets or consequences of misapprehension. But in any case, an order that is not self-effectuating or clear as to its meaning or how to carry it out implicates a court's understanding the consequences of the use of some words, as opposed to others. In this case, the specific paragraph of the Dismissal Order sought by the Plan Investors to be reconsidered, provides as follows:

> 2. The above-captioned bankruptcy is dismissed with prejudice, but shall stay active until such time as the court-appointed receiver is re-appointed in the state court foreclosure filed by GreenLake against, inter alia, the Debtor in the Circuit Court of Cook County Illinois, Chancery Division, Case No. 2020 CH 02969; 3. Upon the reappointment of the receiver, all funds held in any of the Debtor's bank accounts shall be turned over to the receiver.

Not only the Plan Investors' Motion, but GreenLake's Response as well, demonstrate that the Dismissal Order is ambiguous and confusing to all parties in interest, the Receiver, and to the State Court as well. If it were not so, GreenLake's Response could have been one short paragraph stating that the Court ordered x and y, its reasoning was correct or at least considered, and should be enforced as written. Instead, Greenlake's Response was 12 pages long trying to mend its hold with ad hominem attacks such as the Debtor "stole" money while simultaneously arguing that monies coming into the estate had been, "loans" because that is what Greenlake says they were, and even though GreenLake's counsel had admitted in open Court that more than half of the money at issue at least was in fact investor funds:

> MR. TOOSLEY: But I did the math. In November, I was able to match up about 150,000 of equity contributions that came in after the date of the confirmation. [02/14/2024 TR 9:5-8][1]

Indeed, Mr. Toosley had personally done "the math," and found that all the money did not belong to the Debtor's estate, but Greenlake still insists that 100% of the funds should be swept up by a state court receiver, but inconsistently denies that such sweeping could/would create mischief in the Circuit Court. It is disconcerting when able counsel personally represents that about $150,000 in funds came in from investors after confirmation, but the Response signed by the same lawyer argues that "at best" all the funds were "loans." [Response p.2]

---

[1] And on January 18, 2024, Mr. Toosley stated: " MR. TOOSLEY: We are not trying to take – THE COURT: No --MR. TOOSLEY: -- what is not our cash collateral so -- and I am making that representation again that that isn't what we are arguing here. [01/18/2024 Tr: 4-10]

That the Dismissal Order is ambiguous is self-evident. It begins: "The above-captioned bankruptcy is dismissed with prejudice, but shall stay active until such time as the court-appointed receiver is re-appointed in the state court foreclosure filed by GreenLake . . ." But what did "active" mean. It is not a defined bankruptcy term in 11 USC § 101. Active could certainly encompass the Debtor carrying out its duties as it saw them, including returning the Plan Investors' funds. Perhaps GreenLake differs on what some of the funds constituted. However, in that case, if the case is dismissed, there is no forum with the natural expertise in which to decide the discreet bankruptcy issues as between the Plan Investors and Greenlake.

The next paragraph of the Dismissal Order fares no better. "3. Upon the reappointment of the receiver, all funds held in any of the Debtor's bank accounts shall be turned over to the receiver." Paragraph 3 did not enjoin the Debtor from spending any funds except funds that were Greenlake's cash collateral, but the universe of those funds was not determined at the time, and this Court expressed the record is not clear as to what is or is not such cash collateral. This leads right back to the fact the Circuit Court is not a good forum to decide complicated and particularized bankruptcy issues, especially those that in GreenLake's view implicate interpreting and enforcing a bankruptcy court's order. Complicated matters further, the Dismissal Order on its face did not prohibit the transfer of the Debtor's funds not already the subject of a cash collateral order, because the duty to turn over funds in the Debtor's bank accounts only affected those funds in such accounts "Upon the reappointment of the receiver . . ." on a date to be determined later.

The Dismissal Order's inherent ambiguity is well demonstrated by the fact that even GreenLake's Response highlights its double meaning.

