1

1       IN THE UNITED STATES BANKRUPTCY COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2               EASTERN DIVISION

3
  IN RE: PLATFORM II          )  No.  22 B 07688
4 LAWNDALE, LLC,              )  Chicago, Illinois
                              )  January 18, 2024
5                             )  1:00 p.m.
                Debtors.
6

7
                TRANSCRIPT OF PROCEEDINGS
8        BEFORE THE HONORABLE DEBORAH THORNE

9    APPEARANCES:

10
  For the Debtor:          Mr. Gregory Jordan
11

12 For Greenlake Real       Mr. Adam Toosley
   Estate Fund, LLC:
13
   Also Present:           Mr. Scott Krone
14

15

16

17

18   Court Reporter:        Paula O'Driscoll, CSR
                            United States Courthouse
19                          219 South Dearborn Street,
                            Room 661
20                          Chicago, Illinois 60604

21

22

23

24

25

1          THE CLERK:  All rise.  Court is

2    reconvened.  Please be seated and come to order.

3    Taking up this Court's 1:00 o'clock set matter,

4    Platform II Lawndale, LLC.

5          MR. JORDAN:  Good afternoon, Your Honor.

6    Gregory Jordan on behalf of the debtor.

7          MR. TOOSLEY:  Good afternoon.  Adam

8    Toosley.  I represent Greenlake.  Carolyn

9    Leverence (phonetic) is on -- she is in-house

10   counsel, so she is just here as an observer.

11         THE COURT:  So, I would like to hear

12   what is going on.

13         MR. JORDAN: Well, we have been

14   continuing discussions with Red Oak.  We submitted

15   a proposed amendment to the plan to Greenlake a

16   couple, three days ago, and it relates to taking

17   out the consent judgment and promissory note for

18   Platform and putting it on to the Coda entity that

19   Mr. Krone owns and the -- and Mr. Krone continues

20   as the guarantor.  It also eliminates the consent

21   judgment from Coda and Mr. Krone.  Provided that to

22   Greenlake.

23              It is my understanding, based

24   upon the e-mail that I saw from the representative

25   at Greenlake, that he didn't understand why Red Oak

1    cared whether Mr. Krone and Coda had a consent

2    judgment against them or not, and we have been

3    trying to get somebody from Red Oak to provide us

4    with some clarity with regard to that issue so that

5    we can provide that to Greenlake because that is

6    our goal is to have that.

7                In addition to which, Joseph

8    Ransdell is on the screen here.  He couldn't be

9    here, but what the debtor has also done is we have

10    four different -- we reached out to a number of

11    different lenders and there are four different

12    lenders who have expressed interest if worse came

13    to worse case and -- taking over the role that we

14    had identified for Red Oak.  Two of them look

15    better than the other two.  They are asking for

16    information.

17                If we were to put Mr. Krone on

18    today, they would say that they -- there is -- one

19    of the parties is seeking to have a conference call

20    with Mr. Krone this week or early next week trying

21    to move that along, and that, in any event, we are

22    doing everything we possibly can to keep this

23    matter going and alive.

24                Mr. Krone has advised me that

25    there was a concern that -- Getting back to Red

1   Oak, this has just dawned on me, that they had a

2   concern with the amount of monies that were

3   available, and Mr. Krone has raised, I believe,

4   $400,000 in investment funds to augment the loan

5   from Red Oak such that there is certainty that the

6   real estate taxes which are less than $400,000

7   would be paid.  They would be paid through those

8   funds.  In addition to which, Mr. Krone is seeing

9   what he can do to find other sources to fund

10  completely the loan to Greenlake, although I am not

11  making any commitments that that will occur.  So if

12  I were to put Mr. Krone and Mr. Ransdell on, those

13  basically would be what they would testify to.

14          THE COURT:  Mr. Toosley.

15          MR. TOOSLEY: Thank you, Your Honor.  I

16  assume you probably know what I am going to say.

17  It is similar to what we said the last six times

18  that we have been in front of Your Honor.  We are

19  now at our seventh hearing, post-confirmation

20  hearing, and we are at a point where I just don't

21  understand why we are still continuing.

