IN  THE  UNITED  STATES  BANKRUPTCY  COURT
FOR  THE  NORTHERN  DISTRICT  OF  ILLINOIS
EASTERN  DIVISION

Platform II Lawndale, LLC,          )   No. 22 B 07668
                                    )   Chicago, Illinois
                                    )   1:15 p.m.
                          Debtor.   )   May 15, 2024

TRANSCRIPT  OF  PROCEEDINGS  BEFORE  THE
HONORABLE  DEBORAH  L.  THORNE

APPEARANCES:

For the Debtor:        Mr. Kevin Sterling;

For Greenlake:         Mr. Adam Toosley;

Prepared By:           Amy Doolin, CSR, RPR
                       U.S. Courthouse
                       219 South Dearborn
                       Room 661
                       Chicago, IL  60604.

2

1          THE CLERK:  Platform II Lawndale, LLC.

2          MR. STERLING:  Good afternoon, Your

3  Honor.  Kevin Sterling on behalf of debtor.

4          THE COURT:  Good afternoon.

5          MR. TOOSLEY:  Good afternoon, Your

6  Honor.  Adam Toosley for Greenlake, the secured

7  creditor.

8          THE COURT:  Okay.

9          MR. STERLING:  I believe Mr. Morgan,

10  who was representing the investors, is also on the

11  Zoom.

12          THE COURT:  Any update from the

13  parties?

14          MR. TOOSLEY:  So, we continued

15  everything a couple of weeks.  Yesterday I did

16  receive from Mr. Sterling an email showing that the

17  funds were transferred out on March 12th of 2024,

18  which was six days after the rule to show cause was

19  entered.

20          The court entered the rule on the 6th

21  and continued it until the 13th, and the funds were

22  still in the account as of the day before and then

23  transferred out.  So, we still are in a -- I was

24  assuming based on filings from Mr. Morgan and others

25  that the funds had been dissipated well in advance of

1 the rule to show cause order, but it is obviously not

2 the case.  It was six days after, and they still have

3 the money.

4            We are --

5            MR. STERLING:  There --

6            MR. TOOSLEY:  Yeah, go ahead.

7            MR. STERLING:  If I may, Your Honor,

8 that actually is a false conclusion.  Apparently

9 there was -- it was drawn out with a cashier's check

10 on the date that it shows being drawn out from the

11 bank account on I believe it was the 13th or 14th of

12 February.

13            Somehow that first cashier's check --

14 and I have actually contacted the bank to try to

15 obtain a copy of it -- the first cashier's check had

16 been returned back to the bank and a new check had

17 been issued, so the funds were out of the account as

18 of the middle of February.  They just reissued a new

19 cashier's check payable to the investors.

20            And that was part of what Mr. Toosley

21 wanted to know, well, did the investors get the money

22 back.  The check was made payable to the investors,

23 an account that is titled in the name of the

24 investors.  But that money was already out because

25 the bank had taken the funds.  Nobody has presented

1   the first cashier's check.

2              I'm trying to see if I can get a copy

3   of it.  But as of right now, I don't have a copy of

4   that cashier's check, and the bank is trying to

5   locate it.

6              MR. TOOSLEY:  So, Your Honor, that was

7   part of the issue.  Even in the state court case,

8   we've run into every roadblock imaginable just to get

9   bank records for the debtor's accounts.  And, you

10  know, we are now being presented with a cashier's

11  check that I understand what Mr. Sterling is saying

12  is dated March 13.

13             So it shows specifically that it was

14  again after the rule to show cause was entered.  I

15  understand the process may have been started prior to

16  that, but we still don't have what we believe to be

17  relatively straightforward documents, that being the

18  bank records.

19             We know that there is two

20  debtor-in-possession bank accounts.  We now know

21  there's a third debtor bank account, as seen by the

22  bank account information on the bottom of this

23  cashier's check.  I don't know why it's difficult to

24  get the bank records showing the rents coming in

25  still, which would be what we're fighting about

5

1   here.

2             We have a situation in which there

3   was a hundred and some odd thousand dollars in the

4   account in October.  Rents were then collected for

5   November, December, January and February, and then

6   all of a sudden there was only 15 -- at least 30,000

7   every single month.  The only payment the court

8   allowed was one $25,000 payment to counsel, and then

9   magically there's only 15,000 in the account.

10            It just logically isn't making any

11   sense.  They've, obviously, used the rents, our cash

12   collateral, to pay back these loans that predated the

13   date of the plan in October that were given by

14   investors.  And they robbed the state court

15   foreclosure judge of the opportunity to make the

16   determination that the court, Your Honor, wanted her

17   to have to make.

18            And so I'm stuck in this position

19   here, because if you look at all of the prior

20   operating reports, they never referenced any amount

21   of plan investment.  It wasn't until they filed the

22   January one that they for the first time claimed

23   $295,000 of plan investments.  They never identified

24   any loans at any point.

25            I think we have a legal issue here as

1   to whether or not an unapproved loan made just to

2   make adequate protection payments which were made

3   only through January of '23 -- they were collecting

4   rent for over a year without making any adequate

5   protection payments -- could constitute cash

6   collateral.