> Regardless, there is precedent for a court in a Chapter 11 case making a dismissal of a matter ***contingent upon*** funds in the debtor's accounts being turned over to a state court receiver (as the judge did here). [Response p. 12; emphasis added]

Perhaps the Court will find that the Dismissal order provides that dismissal was contingent upon funds in the Debtor's accounts being turned over to a state court receiver. However, it could also be that a higher court will find that the Dismissal Order actually provided for the opposite contingency—the turnover of the funds was contingent upon the dismissal of the case.

The foregoing also demonstrates that whether or not "Motion to Reconsider" was the best title for the Plan Investors' motion, it is controlled by F.R.Civ.P 60. Paragraph 2 of the Dismissal Order dismissed the case with prejudice, but kept it "active until such time as the court-appointed receiver is re-appointed . . ." That reappointment was accomplished on February 22, 2024. Fourteen days later, on March 7, F.R.Civ.P. 60(b) kicked in, allowing an attack on the Dismissal Order for any one of the following reasons:

> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> or
>
> (6) any other reason that justifies relief.

Fraud is implicated regarding Rule 60(b)(3) because the Plan Investors gave money for one purpose (the bait) but GreenLake argues they cannot get it back for extrinsic reasons (the switch). All other arguments made by the Plan Investors implicate Rule 60(b)(6), any other reason that justifies relief.[2]

### III. Reply to Greenlake's Erroneous Factual Responses

The Response makes a number of attacks on the Plan Investors' Statement of Facts, ranging from the odd to the strained. As to the odd, GreenLake states:

---

[2] The Plan Investors did not argue, as GreenLake asserts, that there was newly discovered evidence, inadvertence, surprise, or excusable neglect. [Response p. 7] The Plan Investors are asking for relief based upon mistake, to prevent manifest injustice, and prevent inequity. [Motion p. 1 and p. 2.] The Plan Investors cited to cases enumerating more reasons, but argued only some of them, as they reaffirm in this Reply.

> Paragraph 1 of the Synopsis states that the debtor obtained a loan to take out the foreclosing lender and make payments under a plan. That simply never happened. As the Court is aware, and after the Court continued the case to around 10 post-plan confirmation hearings, the loan never came to fruition. Even later in the Motion, the Plan Investors acknowledged this fact.

GreenLake's criticism is without merit. The Debtor's Plan provided in Article 10 that: "The Debtor has obtained a commitment for a postconfirmation loan from Red Oak Capital Holdings." The Plan made other references to that funding. That is all fully consistent with the Plan Investors' statement that "the debtor obtained a loan." This part of GreenLake's Response is odd, because it criticizes the Plan Investors for making an accurate recitation of facts with which particular recitation GreenLake is in full accord. The Debtor obtained a loan, but it was not funded. It is quite a stretch for Greenlake to "acknowledge" that the Plan Investors accurately reported that the loan failed after being obtained but try to turn that into a criticism of the Plan Investors' Motion.

Next, GreenLake attempts to take on the Plan's provision adhering to the Debtor's obligation to follow the absolute priority rule.

> In Paragraph 2 of the Synopsis, the Plan Investors discussed the Plan's provision in Article IV that the investors who contribute new monies shall hold membership interests as reflected in Exhibit F. However, the Disclosure Statement filed at the time of the Plan stated in Section IV(A)(1): "No person holding an Equity Interest will receive anything of value, including an interest in the Reorganized Debtor, as a result of any contribution made before the Effective Date." An identical provision is in the Plan in Section IV(A)(1). That provision also provided that investors who contributed "new monies" post effective date would get new equity interests, but clearly stated that any investors who made contributions before the Effective Date <u>would get nothing of value</u>. Here, by improperly paying back the "investors" who loaned money to the Debtor in Laste 2022 and early 2023, they clearly received something of value and did so to GreenLake's detriment. [Response p. 4; emphasis in Response]