22              I know Your Honor had mentioned

23  to us back in November that you would be looking to

24  dismiss this at the end of November if this plan

25  was not consummated.  We are still now another six

1   weeks post that time, and we are hearing today that

2   they are reaching out to four other lenders to try

3   to find someone else to fund the plan.

4             When we appeared in front of Your

5   Honor two weeks ago -- I know last week you had

6   Covid.  I am glad to see that you are back healthy.

7   It was represented that week, Thursday or Friday,

8   that there would be a final commitment obtained

9   from Red Oak, and we still obviously do not have

10  that.  We are two weeks later, so that was the

11  representation as to why we were -- and they

12  continued it one week to last week was to report

13  back on that commitment.  That did not happen.

14            I did order all of the estimates

15  of redemption from Cook County myself.  I walked

16  over and did it.  It is about $400,000 of taxes.

17  Not only that, two of the three parcels, the taxes

18  have been sold, so it is not even $400,000 total.

19  It is actually two sales.

20            I am also confused, and I don't

21  know if Your Honor read all the pleadings this week

22  between Counsel and his client as it relates to the

23  fee petition, but on Page 17 of the plan, it

24  specifically says:  The debtor has obtained a

25  commitment for post-confirmation loan from Red Oak

1    Capital Holdings.  It doesn't say it may get a

2    commitment.  It says has.

3                  We had a hearing in which it was

4    based on that representation that within two weeks

5    of that date, we would have had a closing because

6    it was represented to the Court, to myself, to my

7    client that this was just basically a crossing the

8    T's and dotting the I's situation, and so obviously

9    I know that is a point of contention between

10   Counsel and his client because they put it in

11   pleadings this week, but that representation is

12   false, right?  There is absolutely no -- there is

13   still no confirmation of any sort of ability of Red

14   Oak to do this closing or else they wouldn't be

15   going out to get four other lenders, right?

16                  Mr. Jordan is correct.  Two days

17   ago we were sent over a draft of a new disclosure

18   statement.

19                  When we appeared in front of Your

20   Honor two weeks ago, it was also represented that

21   Mr. Krone was going to become the borrower instead

22   of the current debtor.  This one doesn't have him

23   as the borrower.  It has him as the guarantor and

24   some other entity as the borrower, so even what was

25   represented to the court as to what they were

1   asking my client to agree to is not what is

2   actually in this document.  They are also asking us

3   to give up our right to this consent of which I

4   don't understand.  Like Mr. Jordan said, Red Oak's

5   borrower is going to be this borrower who won't be

6   a party to our loan documents anymore.  So why is

7   Red Oak asking for this?

8           Two weeks ago I asked Mr. Jordan,

9   I said, I need from you and Red Oak that these are

10   the last two or three items, and when they were

11   ready to close and tell us when we are going to

12   close or else we are not going to agree to anything

13   as the lender.

14           Your Honor represented lenders.

15   You know all about all of this.  We are not going

16   to just agree to things in a vacuum and then have

17   this kicked out for 60 more days.  We don't still

18   have this as we sit here today.  All we have here

19   is an amended disclosure statement.  We are asking

20   you to change the entire loan documents from what

21   you agreed to and what went to hearing back in

22   October in a vacuum without anything, right?  So I

23   don't understand.

24           Again, Your Honor mentioned

25   dismissing it in November, and it is now the middle

1    of January.  Why are we still here?  Like, I mean,

2    we can't do this.  We have gone a year without any

3    adequate protection payments.  There hasn't been a

4    single one since January of last year.  The taxes

5    have been sold.  Why are we still -- Your Honor

6    mentioned this last week, I think.  Even if you

7    dismiss the bankruptcy, the parties can still try

8    to talk to Red Oak and do other things too.

9                    I think that we have met all the

10   elements here with regards to the fact that there

11   was three orders that Your Honor entered that

12   specifically required, based on a budget presented,

13   to pay adequate protection payments to us that were

14   violated; that there was an amount that was

15   supposed to be set up for escrow for taxes that was

16   not done.  The taxes have not been paid, and like I

17   said, we were all told that the commitment was in.

18   It was in the plan and that this closing was going

19   to happen within two weeks back in October.