7               We put forth all of our reasons why

8   and identified those in the documents.  Now, again, I

9   think the intention was this was all going to be

10  decided by the state court, but now we've been robbed

11  of that opportunity because the money disappeared.

12              But I think that from a legal

13  standpoint, based on the briefs -- there's three

14  briefs on the rule to show cause.  There are three

15  briefs on the motion to reconsider that was filed as

16  well that go through in depth all of these stops,

17  including what was filed with the plan, what was

18  filed with the disclosure statement, what was in the

19  account in October, and the court to make a

20  determination as to whether this constitutes cash

21  collateral.

22              Because we still -- I know counsel is

23  saying he still doesn't have the documents.  We've

24  been asking for them since we were in front of you on

25  February 14th, and we're now three months later and

7

1  still can't get basic information as to exactly how

2  this process happened and why the determination was

3  made unilaterally by the debtor to just say these

4  were plan investments and take out the $295,000.  So

5  that's where I'm at.

6              MR. STERLING:  Your Honor, if I may,

7  while Mr. Toosley has testified here with a whole

8  bunch of facts that --

9              THE COURT:  Well, a lot of facts that

10  I recall as well.

11              MR. STERLING:  Well, the --

12              THE COURT:  The court was -- I was

13  here.  I am aware that there was supposedly rents

14  coming in.  I'm also aware that there was an effort

15  made by the debtor to collect from investors.  And

16  all I was trying to say -- and it was pretty clear --

17  there should be an accounting so we know what rents

18  came in.

19              Mr. Toosley's client has a lien on

20  rents.  He had that the day he -- this came into the

21  court.  I don't think anybody is disputing that.

22              We also know that there was some

23  investor monies.  This is not a difficult issue.  I

24  mean, I, frankly, have thought, like, okay, spread

25  out the bank accounts.  You can see where this money

1   came in or that money came in.  I used to be a

2   receiver in CFTC cases.  It's tracing where the money

3   comes in.

4           And that was the order that I

5   entered.  And I have jurisdiction to enforce my

6   order.  And I am going to enter an order.  I want to

7   make sure it's clear, because I believe that your

8   client is in contempt for failure to abide by the

9   order, and I'm going to give him time to purge that

10  contempt, but I want to be very specific so there's

11  no question.

12          MR. STERLING:  Your Honor, if I may,

13  one, the -- the -- I came into this for the motion

14  for rule to show cause.  And I got to take a nice

15  clean look at things.  And Your Honor instructed me

16  at my first appearance here to identify the sources

17  of the investor money coming in.  We did that.

18          In our response brief, we detail each

19  investor.  We attached the dates.  And Mr. Toosley is

20  incorrect.  He has -- there are -- from what I

21  understand, there are two debtor bank accounts.  He

22  has those bank statements.  You can see the day that

23  that 285 came out of the account.

24          It went to the bank -- I believe it

25  was Highland Park Bank -- to fund a cashier's check.

1  That check got delivered to the investors.  For some

2  reason, the first cashier's check was not negotiated,

3  and they turned it in and got a new check issued.

4  That check is the check that I provided to

5  Mr. Toosley where the money went.

6              THE COURT:  But where are --

7              MR. STERLING:  -- exactly --

8              THE COURT:  -- the rents?  Where are

9  the rents?  That's the part we're missing.  I don't

10  think Mr. Toosley is saying that once it's

11  established how much an investor invested that the

12  investor doesn't get the money back.

13              MR. STERLING:  Understood.

14              THE COURT:  Tell me if I'm wrong.

15              MR. TOOSLEY:  Yeah, the proposed

16  plan --

17              MR. STERLING:  Well, to that end, Your

18  Honor, I don't see that the -- that Your Honor's

19  order of I believe it is February 14th, one, asked

20  for an accounting.  What it said was that the case

21  was dismissed with prejudice, but will remain active

22  until the state court receiver was put back in place.

23  I may be paraphrasing.

24              THE COURT:  And I'm turning over the

25  funds.

1            MR. STERLING:  And to turn over all

2     the funds.

3            THE COURT:  Right.

4            MR. STERLING:  It doesn't say which

5     funds.

6            THE COURT:  Okay.

7            MR. STERLING:  It doesn't say

8     effective of what date.  And once the court -- and

9     in my opinion, Your Honor, once the court dismissed

10    the bankruptcy, the debtor was free -- absent being

11    told don't pay bills, don't do anything with the

12    money, that there were ComEd payments made, there

13    were other utility payments made, and they returned

14    the money from the investors that they had been

15    collecting.

16            THE COURT:  Well --

17            MR. STERLING:  So unless there is a

18    clear mandate within Your Honor's order as to which

19    funds or an amount or a balance as of a particular

20    date, I don't see how you can hold Platform II

21    Lawndale in contempt.

22            THE COURT:  Listen, it was very -- it

23    was very clear.  We had gone on for months.  And if

24    you want to go back and review all the transcripts

25    and all the discussions between Mr. Jordan and Mr.