To begin, it is extremely disconcerting that GreenLake's analysis begins with a quote out of context, because the context demonstrates why GreenLake's argument is off-base, so that it is a fair observation that the omission must have been studied. In that regard, the Disclosure States does not

just say: "No person holding an Equity Interest will receive anything of value, including an interest in the Reorganized Debtor, as a result of any contribution made before the Effective Date." Rather, the Disclosure Statement says that: ***"1. Each of the Debtor's members hold an Equity Interest due to pre-petition contributions.*** No Person holding an Equity Interest will receive anything of value, including an interest in the Reorganized Debtor, as a result of any contribution made before the Effective Date." [emphasis added] GreenLake's quotation does not mention or quote the emphasized words. When those words are added, the provision cited by GreenLake refers to the fact no equity security holder would receive anything on account of pre-bankruptcy contributions, and has absolutely nothing to do with the date any Plan Investor happened to send in the funds for new equity security interests under a Plan.

GreenLake's analysis overlooks the obvious, which is that this provision is nothing more than typical boilerplate reflecting the "fair and equitable" standard of 11 USC § 1129(b)(2)(B)(ii), provides that in order for a Chapter 11 plan to be crammed down, "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." That simply means that equity comes last in line. Therefore, unless the plan is accepted by all, then absent providing "new value," for new equity, a Chapter 11 plan may not be confirmed. The provision was never some sort of trap intended to fleece the Plan Investors if pursuant to an in-the-making, filed, or confirmed plan, on this day as opposed to that day, they deposited monies for their *new* membership interests created under the Plan for the time when their old membership interests were extinguished. The focus of the provision is why the Plan Investors made deposits, not when they did so.

Other aspects of the case demonstrate why this Court should decide who is entitled to the disputed funds. For instance, at the January 18, 2024, hearing, the Court and counsel then present

engaged in some good natured banter about this Court living with a state court judge but even so, this Court does not know what "chancery" is. [01/18/24 Tr. 20-21]. The flip side of that is that in general, a state court judge would not understand the bankruptcy process. That banter well points up exactly why the Plan Investors brought their motion, which is to prevent GreenLake from taking words out of their context as a plan provision whose arcane bankruptcy meaning would be known only to GreenLake's sophisticated counsel, who could present them as a reason the Plan Investors' funds deposited for a particular reason should basically be seized as the Debtor's general funds.

Shifting gears, GreenLake next asserts that the Plan Investors make a "strange" argument that the Rule to Show Cause motion was brought by GreenLake, not the state court receiver. GreenLake notes that it brought the motion because the state court receiver had not yet been reappointed. [Response p. 4] GreenLake essays to meet the strange argument by noting: "And because there was/is an argument that at least some of the funds held by the Debtor are or were GreenLake's cash collateral, it made sense for GreenLake to be the one to file the motion when the funds were stolen by the Debtor." [Response at 4]

Well, there one has it. The Plan Investors are neither the Debtor nor the Receiver nor GreenLake. Since GreenLake maxes out its claim at "at least some" of the funds belong to the Plan Investors, if anything is strange, it is that GreenLake wants the receiver to control *all* of the Plan Investors' funds—even those that GreenLake concedes do not belong to the receiver. While the Plan Investors do not believe that GreenLake's use of hot public relations words such as "stolen" are productive, by GreenLake's own admission, if any party or the receiver gets control of any funds greater than "at least some" of them, that money has been stolen from the Plan Investors by whomever gains that control. The Plan Investors, would rather that their funds not be stolen from them by anyone.

GreenLake also plays with the word, "new" in attempting to glomb onto the Plan Investors' funds. GreenLake takes issue with the Plan Investors' assertion that approximately 95% of the funds on hand at the time of the Dismissal Order were "new monies." [Response p. 5] GreenLake then spends considerable effort saying the funds were not "new" monies because some of the money came in early in the case instead of post-confirmation, and asserts without evidence of any sort that the money was not new but rather intended for adequate protection payments. [Response p. 5] However, the word, "new" was not used by the Plan Investors in the temporal sense in relation to whether the funds were contributed at points a-z in the case, but rather simply after the bankruptcy case was filed for the purpose of equity contributions related to "new" value as opposed to the "old" equity contributions made prior to the bankruptcy case filing.