20                   So I mean we can talk about the

21   mechanisms of how we think it would happen and what

22   happens with the funds and payment of attorneys and

23   everything separately, but I think we have to reach

24   the threshold question of whether Your Honor is

25   going to entertain dismissal.

1          MR. JORDAN:  Your Honor, first off, I

2     don't think that we should be penalized for trying

3     to be creative by saying even if any problem with

4     Red Oak occurred, that we would seek alternative

5     sources because we remain confident that the Red

6     Oak provision and Mr. Ransdell and Mr. Krone have

7     been speaking with Red Oak and directed me to

8     prepare the revision and disclosure statement which

9     is what Red Oak wants to see, you know, what I am

10    advised; and the other thing is is that I did get

11    an e-mail from Brad Hattich who is -- Mr. Ransdell

12    works with him at Commercial Lending Acts, and he

13    said -- and I think it is correct.  He said what I

14    can tell you is that in order to get a refinance

15    like this completed, the property will need to be

16    operating.

17          In addition, if the bankruptcy is

18    dismissed due to the pending lawsuits and other

19    open items, it will likely be impossible for a new

20    lender to step into the situation and provide

21    financing.  Any lender is going to be too worried

22    about unknown or other liabilities that will

23    continue to exist.

24          We are trying to pay Greenlake.

25    Working like crazy trying to pay Greenlake, and I

1    acknowledge that it has been more trouble than I

2    had hoped it to be, and I certainly, like everyone

3    else, thought that this transaction plan had been

4    consummated a long time ago, but the fact is is

5    that all parties, Greenlake included, but certainly

6    the unsecured creditors and the estate, will get

7    nothing if the case were dismissed are -- would be

8    better off if we can try with Greenlake -- I am

9    sorry, Red Oak said that, you know, they are

10   committed to close this.  They thought that the

11   earliest date that they could close would be the

12   end of January, but you know, we are working with

13   them to try to work out with Greenlake.  We are

14   trying to, you know, get items organized so that

15   there can be a closing.

16                Everybody wins if the case is

17   alive, and I am not even sure even Greenlake wins

18   if the case is dismissed because they are stuck

19   with the property and that they don't have anybody

20   to manage it presumably, and even if they do, you

21   know, how does that all work out?  So we are just

22   asking for a little more time to try to get this

23   transaction past the goal line.

24                THE COURT:  Is there anybody here from

25   Red Oak today?

1            MR. TOOSLEY: I don't see anyone.

2            MR. JORDAN: Do you recognize anyone --

3    Mr. Hattich is the lender.   We asked them to come

4    in -- I don't know if --

5            MR. KRONE:  Hello, Your Honor.  I am

6    sorry.  If I may just respond to a couple

7    statements that Mr. Toosley made?

8                    When we went through this plan

9    beginning in November of last year, we drafted the

10   original plan based upon what the -- the term sheet

11   that we got from Green Oak -- I mean from Red Lake,

12   I am sorry, and it specifically said not to be any

13   encumbrances.

14                    Between November and until the

15   plan was submitted in September, there was ten

16   months of constant changes that were constantly

17   being added to it including the first additional

18   payment amounts.  Then it was a guarantee up to $4

19   million, and it was down to $1.6 million, and then

20   the last thing that got added was either a spring

21   mechanism or some sort of way; and when Red Oak

22   learned of this, that is when they began objecting

23   to it.  I mean, we made the comment back in

24   November that this was their objection, and they

25   have been very clear on that objection, and so we

1    have given them the document to revise that, and we

2    have been waiting for the comments back from

3    Greenlake, but Red Oak is very concerned that

4    Greenlake will have the ability to re-open this and

5    bringing themselves back into this.

6                    With regard to the taxes, we have

7    done exactly what we said.  The taxes weren't

8    recently sold.  They were sold previous which was

9    represented to the Court, but we have been working

10   very diligently on this, and the whole point that

11   we are going to additional lenders is to resolve

12   this $800,000.