1  Toosley and this court -- and if there is any

2  criticism, it probably is of the court that I let

3  this case go on way too long.

4           But once the motion was -- there was

5  an order modifying the stay to go back to the state

6  court, I wanted and was very clear that the funds s

7  should be turned over to the receiver.

8           And I did not say only the rents.  I

9  meant all the funds.  Because the state court

10 foreclosure judge can determine what belongs to

11 Mr. Toosley's client in terms of his rents.

12           MR. STERLING:  Well, I --

13           THE COURT:  And that was --

14           MR. STERLING:  Okay.

15           THE COURT:  -- when I say the funds

16 that are in the debtor's account should be turned

17 over, it didn't say only the investor account, only

18 the rents.  It was the funds.  And I believe that

19 your client, who I know was very concerned about

20 returning investor money -- I don't blame him.  He

21 got that money because he was trying to fund a plan

22 that didn't happen.  But that order was to turn over

23 the funds.  It did not say just the rents.

24           MR. STERLING:  Okay.  Understood, Your

25 Honor.  I read the transcript leading up to that

1  order.  I did not -- I personally in review of it did

2  not see that that was the case.

3             THE COURT:  Well --

4             MR. STERLING:  But be that as it may,

5  my client -- it's impossible for my client to purge

6  the contempt because he doesn't have the money.

7             THE COURT:  But your client could

8  provide the accounting so that Mr. Toosley's client

9  or the state court could see every single month that

10  Joe Schmo who was renting this little storage locker

11  made this rent.  That's not impossible.  That is

12  money -- that is -- if they don't have those kind of

13  accounts, then I really can be faulted for letting

14  this case continue as long as I did.

15             That accounting must be provided.  I

16  don't know where the state court receiver is at this

17  point, but Mr. Toosley's client is entitled to those

18  rents.

19             MR. STERLING:  Well, Your Honor, one,

20  I think that the order of an accounting went away

21  when the case got dismissed with prejudice.  I

22  understand Your Honor has the authority to enforce

23  your orders, which I am not disputing that, but I'm

24  suggesting that the order doesn't provide for a clear

25  mandate to hold in contempt.  That's number one.

1          And I went back to the transcript, and

2     the transcript dismissed the case with prejudice.

3     And the only thing that -- based on the transcript,

4     the only thing the court retained jurisdiction on was

5     to adjudicate Mr. Jordan's fees.

6          THE COURT:  I also said turn over the

7     money to the receiver.

8          MR. STERLING:  Your Honor --

9          THE COURT:  And that money was not

10    turned over to the receiver.

11         MR. STERLING:  I under --

12         THE COURT:  And now I'm entitled to

13    know what money should have been turned over.  And I

14    don't know that because nobody has since February

15    given us any kind of accounting.  It's just not that

16    hard.

17         MR. STERLING:  I understand.  But,

18    Your Honor, Mr. Toosley's client has their remedies

19    in state court if these monies were improperly paid

20    out.  That would be -- he could file an action for

21    constructive trust against the investors.

22         THE COURT:  But I entered an order

23    saying turn the money over to the receiver, and that

24    was not -- believe me, I would be a very happy person

25    to never see this case again.

1          MR. STERLING:  Okay.

2          THE COURT:  But I right now have an

3  order that needs to be enforced and that is to turn

4  over the money.  And if your client isn't capable of

5  turning over the money because it's gone, then your

6  client better show us an accounting that shows what

7  money should have been turned over.

8          Does that -- I mean, I don't think I'm

9  being illogical.

10          MR. STERLING:  It's not illogical,

11  but, Your Honor, once the court dismissed the

12  case --

13          THE COURT:  I retain jurisdiction over

14  my orders.

15          MR. STERLING:  I understand.

16          THE COURT:  My order was to turn over

17  the money, and if you can't turn over the money, I

18  want an accounting.  And if that's been supplied in

19  the state court, then --

20          MR. STERLING:  Well --

21          THE COURT:  -- great.

22          MR. STERLING:  Okay.  Well, I mean, I

23  would also suggest that before a contempt order is

24  put in place that we are entitled to an evidentiary

25  hearing.  And there hasn't been an evidentiary

1    hearing on the contempt.

2            THE COURT:  Is anybody denying that

3    the money wasn't turned over?

4            MR. STERLING:  We are denying that we

5    violated the court's order.

6            THE COURT:  Did your client turn over

7    the money to the receiver?

8            MR. STERLING:  There was monies turned

9    over to the receiver, yes.  Mr. Toosley --

10           MR. TOOSLEY:  15,000.

11           MR. STERLING:  Mr. Toosley in his

12   motion said we turned over nothing.

13           MR. TOOSLEY:  No, that's not correct.

14           MR. STERLING:  Not only did we

15   turn over the $15,000, the receiver actually sent

16   money back to my client to pay bills for the

17   property.