In addition, it is obvious that even the early monies were provided purely for the investment purposes of a plan, and not GreenLake's cash collateral payments. In that regard, Movant, Mercury Capital Management, an Individual Retirement Account, by its owner, Lynda Mercurio, wrote to the Debtor's Manager, Scott Krone, on December 23, 2022, referencing her new contribution and the one she had made near the beginning of the case in August, 2022:

> On Fri, Dec 23, 2022 at 2:11 PM Lynda Mercurio <Lynda@mercuryhomesolutions.com> wrote:
> Hi Scott,
> One question and one confirmation:
> ***I see my $5k wire investment on 8/24/22*** but cannot see it on the portal. Where can I find that? [emphasis added] There are other investments in my 401k that I can sell and get cash to contribute to the new company. It will take a couple of business days to get it transferred. If the full preservation is $33,000, my goal is to get $28,000 wired next week. Please confirm I can do that. Thanks again! Lynda

That the Plan Investors did not contribute funds to pay "cash collateral" payments but to keep their stakes in the Debtor is also shown by an earlier email the same day by Ms. Mercurio to Mr. Krone, where the general conversation among the Plan Investors was discussed.

> On Fri, Dec 23, 2022 at 12:21 PM Lynda Mercurio <Lynda@mercuryhomesolutions.com> wrote:
>
> Hi Scott,
>
> ***Other investors are saying that if I don't do a further investment that my initial investment will be completely wiped out, as opposed to your comment below.*** I'm confused. Are there different types of investments? Could you please explain this? [emphasis added]
>
> Thanks so veru much for your time.
>
> Lynda

Another investor, Richard Davis authored a similar email demonstrating that the investors as a group were always sending money for new interests under plan, not to fund "adequate protection" payments to GreenLake.

> From: Richard Davis <r1ckd4v1s@gmail.com>
> Date: Fri, Feb 10, 2023 at 11:47 AM
> Subject: Lawndale
> To: Scott Krone <skrone@codamg.com>
> Cc: Lynda Mercurio <lynda@mercuryhomesolutions.com>, Michael Gillespie <mnjgillesp@aol.com>, Hardy Hodges <hodges_h@yahoo.com>, Leslie Marquard <lesliemarquard@comcast.net>, Phil Y <rentalpriseproperties@gmail.com>, Josh <josh@aretehomesinc.com>, Minna Folkman <minna.folkman@gmail.com>, Daniel Fullmer <dan@fullmerfam.com>, Richard Banach <advancedhomesav@optimum.net>
>
> Hi Scott, Can you give an update on where we stand? How close to refinancing with the new lender, what are the hurdles and can we meet them? Are enough of the original investors staying in with immediate capital? What are the timing prospects for coming out of bankruptcy?
>
> As you know various equity investors are communicating. I'm reluctant to be involved with these discussions since I have plenty more on my plate. As I understand, some are getting out but many who remain like me want to support the deal and get it through. What are the remaining obstacles a coordinated investor effort may help to overcome?
>
> I would like to see as soon as possible:
>
> Current standing, obstacles and time expectations for the refi and emergence from bankruptcy
> New Op Agreement going forward, or at least a plan showing changes from the old one
> A new Schedule A showing all ongoing investors that have stepped-up to support the deal

> A form of contract for investors who have paid upfront installments based on verbal understandings, agreeing to specified future capital payments to protect an equity percentage.
>
> Can you soon organize an update call inviting remaining investors following on from the one you had before?