13                   If we can get additional loan

14   proceeds, then this whole secondary note goes away,

15   and so that is what we are trying to accomplish;

16   and so, you know, Red Oak has been firm on their

17   terms, and so we are trying to get better terms in

18   order to address this because we are concerned that

19   this ability that Greenlake is insistent upon --

20   but we have given them the option to remove it, and

21   that is exactly what Red Oak said back in November

22   was the issue, and so we have been trying to get

23   the exact language, which we did, and we have

24   provided it to them.  Now we are waiting for the

25   feedback.

1           MR. TOOSLEY:  And, again, this was

2    provided two days is what we are talking about, and

3    it is also -- when we agreed to not object to the

4    plan, it was after many, many months of discussion

5    based on the fact that we were going to -- this was

6    going to be done in November because we now have

7    another three months where our cash collateral is

8    being used, and Your Honor said no to cash

9    collateral for December and January and have to be

10   sequestered, but we would never have agreed to this

11   knowing that it was going to be kicked four, five,

12   six months later without something in there for us

13   on the adequate protection side because as part of

14   this deal in the plan, they are paying the missed

15   adequate protection payments, but they are only

16   paying them for the first couple of months that

17   they missed then because that is when we agreed on

18   everything.

19           So, you know, to the extent that

20   there are three additional months of adequate

21   protection that were -- that when we agreed back in

22   June or July when we first started talking were

23   fine, but now we have four more months of that,

24   right, so I don't -- and I don't believe my client

25   is in a position to agree based on where things

1    currently stand to the changes, based on things

2    that I have talked to them in the last two days.

3    So without our agreement to just modify the loan, I

4    don't see how we have anything to do other than

5    dismiss it because it is not happening in

6    accordance with what was agreed to.

7                THE COURT:  I think the 11, 12, what,

8    (b)(m), the inability to factually -- substantial

9    consummation of a confirmed plan is what we have

10   got here, and I do not fault any of the lawyers or

11   Mr. Krone for not working hard to try to make this

12   possible; but I confirmed the plan back when we

13   confirmed it based on the fact that this thing

14   could close, and I don't see anybody from Red Oak

15   here arguing that it can close or that this is

16   important to them.  I am not sure how important

17   this was to them.  I really don't have a good sense

18   of that.

19                They have been the absent white

20   knight, just not here, and there is -- I don't

21   think any bankruptcy judge in the country who likes

22   to dismiss a case that has been worked on as hard

23   as this has been, but I really do not see under the

24   Bankruptcy Code that I have -- and the facts here

25   that I have any other choice but to dismiss the

1    case.  I mean, I could convert it, but I don't see

2    that conversion does anything for anybody except to

3    make some trustee crazy because there is nothing

4    here to do, so I am going to enter an order --

5           MR. JORDAN:  Your Honor, I would say, by

6    the way, there are in excess of 200, maybe $300,000

7    worth of cash that is unencumbered.  It is not made

8    by Greenlake, so if you converted the case, there

9    would be monies that would go to the unsecured

10   creditors.

11          MR. TOOSLEY:  Your Honor, and I will --

12          THE COURT:  There are also attorney's

13   fees that I would like to address.

14          MR. TOOSLEY: I was going to speak to

15   that.  So there is -- A few years ago there was a

16   case called U.S. Bank versus Randhurst Crossing

17   which was my case that brought -- I can't remember

18   his name.  My mind is blank, and there the issue

19   was what happens with rents that were collected

20   during the course of the bankruptcy, and it went up

21   to the First District Appellate Court after it went

22   back to the state court, and the Court held there

23   that any monies that were collected during the

24   bankruptcy belonged to the lender under their cash

25   collateral order.

1           So Counsel is -- filed something

2    45 minutes before this hearing, and Your Honor saw

3    this --

4           THE COURT:  I got off the bench at

5    12:30.

6           MR. TOOSLEY: Where he is claiming that

7    this is not our money, even for the monies that

8    were generated through rents because even though we

9    had a receiver in place on the date that the

10   bankruptcy was filed, somehow we had not perfected

11   our security interest, and that is what that case

12   said is that you can take possession by way of an

13   appointment of a receiver, and Counsel is saying

14   well, there is 300,000 or 400,000 or 500,000 in the

15   bank.  They haven't filed any operating reports.