18           MR. TOOSLEY:  And I didn't say that.

19   I specifically --

20           MR. STERLING:  Well --

21           MR. TOOSLEY:  -- identified --

22           MR. STERLING:  -- we just have to look

23   at his motion.  He said nothing was turned over.

24   He's made broad statements asserting -- asserting

25   over-generalizations, and the wrong conclusions based

16

1   on the facts as he's interpreting them.

2               But, yes, I will say to Your Honor the

3   285 was not turned over to the receiver.  The 285 and

4   change was given to the investors.

5               MR. TOOSLEY:  So I think all the

6   parties are in agreement with that.  I have not

7   received February's bank statements.  I don't know --

8   maybe -- again, I've gotten 1500 emails in this case

9   in the last year and a half, as you can probably

10  imagine.  We've seen you a lot over the last three

11  months, four months.

12              But I don't -- the last operating

13  report that was filed with the court was January.

14  And Your Honor entered an order on January 23rd

15  requiring a detailed accounting.  So this is not the

16  first time that there's been an order requiring a

17  detailed --

18              THE COURT:  Are you suggesting that I

19  shouldn't enforce that order?  There never was an

20  accounting.

21              MR. STERLING:  Well --

22              THE COURT:  If Mr. Samuels, who is the

23  receiver, wants to come in here and say that there's

24  been a fine accounting, I don't need anything more,

25  I'll let him do it, but --

1          MR. TOOSLEY:  We just received -- we

2     just received March and April in the state court

3     case.  We had a hearing yesterday in front of the

4     foreclosure judge.  We are still missing all of

5     February, which is the time period which we are now

6     hearing is the critical time period when the funds

7     were allegedly first distributed.

8               February is the critical -- we have

9     the bank statements for the borrower/debtor for March

10    and April that just came in at the end of last week.

11    I did not get February, so that's kind of where we're

12    outstanding, especially if I'm hearing today that

13    that's when the transfer happened despite the date on

14    the certified check that I received.

15              MR. STERLING:  I believe he has the

16    February statements, but if he doesn't, I will give

17    them to him within the week.  But, Your Honor, if it

18    is the case that an accounting was required based on

19    your January order, then I respectfully suggest that

20    this case should not have been dismissed then with

21    prejudice because the case was dismissed with

22    prejudice.

23              And as long as I've been practicing,

24    once the case was dismissed with prejudice -- and I

25    understand what Your Honor ordered relative to the

1  turnover of funds, but that would terminate all the

2  prior orders.  So if an accounting was required in

3  January, I just postulate that the case should not

4  have been dismissed with prejudice --

5              THE COURT:  Let me just --

6              MR. STERLING:  -- when it was

7  dismissed with prejudice.

8              THE COURT:  Mr. Toosley.

9              MR. TOOSLEY:  Yes.

10             THE COURT:  What are you missing

11 in the state court?  Because maybe I don't have to

12 go down this road.  I mean, clearly I don't -- I

13 don't even know what funds should have been turned

14 over --

15             MR. TOOSLEY:  Correct.

16             THE COURT:  -- because I really can't

17 tell whether you ever got all of your rents,

18 whether -- with the cash collateral orders that were

19 entered in the case -- you know, we had a cash -- I

20 think we had only the interim order that was

21 continued throughout the case.

22             MR. TOOSLEY:  That's correct.  And we

23 received the first four-and-a-half months of adequate

24 protection.  Then January of '23 they stopped.  And

25 the next four months Your Honor entered an order that

1  required adequate protection payments.  They weren't

2  made.

3              THE COURT:  Right.

4              MR. TOOSLEY:  The parties were working

5  out a plan at that point.

6              THE COURT:  Right.

7              MR. TOOSLEY:  So we didn't actually

8  raise it as an objection.  We then worked together on

9  a plan, and it was filed in September for presentment

10 in October.  It did not, obviously, consummate due to

11 facts that we don't have to rehash.

12             THE COURT:  Right.  And also the case

13 was dismissed.

14             MR. TOOSLEY:  Correct.  And so there

15 was no cash collateral then entered after that date.

16 Adequate protection -- they weren't able to -- Your

17 Honor said if they want to make payments of, you

18 know, critical utilities and employees --

19             THE COURT:  Right, and then I think

20 you were happy to --

21             MR. TOOSLEY:  I said -- and I even

22 said I would work with Mr. Jordan if there were

23 specific expenses that weren't -- that were a little

24 outside the ordinary to approve.  Mr. Jordan and I

25 worked together really well on this.  I'm sure Your

1  Honor heard that.

2              And so, you know, then there was

3  four more months of rents that came in.  And,

4  obviously, they used the rents to pay back the

5  pre-confirmation investments that were used for

6  adequate protection.  That's the only explanation

7  as to where the money went because the

8  post-confirmation investments only attribute to

9  150,000 or so.  There were 300,000 in the account,

10 over 300,000 as of the end of January.