The foregoing emails are entirely consistent with the Plan, the Disclosure Statement, the funding materials, and Mr. Jordan's Exhibit F. In order to comply with the absolute priority rule, the Plan Investors had to come up with new investment funds under the Plan.[3]

GreenLake's argument ends with a tautology, which is that it was granted a post-petition lien on the Debtor's accounts, and therefore it was granted a lien on the Plan Investors' funds. However, that position assumes that which it seeks to prove, and it was to counter such unreasonable positions that the Plan Investors analogized their plight to "earmarked" funds. GreenLake's lien could only go so far as the Debtor's interest in any funds in its accounts, and in this case, that extent was nothing, because funds given to a debtor for a specific purpose are not a debtor's property. *In re Kenosha Liquidation Corp.*, 158 B.R. 774 (1993). In addition, if funds could be solicited by a debtor to fund a plan without the subject debtor and the creditor informing a prospective investor that the funds were at risk for the debtor's general expenses, that would work a fraud upon the prospective investors who would later learn to their shock that their investment fund had been taken without any notice and without their consent.

---

[3] GreenLake concedes that what it wants is to send all of the funds to the state court receiver even though it concedes that not all of the funds are the receiver's. Yet, it asserts that it had no obligation to give any of the Plan Investors notice of its plan to deliver their money to the receiver, because they had not filed individual appearances in the Debtor's bankruptcy case. [Response at 11] GreenLake evidently has a different view of due process from most litigants. Its lawyer asserts that he personally calculated how much Plan Investor funds came in after Plan confirmation yet asserts it was the Debtor's burden to account even though GreenLake did not submit its counsel's accounting. Similarly, GreenLake admits it is seeking to send known persons' funds to the state court receiver yet feels no compulsion to inform the affected persons.

The most puzzling aspect of GreenLake's vociferous Response is that it has already conceded that more than half the Plan Investors' funds were not the Debtor's property, yet it still wants 100% of them swept up and sent to the state court receiver. Yet, GreenLake denies there could be any mischief in that. Besides the Response itself conceding that GreenLake has at best a claim on "some" of the funds at issue, its counsel was crystal clear that he had himself had done the arithmetic leading to that conclusion, other evidence unmistakably shows that all post-bankruptcy funds were contributed by investors for new equity interests from day one of the case, and not to make cash collateral payments.

First, there is no getting around that the Debtor's confirmed Plan called for and "Exhibit F" that recited which investors contributed what amounts for new equity interests and when, and that the listed amounts stretched back almost to case beginning and that they reflect the amount in dispute as belonging to the Plan Investors. GreenLake did not object to Exhibit F. GreenLake did not move to sanction the Debtor's lawyer, Mr. Jordan, for filing Exhibit F. GreenLake stood ready to profit from Exhibit F if the Red Oak loan had been closed. While Greenlake correctly notes in its footnote No. 1 that investor Scott Krone did not invest funds post-bankruptcy, as an undisputed investor in the Debtor he has an interest in protecting his investment by ensuring that the investments of co-investors are protected. Mr. Krone is not seeking to receive any funds but to protect his own investment by trying to rectify GreenLake's attempted dominion and control over the funds of his co-investors. Other investors desire to join in the Motion to Recondider in the near future to protect their own investments and funds.

### IV. Conclusion

GreenLake's entire position is intended for only one purpose—to obtain the Plan Investors' money. This is ironic, because in its "Heads, I win; Tails, you lose" universe, GreenLake wants its

rights against the real estate back because the Plan failed, but it wants to keep the Plan Investors' money even though the Plan failed. The state court can determine what to do with the real estate, which is its strong suit. But only this Court can deal with the many bankruptcy issues concerning the Plan Investors' funds.

Scott Krone; Mercury Capital Management, an Individual Retirement Account; and  Yellow Hat Capital LLC

                                                      By:    /s/Keevan D. Morgan
                                                              Their Attorney

Keevan D. Morgan (1958844)
kmorgan@morganandbleylimited.com
Morgan & Bley, Ltd.
900 W. Jackson Blvd.; Suite 4 East
Chicago, Illinois 60607
Tel: 312.243.0006
ARDC No. 1958844