16   The last one was filed for October, so I don't know

17   what is in the account, but as of October 31st when

18   this plan was confirmed, there was 80,000 in the

19   account prior to any funds being brought in from

20   investors.  It is -- one of them says 77 and one of

21   them says 2,000, so there was 80,000 in the account

22   as of October 31st.

23           THE COURT:  And there have been rents.

24           MR. JORDAN: The rents are only $30,000,

25   and there is only $14,000 a month, so that included

1    investor funds -- I am sorry, Mr. Krone hasn't

2    agreed to sign the operating reports, so I haven't

3    filed operating reports, but there are -- there is,

4    I think, over $250,000 in the bank.

5                      Even if Mr. Toosley were correct

6    and to say that he has a lien on the rents, he

7    doesn't have a lien on the monies that did not

8    derive from rents, and those funds are available

9    for distribution free and clear of any claim that

10   they have because they couldn't have had a

11   prepetition claim on the funds that came in from

12   the investors.

13              THE COURT:  Let's just back up a minute.

14   I am going to dismiss the case, but I am not going

15   to dismiss the case until a couple of things are

16   sorted out, I think.  They should be.

17                      There are several things that

18   happened.  There are rents that have come in.

19   Those, at least -- you could make a pretty good

20   argument that those are -- there was an assignment

21   of rents based on the state court.  I haven't made

22   a finding on that, but let's just say for the sake

23   of argument that there is that, and then we have

24   the investor funds that came in with the hope of

25   funding the plan with Red Oak, and I assume that

1    that was to have additional equity for that plan to

2    go forward.  There has been no finding as to whose

3    money that is.  That I can see, separate, that I

4    would have to make some kind of determination on.

5    I mean, I don't think that your assignment of rents

6    would cover that.

7          MR. TOOSLEY: I don't think we are making

8    that argument, but because we don't have an

9    accounting and we don't have operating reports, so

10   if I could make a suggestion is that we set this

11   over for a short period of time.

12          Your Honor can enter the order

13   that allows us to also potentially go back to state

14   court to get the receiver reappointed so that we

15   can have whatever monies Your Honor orders belong

16   to us immediately turned over to the receiver.  So

17   if the order today allows us relief as to that so

18   that we can get in front of a Cook County judge

19   while this issue of accounting and fee applications

20   and all that is still --

21          THE COURT: I think that makes sense

22   because there are some other claims here.  I know

23   that there has been a lot of hard work put into

24   this case, and I don't think that anybody accepted

25   this case on a contingency basis, but I know that

1    Mr. Jordan has worked hard on it.  I know you have

2    worked hard on it.

3              MR. JORDAN:  Mr. Martin, by the way.

4              THE COURT:  And Mr. Martin, okay.

5              MR. TOOSLEY:  On the taxes.

6              THE COURT:  Right, on the taxes which

7    have been reduced, as I understand, so that is a

8    benefit to everybody, including the lender.

9                   So I do think that the way to do

10   this -- I think your suggestion is a good one that

11   I modify the stay at this point to go back to state

12   court for the appointment of the receiver and to

13   move forward on that, but I continue to have this

14   case in front of me to determine -- well, to

15   determine the amount of rents that come in which I

16   assume there is an answer that is black and white

17   on that.  Either they have come in or they haven't

18   come in, and then we also have the issue of the

19   investor funds that have been put up, and I don't

20   know what the agreements were for those, whether

21   there was an agreement that these stay our money

22   until, you know, there is a deal but the deal is

23   not happening.

24             MR. JORDAN: I have had no involvement in

25   the raise of funds, and so I don't want to

1    represent to the Court anything that was said.   I

2    will endeavor to find out but that was -- and I am

3    not a securities lawyer.

4         MR. TOOSLEY: We are not trying to

5    take --

6         THE COURT:  No --

7         MR. TOOSLEY: -- what is not our cash

8    collateral so -- and I am making that

9    representation again that that isn't what we are

10   arguing here.   It is over the -- There was 80,000

11   prior to any of these funds coming in per their own

12   operating report in the account plus the rents that

13   would have come in.