11             MR. STERLING:  That was the $285,000

12 that we detailed the date in which those deposits

13 were made.  Mr. Toosley has those bank account --

14 bank account statements showing those deposits coming

15 in.  The amounts match exactly.  We provided it in

16 our response to the motion for rule dollar for dollar

17 and the date it came in.  The fact that the plan

18 wasn't approved until October is, frankly, I think a

19 red herring because these investors -- he was

20 planning --

21             THE COURT:  I know.  We've --

22             MR. STERLING:  My client was leading

23 up to this, but he's making statements.  He's making

24 statements that are just not true.

25             THE COURT:  Okay.

1          MR. TOOSLEY:  Even Mr. Jordan said

2    that on the record on February 14th that they were

3    not plan investments.  He said it doesn't make sense

4    logically because of the amount of rents that came

5    in.  I cited that in my response on the motion to

6    reconsider.

7          So previous counsel for the debtor

8    admitted that these were not plan investments.  They

9    were rents.  That's why we need this information.

10   Again, it just logically doesn't make sense how we

11   can collect $35,000 a month in rent without cash

12   collateral -- use of cash collateral, and then only

13   have 15,000 to turn over.  It just -- logically it

14   doesn't -- can't happen.  So --

15          MR. STERLING:  Well, I --

16          THE COURT:  So, I think this is -- I

17   mean, I'm going to have to cut this off because I

18   know -- we can have an evidentiary hearing, and you

19   can put in -- I mean, we can go back to the beginning

20   of time, what was rents, what wasn't and what was in

21   that account.  Maybe those weren't all investor

22   monies.  Maybe they were investor monies that came in

23   in January, but there were rents that went places it

24   shouldn't have gone.

25          This is kind of a -- and I don't --

1  and I certainly do not want to overlap with what is

2  going on down the street in terms of whatever your

3  client's claims are for rents that they should have

4  received.

5              MR. STERLING:  The court has no

6  authority to do anything before the case was

7  reinstated in state court.

8              THE COURT:  So basically the debtor

9  has got some limbo out there telling me I can't

10  require an accounting to know what was turned over.

11  I mean, we're talking about money that came into an

12  account.  Maybe it came in in November.  Maybe it

13  came in in January.  Maybe it came in in early

14  February.  And then a big chunk is returned to

15  investors, but there may have been other shenanigans

16  going on before.  I don't know.

17              And I don't really want to spend time

18  that -- I mean, I want my order to -- I want somebody

19  to pay attention to the order, turn over the funds.

20  But when we don't know what that number is, it's hard

21  for your client to know what to turn over.  It's hard

22  to know whether Mr. Toosley has gotten the right

23  amount, and I have no idea.

24              So maybe we should set this for an

25  evidentiary hearing.  And I'm going to ask to go back

23

1 | through an accounting.  I mean, what rents came in

2 | from the beginning of this case?  You know, because

3 | how do I know whether the right amount was turned

4 | over.

5 | MR. STERLING:  Well, Your Honor, I

6 | understand.  The point of the evidentiary hearing in

7 | my mind based on where I came into the case is

8 | whether or not Platform II Lawndale should be held in

9 | contempt for disobeying your order.  Is that -- I

10 | mean, I'm just suggesting that's what I understand is

11 | before you.

12 | THE COURT:  But how do I know?  Your

13 | client says I turned over the money.  It was $15,000.

14 | And I took out the rest of this money and returned it

15 | to investors.

16 | MR. STERLING:  Right.

17 | THE COURT:  Okay.  Well, how do I

18 | know that that's the right amount?  How do I know

19 | what happened to the rents that may have gone for

20 | other --

21 | MR. STERLING:  Well, I --

22 | THE COURT:  -- reasons?  I'm now

23 | starting to really wonder what in the heck happened

24 | in this case.

25 | MR. STERLING:  I submit that Mr.

24

1    Toosley has his rights and has his remedies to pursue

2    in the state court action, and that -- and that Your

3    Honor doesn't need to go through this.  One, we can't

4    purge the contempt by bringing the money back.  We

5    don't have it.

6              So if there's a contempt, he can't

7    purge that contempt because he can't -- he has no

8    ability or I say Platform II Lawndale does not have

9    the ability to get that money back.  It's in the

10   hands of third parties.  That's number one.

11             So, if Mr. Toosley believes he has

12   rights to pursue that money, he has those rights in

13   a state -- in a state court action.  That's number

14   one.

15             Number two, it's my opinion there was

16   not a clear mandate prohibiting --

17             THE COURT:  And I understand you don't

18   think I did a good job on my order.

19             MR. STERLING:  And that said -- and

20   then the whole idea of purging it with an accounting,

21   I see that outside -- I mean, the accounting won't

22   necessarily purge the contempt.

23             THE COURT:  No, but it might give me

24   an idea of whether your client's in contempt or not.

25   I mean, you see what I mean?

1           MR. STERLING:  Well --

2           THE COURT:  I mean, we know money

3   came in and we know money went out.  I ordered that

4   the money that was in that account be turned over.

5   I did not say return it first to the investors.  I

6   wanted it all turned over to the state court receiver

7   so that it could be determined down the street.