14        THE COURT:  I think the only use of cash

15   collateral was a minimal use to keep the thing

16   alive.

17        MR. JORDAN: It is about $15,000 a month.

18   What I suggest is we haven't -- I whispered over to

19   Mr. Toosley.  I said:  How long do you think it is

20   going to take to have a receiver, and he said two

21   to three weeks.

22        MR. TOOSLEY:  And I said three to four

23   just to be safe because the county is a little

24   behind.

25        THE COURT:  I happen to live with a

1    state court judge, and I can tell you -- I don't

2    know what chancery is --

3              MR. JORDAN:  He is terrific, by the way.

4              THE COURT:  He is not in chancery.

5              MR. JORDAN: The order will indicate that

6    we will (a) file the operating report and (b)

7    provide -- file with the Court a statement relating

8    to funds that were from rents, funds that were from

9    investors, and to the extent that they are from

10   anybody else, funds from anybody else.

11             THE COURT:  And the receiver is going to

12   want to know what funds have not come in for rents

13   to the extent that there are folks who are --

14             MR. JORDAN: Accounts receivable.

15             MR. TOOSLEY: So all the funds that were

16   in the account when the case started and the

17   receiver turned over are absolutely not -- would be

18   part of --

19             THE COURT:  I don't think this is a

20   difficult accounting problem.  So what I am going

21   to do, and I don't know -- I want to see what the

22   order that --

23             MR. TOOSLEY: I don't think any of those

24   orders would work.  I think that we would have to

25   say --

1          MR. JORDAN: I think Mr. Toosley and I

2     never had a problem getting along.  I think he has

3     some good ideas.  I think I have some ideas.

4     Together we can put a draft order to follow

5     because, for instance, I wouldn't even have thought

6     about the monies that were delivered on the 11th of

7     July 2020 --

8          THE COURT:  Yes, the best way to do this

9     would be to have an order modifying the stay with

10    an accounting attached to it because if I am the

11    receiver over there, I want to know what I should

12    have on day one and what I should be out there

13    trying to collect on day two.

14         MR. JORDAN: The accounting would not

15    indicate that those were funds necessarily turned

16    over to receiver.  Obviously that is for the Court

17    to determine.  We will put a footnote or a comment

18    in the order with regard to that.

19         MR. TOOSLEY: So Mr. Samuels who was the

20    court appointed receiver and -- so he is very well

21    aware, and so what we will do is until he gets a

22    bond back in place because receivership doesn't

23    become effective --

24         THE COURT:  Which judge had the case?

25         MR. TOOSLEY: I cannot remember.  We were

1   just in front of her last month because the case

2   has been idle for -- because there is the guarantor

3   times two. She is relativity new to the foreclosure

4   bench, but I will make sure that the order that

5   reappoints him as the receiver basically says it is

6   stayed until we are back in front of here because

7   then there is -- I don't want to have a fight over

8   any --

9          MR. KRONE:  Mr. Samules, it was under

10   his receivership that we discovered that CubSmart

11   was stealing from us.  We have concerns about --

12          THE COURT:  That is before another

13   judge.

14          MR. JORDAN:  I have already told Mr.

15   Krone that the state court wants to do what the

16   state court wants to do.

17          MR. TOOSLEY: So I will make sure that

18   Mr. Samuels doesn't take any actions until we come

19   back on our hearing which I was going to suggest

20   maybe a month out just because we can allow for

21   that time period, and then that way we don't have

22   to worry about attaching an accounting to the stay.

23   It will just say that his appointment will become

24   effective upon the final dismissal in this case.

25          MR. JORDAN:  We will get the operating

1    reports on file.  We will get the accounting

2    together.  We will get the stay order, and when

3    would you like us to come back?

4            THE COURT:  I was going to suggest

5    basically -- well, why don't you come back -- today

6    is the --

7            MR. TOOSLEY: The week of February

8    18th --

9            THE COURT:  I was going to say what

10    about either February 14th or 7th?

11            MR. TOOSLEY: I think that the 14th is

12    better for me because I love coming into court on

13    Valentine's Day.

14            MR. JORDAN:  A little bit of trivia:  My

15    father was born on Valentine's Day.