8           MR. STERLING:  Well --

9           THE COURT:  And it wasn't.

10          MR. STERLING:  Okay.

11          THE COURT:  Now your client has

12  violated my order.

13          MR. STERLING:  Well, I didn't glean

14  that from your order.

15          THE COURT:  My order said turn over

16  the money in the debtor's account.

17          MR. STERLING:  Well, if I may, Your

18  Honor, I will go back and pull out the order, but

19  I -- word for word to me the order -- and I believe

20  Mr. Toosley is the one that submitted it to the

21  court.  I believe it's ambiguous.

22          THE COURT:  No, I think --

23          MR. TOOSLEY:  By the way, March 6th

24  Your Honor did already find a rule to show cause has

25  been entered.  It was just continued for a hearing on

1    the 13th, so there has already been an order finding

2    on the rule.  So I just wanted to make sure we're

3    clear that the March 6th order already did make that

4    finding.

5                    MR. STERLING:  I didn't --

6                    THE COURT:  The appointment of the

7    receiver, maybe the receiver wasn't appointed exactly

8    the next day, but the reason that I kept that -- put

9    that in was that we didn't know at what point the

10   receiver would be appointed.  We knew it might be

11   about a day or so.  And so if between February 14 and

12   the appointment of the receiver money jumped out of

13   that account that shouldn't of, I consider that a

14   violation of my order.

15                   MR. STERLING:  Okay.  I understand.

16                   THE COURT:  Does that make sense to

17   you?  I mean, I understand --

18                   MR. STERLING:  Well, I understand

19   perhaps what Your Honor's intent is behind the order,

20   but it's not manifested in the transcript, and I

21   don't believe it's manifested in the order.

22                   THE COURT:  Upon the appointment of

23   the receiver all funds held in any of the debtor's

24   bank accounts shall be turned to the receiver because

25   at that point we knew that there were several

1    different bank accounts.

2              MR. STERLING:  Understood.  I'm not

3    trying to be -- I'm not trying to be --

4              THE COURT:  I suppose I should have

5    said any -- I mean, I guess you could fault me -- any

6    money in the account on February 14th will be turned

7    over, because if money went elsewhere between

8    February 14th and the day the receiver was actually

9    appointed, I suppose you could make a very good

10   argument that it was a terrible order and it wasn't

11   precise enough.

12             MR. STERLING:  I'm not suggesting it's

13   a terrible order.

14             THE COURT:  Well, you're --

15             MR. STERLING:  But I'm just suggesting

16   that the money to be turned over --

17             THE COURT:  When did the money leave

18   the account?

19             MR. STERLING:  -- to the receiver was

20   it on the date that this case was dismissed or is it

21   on the date the receiver was appointed?  I mean,

22   that's the conflict, and that's the ambiguity in the

23   order.

24             THE COURT:  So, are you saying --

25             MR. STERLING:  So as --

28

1          THE COURT:  -- today -- let me ask a

2    question.

3          MR. STERLING:  All right.

4          THE COURT:  Are you saying today that

5    when this order was entered on February 14th there

6    was money in the account that was not turned over to

7    the receiver because we had this gap of a couple of

8    days?

9          MR. STERLING:  That's not what I am

10   saying.

11         THE COURT:  Then what are you saying?

12         MR. STERLING:  What I'm saying is

13   during that period of time when the court had

14   dismissed the case with prejudice, albeit it said

15   turn over the money when the receiver is appointed --

16         THE COURT:  So, you're not answering

17   my question.  My question is what monies were in the

18   account on February 14th and what monies were turned

19   over to the receiver?  Is it the same amount?

20         MR. STERLING:  No.

21         THE COURT:  Okay.

22         MR. STERLING:  The reason it wasn't

23   the same amount, as I detailed in my response brief,

24   is, A, the money was returned to the investors, the

25   285; and, B, there were a -- there was monies that

1  were paid to Neal Gerber, which was authorized by the

2  court.

3           THE COURT:  That was different.

4           MR. STERLING:  And then the -- and

5  then the third amount related -- or the third

6  group -- group of funds were property expenses which

7  were paid.  And we provided that detail of what

8  monies were spent in that period of time between the

9  entry of the order dismissing the case and the

10 appointment of the receiver.

11          So to the extent that that order is

12 ambiguous, I think -- my opinion, and based on having

13 addressed contempt matters before, that there needs

14 to be a clear mandate which my client violated.

15          THE COURT:  I think your client did

16 violate the sentiment that was in this order.

17          MR. STERLING:  Okay.

18          THE COURT:  It was that I'm going to

19 dismiss this came.  I want the money to -- and there

20 was a statement made on the record that day that the

21 receiver wouldn't necessarily be re-appointed on the

22 14th; that they'd have to go back to state court, the

23 receiver has to post a bond, all these things.  So,

24 in that interim, your client took advantage of that

25 interim and may have taken the money and put it

1 elsewhere.  In this sense, I think my order was

2 violated.

3                    MR. STERLING:  Okay.

4                    THE COURT:  And because of that, I

5 want an accounting to know what was taken out of the

6 account and where did it go and what was in the

7 account.  I think that at least answers the question

8 that Mr. Toosley is entitled to know and, frankly,

9 the court is.