16            THE COURT:  So was my daughter.  Let's

17    do it in the afternoon, the early afternoon.  1:00

18    o'clock?  1:30?

19            THE CLERK:  1:00 o'clock?

20            THE COURT:  1:00 o'clock is fine.

21            MR. TOOSLEY: The compensation -- Are you

22    okay with that date?

23            MR. JORDAN: Yes.

24            MR. TOOSLEY: And then the fee

25    applications will just be continued for --

1        THE COURT:  Let's do them that day as

2    well.

3        MR. JORDAN: Your Honor, not for me, and

4    obviously, the -- 1:00 o'clock, right?  Obviously,

5    it is not an order directing payment, but there is

6    no one that is objecting to Mr. Martin's fees.  He

7    shouldn't need to come back.  He earned his fees,

8    and he hasn't been paid from his first application,

9    but he has to come back here, so I would ask that

10   the order be entered approving his fees and the

11   order indicates -- it is not directing the debtor

12   to do that.

13       THE COURT:  So what would they be paid

14   out of?

15       MR. JORDAN: What is that?

16       THE COURT:  What funds would they be

17   paid out of?

18       MR. JORDAN: The order would not direct

19   the -- Platform to do it.  In fact, if we want to

20   say the order will -- that the Platform shall not

21   make a distribution to Neil Berber until further

22   order of the Court, but Mr. Martin shouldn't have

23   to come back.

24       THE COURT:  No, I agree.  I think that

25   can be allowed.

1          MR. TOOSLEY: I am completely fine with

2     that.

3          MR. MARTIN:  Thank you.

4          THE COURT:  You are welcome, and I

5     apologize that you had to come back so many times,

6     but special counsel is allowed administrative claim

7     for compensation in the amount of 24,642, and I

8     will take out -- debtor is not -- there is no

9     authorization without further order of Court.  I

10    can change that.

11         MR. TOOSLEY: That sounds great.

12         MR. JORDAN: There is one other thing.

13    Just housekeeping.  What is the date by which we

14    should file the operating reports and the

15    accounting?

16         THE COURT:  Filed by February 1st.

17         MR. JORDAN: Okay.  That is fine.  I just

18    want to make sure that we don't end --

19         THE COURT:  Let's not do it on the last

20    minute.

21         MR. JORDAN: Right, exactly.  That is

22    what I am thinking.  Thank you.

23         THE COURT:  There is no authorization to

24    make the payments.

25         MR. TOOSLEY: And I know that Counsel had

1    concerns last time or Mr. Krone about us not

2    working with him.  We are happy to continue even

3    before the 14th to see if we can try to

4    work --

5              THE COURT:  If something happens --

6              MR. JORDAN: Right.  I am not complaining

7    about Mr. Toosley or his client.  We are trying to

8    work with them.  The perfect world is that we come

9    back at some point, maybe the 14th, and say:  Hey,

10   you know what?  We have this agreement with

11   Greenlake.  Everything -- the sun is shining and it

12   is 50 degrees.

13             MR. TOOSLEY: That would be nice.

14             MR. JORDAN: We are going to continue to

15   work to try to resolve this.

16             THE COURT:  I appreciate the work that

17   everybody has done.  I know it has been a lot of

18   work, and it is -- maybe doesn't have a happy

19   ending -- Okay, I am just -- you have such long

20   paragraphs.  The first paragraph of the order, I

21   will read it when I can actually focus on it, but I

22   will get that order entered for Mr. Martin today

23   allowing the fees but with no payment until further

24   order of Court.  I will see everybody back on

25   February 14th at 1:00 o'clock.

1              MR. TOOSLEY: We will work on the order.

2              MR. JORDAN: Thank you, Your Honor.

3              THE CLERK:  All rise.  Court is

4    adjourned.

5                        (Which were all the proceedings had

6                          in the above-entitled cause,

7                          January 18, 2024, 1:00 p.m.)

8

     I, PAULA O'DRISCOLL, CSR, DO HEREBY CERTIFY THAT
9    THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF
     PROCEEDINGS HAD IN THE ABOVE-ENTITLED CAUSE.)(s/s)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25