10                    MR. TOOSLEY:  Okay.  And, Your Honor,

11 today --

12                    THE COURT:  We're not talking about a

13 long time.

14                    MR. TOOSLEY:  No, I said we now have

15 March and April.  I don't think we have a problem

16 with March and April.  So it's just that time period

17 that we're hearing about, about the weeks leading up

18 to the dismissal of the 14th, and then the rest of

19 that month of February.

20                    MR. STERLING:  So, if I get a date --

21 if he has a date range, and that will purge the

22 contempt just by providing that accounting?

23                    THE COURT:  Well, it will go a long

24 ways towards it.  It's not going to -- I mean, I

25 can't -- you're not going to re-invent the money.

31

1  If it's not there, I'm going to let Mr. Toosley

2  deal with that.  But what I want to know is when

3  the last operating report -- we're going to go

4  back to the last operating report, which was signed

5  under penalty of perjury, what month did that

6  reflect?

7                 MR. TOOSLEY:  January 31st was the

8  last one.

9                 THE COURT:  Okay.  So that was filed

10  sometime in February?

11                 MR. TOOSLEY:  Yeah, there was like

12  five months that were filed.

13                 THE COURT:  Okay.  So from January

14  31st through the date that the receiver received

15  whatever money the receiver received, that's the

16  accounting I want.  It's only probably six weeks at

17  the most.

18                 MR. STERLING:  So January 31st to I

19  believe --

20                 MR. TOOSLEY:  The date that the check

21  was written to the receiver.  I don't know what that

22  is off the top of my head.

23                 MR. STERLING:  The funds were wired.

24                 MR. TOOSLEY:  Or wired.  That's what I

25  meant, but...

32

1          Your Honor, I'm hearing for the first

2  time today that the money -- I mean, we know that the

3  money was taken, but that it was no longer in the

4  account.  I mean, I did get -- like I said, I got a

5  cashier's check today.  I didn't get the prior ones.

6  But it did show that over the course of that month it

7  was still in -- technically in the account.

8          THE COURT:  That's what --

9          MR. STERLING:  Once a cashier's check

10  is cut, the bank takes the money --

11          MR. TOOSLEY:  I know.  I know.  I'm

12  just saying that's the reason why I'm asking --

13          THE COURT:  I want to go back to the

14  January 31st date so we can see what happened during

15  that February time period to the date that the

16  receiver actually got the funds.

17          MR. STERLING:  Okay.  I guess my

18  question is is there an order of contempt that this

19  is how we purge it or are you just ordering us to

20  produce this?

21          THE COURT:  Well, I don't think you

22  could ever purge the contempt basically because the

23  funds weren't turned over, but right now we don't

24  know what that amount is.  So --

25          MR. STERLING:  Well, okay.

1          THE COURT:  -- why don't we take it

2  one step at a time.  We can --

3          MR. STERLING:  I guess the point then,

4  though -- I mean, just from a theoretical standpoint

5  is while I understand that there is this pending

6  motion for rule, given the dismissal with prejudice,

7  I guess I am just confused as to -- when does this

8  end?

9          THE COURT:  I would be very happy if

10  it's soon.

11          MR. STERLING:  Okay.  Well, I'm

12  just --

13          THE COURT:  I'll tell you what your

14  client -- the principal of your client was here, and

15  I know it was very clear he was very worried about

16  his -- the money he collected from investors.  I

17  don't blame him.  He was trying to fund a plan.  I

18  wasn't born yesterday.  But it was very clear what I

19  wanted to have happen.  I wanted that to be

20  determined down the street by the state court

21  receiver.

22          And I believe that what happened was

23  that you -- that somebody thought that, oh, we've

24  got this glitch in the order.  We can do whatever we

25  want until the receiver is there.  And that was

34

1  really not the sense of this order at all.  And say

2  it's vague, but it was clearly the money that was in

3  the account that day should be turned over to the

4  receiver.

5              It couldn't be turned over before the

6  receiver was up and standing.  But to take the money

7  in that interim was clearly a violation of the sense

8  of this order, and I want to know what that number

9  is.

10             MR. STERLING:  Okay.

11             THE COURT:  And then hopefully we

12  can --

13             MR. STERLING:  But I guess in what

14  context?  Because if a contempt order is being

15  entered --

16             THE COURT:  Well, I won't enter it

17  today until -- I mean, there's already been a rule

18  entered.

19             MR. STERLING:  Okay.

20             THE COURT:  I am not --

21             MR. STERLING:  Well --

22             THE COURT:  -- going to bring your

23  client in in an orange original suit or anything.

24             MR. STERLING:  I understand.

25             THE COURT:  I want Mr. Toosley to get

35

1  this information.

2              MR. STERLING:  Okay.

3              THE COURT:  And he can take it from

4  there.

5              MR. STERLING:  Okay.  But I guess the

6  only reason I ask that is that, you know, if my

7  client makes the decision to have the orders reviewed

8  and -- you know, as to the -- you know, frankly, I

9  think it's to the court's jurisdiction and the scope

10 of what the order commanded my client to do.  If

11 there's a contempt finding, then arguably I -- you

12 know, I can pursue that appeal to the district court.

13 Otherwise --

14             THE COURT:  I mean --

15             MR. STERLING:  -- we're --

16             THE COURT:  -- threatening an appeal

17 to me is really not --

18             MR. STERLING:  No, no, no, I'm not --

19             THE COURT:  -- going to get you

20 anywhere.

21             MR. STERLING:  Your Honor, I'm not

22 doing this for the purpose of --

23             THE COURT:  Okay.  This is what we're

24 going to do right now.  And I have to leave at

25 3:00 o'clock for a meeting I'm speaking at.  Right

36

1  now I'm going to revise this order because I want to

2  be clear.  Obviously --

3                    MR. TOOSLEY:  And I do think just

4  February because March 1st is when I know there's

5  correspondence about it.  So, I think --

6                    THE COURT:  Okay.

7                    MR. TOOSLEY:  And I think we do have

8  March now.  We just got it last week.  So I think as

9  long as it's the February accounting --

10                    THE COURT:  Okay.  So --

11                    MR. TOOSLEY:  -- after the last

12  operating report.

13                    THE COURT:  Okay.  So let's be clear

14  what you're looking for.  You're looking for monies

15  that were in the account on January 31 or February 1.

16  I don't care which day you want to pick.

17                    MR. TOOSLEY:  Right.

18                    THE COURT:  Through the end of the

19  month of February, monies that came in, monies that

20  went out.  It shouldn't be hard.  And I think that

21  that should be furnished to Mr. Toosley.  I mean, May

22  29th seems like a long time to do it.  It's really

23  only month's worth of --

24                    MR. TOOSLEY:  Okay.

25                    MR. STERLING:  Two weeks?

1          MR. TOOSLEY:  Okay.  And hopefully we

2    don't have to see you other than one more time.

3          THE COURT:  Okay.  And I'm always

4    happy to see people, but this is really a case that I

5    thought we were going to be done with.  So right now

6    I'm just going to -- I am making an -- the order is

7    that the accounting for the month of February will be

8    furnished to Mr. Toosley on or before the 29th, and

9    I'll have a status on June 5th to see if it's been

10   complied with.

11         MR. STERLING:  Your Honor, I do know

12   that I am actually -- what time would the hearing be

13   on June 5th?

14         THE COURT:  It would be at 1:15.

15         MR. TOOSLEY:  It's just a status,

16   right?

17         You're out that week?

18         MR. STERLING:  No, I'm not out, but I

19   have two hearings.  I have one hearing in the

20   morning.  So, the afternoon is fine.

21         1:15?

22         THE COURT:  1:15 on the 5th of June

23   for an accounting of January's --

24         MR. TOOSLEY:  February.

25         THE COURT:  Of February's monies in

38

1   and out.

2                   Okay.  Any question about the

3   vagueness of that order?

4                       MR. STERLING:  That's clear to me.

5                       THE COURT:  Okay.

6                       MR. TOOSLEY:  Thank you, Your Honor.

7                       And, like I said, if I do have the

8   February already -- I said I wouldn't have filed all

9   of this.  And I apologize.  Like I said, I just got

10  the March and April last week, so I want to make sure

11  it's clear that's why I --

12                      THE COURT:  Okay.  What's going on

13  with the -- is the -- what's going on with the

14  foreclosure?

15                      MR. TOOSLEY:  The foreclosure sale is

16  going forward in about a month.  The judge did give

17  them one last time to come up with a plan to try to

18  pass off, but it did not happen.

19                      THE COURT:  Okay.

20                      MR. TOOSLEY:  So, the foreclosure is

21  the middle of -- the third week of June, I think.

22                      MR. STERLING:  I don't know if you

23  know.  I mean, I'm basically --

24                      MR. TOOSLEY:  Yes.

25                      THE COURT:  All right.

1                    MR. TOOSLEY:  Thank you, Your Honor.

2                    MR. STERLING:  Thank you.

3                    And, Your Honor, no disrespect.  I

4     mean, this is -- I mean, I'm representing my client.

5                    THE COURT:  I understand.  I just want

6     to make sure that you understand that I think your

7     client was quite clear in what the order was.

8                    MR. STERLING:  Okay.

9                    THE COURT:  And it looks like he

10    didn't do it, and that's a problem.

11                   (End of Audio Recording.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

40

CERTIFICATE

1

2

3

4

5

6           I, AMY DOOLIN, CSR, RPR, do hereby

7   certify that the foregoing is a true and accurate

8   transcription of proceedings electronically recorded

9   on May 15, 2024, submitted to D&E Reporting for

10  transcription, and contains all the content contained

11  in said recording and has been transcribed to the

12  best of my ability.

13

14  _____

15           /s/Amy Doolin, CSR, RPR

16

17

18

19

20

21

22

23

24

25